Mary E. PANZER, personally and as Majority Leader of the Wisconsin Senate, John G. Gard, personally and as Speaker of the Wisconsin Assembly, and Joint Committee on Legislative Organization, Petitioners,

v.

James E. DOYLE, in his official capacity as Governor of Wisconsin and Marc J. Marotta, in his official capacity as acting Secretary of the Wisconsin Department of Administration, Respondents.

Supreme Court

*No. 03–0910–OA. Oral argument January 27, 2004.—Decided May 13, 2004.*

2004 WI 52

(Also reported in 680 N.W.2d 666.)

For the petitioners there were briefs by *Gordon B. Baldwin,* University of Wisconsin Law School, *Ellen E. Nowak,* legal counsel state assembly/speaker's office, *Stephen L. Morgan* and *Murphy Desmond, S.C.,* Madison, and oral argument by *Gordon B. Baldwin* and *Stephen L. Morgan.*

For the respondents the cause was argued by *John S. Greene,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

An amicus curiae brief was filed by *State Senator Gary R. George,* Madison.

An amicus curiae brief was filed by *Douglas B.L. Endreson, William R. Perry,* and *Sonsoky, Chambers, Sachse, Endreson & Perry, LLP,* Washington, D.C.; *Howard Bichler,* Hertel; *Jennifer L. Nutt Carleton* and *Oneida Law Office,* Oneida; *Douglas William Huck,* Bowler; *Kris M. Goodwill,* Hayward; *Larry Leventhal* and *Larry Leventhal & Associates,* Minneapolis; *David M. Ujke,* Bayfield; *Kevin L. Osterbauer,* Odanah; *Rebecca R. Weise,* Black River Falls, on behalf of St. Croix Chippewa Indians of Wisconsin, Oneida Tribe of Indians of Wisconsin, Bad River Band of Lake Superior Tribe of Chippewa Indians, Stockbridge-Munsee Community, Ho-Chunk Nation, Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin and Red Cliff Band of Lake Superior Chippewa Indians.

Amicus curiae briefs were filed by *Thomas J. McAdams,* Assistant District Attorney and *E. Michael McCann,* District Attorney, Milwaukee.

An amicus curiae brief was filed by *Tori L. Kluess, Jodi L. Arndt* and *Liebmann, Conway, Olejniczak & Jerry, S.C.,* Green Bay, on behalf of the Green Bay Area Chamber of Commerce.

An amicus curiae brief was filed by *Grant F. Langley, Patrick B. McDonnell* and *William J. Domina,* Milwaukee, on behalf of the City of Milwaukee and Milwaukee County.

301

An amicus curiae brief was filed by *Michael J. Kirschling* and *Stellpflug, Janssen, Hammer, Kirschling & Bartels, S.C.,* DePere, on behalf of Wisconsin Citizen Action and Bay Area Workforce Development Board.

An amicus curiae brief was filed by *Brady C. Williamson, James A Friedman* and *LaFollette Godfrey & Kahn,* Madison, on behalf of Menomonee Valley Partners, Inc., Teamsters Local Union Nos. 200 and 344, Milwaukee Building & Construction Trade Council, and Professional Firefighters of Wisconsin, Inc.; and by *Kevin J. Wadzinski,* and *Gardner Carton Douglas LLP,* Washington, D.C., on behalf of Indian Community School of Milwaukee, Inc.

¶ 1. DAVID T. PROSSER, J. This is an original action under Article VII, Section 3(2) of the Wisconsin Constitution.[1] The petitioners are Mary Panzer, personally and in her capacity as the Majority Leader of the Wisconsin Senate, John Gard, personally and in his capacity as Speaker of the Wisconsin Assembly, and the Joint Committee on Legislative Organization[2] (collectively referred to as the petitioners). The respondents are James E. Doyle, in his official capacity as Governor of Wisconsin, and Marc J. Marotta, in his official

---

[1] "The supreme court has appellate jurisdiction over all courts and may hear original actions and proceedings. The supreme court may issue all writs necessary in aid of its jurisdiction." Wis. Const. art. VII, § 3(2). Wisconsin Stat. § (Rule) 809.70 sets out the contents of a petition for an original action.

[2] The Joint Committee on Legislative Organization is a statutorily created legislative committee consisting of the Speaker of the Assembly, the President of the Senate, and the majority and minority leaders and assistant majority and minority leaders of the Senate and Assembly. Wis. Stat. § 13.80.

capacity as Secretary of Administration (collectively referred to as the Governor).

¶ 2. The supreme court hears original actions in cases that involve substantial legal questions of more than ordinary importance to the people of the state. Normally, these questions require prompt and authoritative determination. This case presents questions about the inherent and delegated power of Wisconsin's governors to negotiate gaming compacts with Indian tribes.

¶ 3. The petitioners contend that the Governor exceeded his authority in 2003 when he agreed to certain amendments to the gaming compact our state has entered into with the Forest County Potawatomi (FCP) Tribe, a federally recognized Indian tribe indigenous to Wisconsin. They assert that the Governor improperly agreed to amendments that (1) expand the scope of gaming by adding games that were previously not permitted for any purpose by any person, organization, or entity in Wisconsin; (2) extend the duration of the compact indefinitely so that it becomes perpetual; (3) commit the state to future appropriations; and (4) waive the state's sovereign immunity.

¶ 4. The Governor responds that the legislature granted Wisconsin governors expansive authority in Wis. Stat. § 14.035 to enter into and modify gaming compacts with Wisconsin Indian tribes and that he acted in complete conformity with this statute, with the federal Indian Gaming Regulatory Act (IGRA), and with the terms of the original compact, in negotiating amendments to the FCP Gaming Compact.

¶ 5. We hold that the Governor exceeded his authority when he agreed unilaterally to a compact term that permanently removes the subject of Indian gaming from the legislature's ability to establish policy and

303

make law. Further, we hold that the Governor acted contrary to the public policy embodied in state law and therefore acted without authority by agreeing to allow the FCP Tribe to conduct new games that are prohibited by Article IV, Section 24 of the Wisconsin Constitution and by Wisconsin's criminal statutes. Finally, we conclude that the Governor exceeded his authority by agreeing to waive the state's sovereign immunity, an act which he had no inherent or delegated power to undertake. We also address other issues raised by the parties and declare rights.

### FACTUAL BACKGROUND

¶ 6. The petitioners seek a declaration that certain provisions of the FCP Gaming Compact as amended in 2003 are invalid. To understand the factual and legal issues that affect our decision, we recapitulate our state's unique history with respect to legalized gambling. *See generally* Dan Ritsche, Wisconsin Legislative Reference Bureau, *The Evolution of Legalized Gambling in Wisconsin,* Research Bulletin OO-1 (May 2000); *see also* Douglass Charles Ellerbe Farnsley, *Gambling and the Law: The Wisconsin Experience,* 1848–1980, 1980 Wis. L. Rev. 811.

¶ 7. Article IV, Section 24, as part of the original constitution, prohibited the legislature from ever authorizing "any lottery." Wis. Const. art. IV, § 24 (1848) ("The legislature shall never authorize any lottery, or grant any divorce."). In all likelihood, the term "lottery" in this context was intended to apply to a particular species of gaming, inasmuch as contemporaneous legislation before and after the adoption of the constitution contained specific prohibitions against lotteries as well as separate prohibitions against other forms of gam-

ing.[3] Moreover, most states passed anti-lottery amendments or legislation by the 1840s because of notorious scandals involving lotteries, including the Grand National Lottery authorized by Congress.[4]

¶ 8. Over time, however, attorneys general and courts interpreted Wisconsin lottery statutes to prohibit any form of gaming that included the elements of prize, chance, and consideration. These statutory interpretations were linked eventually to the term "lottery" in Article IV, Section 24, blurring the implicit limitations of the provision. *See Kayden Indus., Inc. v. Murphy,* 34 Wis. 2d 718, 724, 150 N.W.2d 447 (1967); *State v. Laven,* 270 Wis. 524, 528, 71 N.W.2d 287 (1955); *State ex rel. Regez v. Blumer,* 236 Wis. 129, 130, 294 N.W. 491 (1940); *State ex rel. Trampe v. Multerer,* 234 Wis. 50, 56, 289 N.W. 600 (1940); *State ex rel. Cowie v. La Crosse Theaters Co.,* 232 Wis. 153, 155, 286 N.W. 707 (1939). Under this broad reading, the legislature could not

---

[3] At the First Session of the Legislative Assembly of the Territory of Wisconsin, the territorial legislature approved an act to prevent and punish gambling. Ch. 65, Laws of the Wisconsin Territory, First Session (approved Jan. 18, 1838). The act provided criminal penalties for setting up, keeping, and permitting any gaming table or gambling device or betting money at any gaming table, but it made no reference to lotteries. The 1839 Statutes of Wisconsin contain "An Act to provide for the punishment of offences against public policy." Statutes of the Territory of Wisconsin 363–65 (1839). The first 7 sections of this act deal with lotteries, while sections 8, 9, and 10 deal with other forms of gaming. This legislation was carried over after statehood. Chapter 138, "Of Offences Against Public Policy," Revised Statutes of the State of Wisconsin 705–07 (1849). In these early statutes, table games such as faro, "E O," and roulette were treated differently from lotteries. *Id.*

[4] John Scarne, *Scarne's New Complete Guide to Gambling* 150, 152 (1974); *see also Clark v. Washington,* 25 U.S. 40 (1827).

authorize any gaming activities without amending Article IV, Section 24. The legislature enforced the public policy against gaming in the constitution by enacting criminal statutes. *See* Wis. Stat. ch. 945; *see also* Farnsley, 1980 Wis. L. Rev. at 854–62 (summarizing the history of Wisconsin's statutory provisions on illegal gaming through 1980).

¶ 9. Article IV, Section 24 was amended five times between 1848 and 1987 to permit the legislature to authorize specific limited types of gaming. The first amendment (1965) modified the definition of "consideration" so that the legislature could authorize certain promotional contests. The second amendment (1973) authorized charitable bingo; the third (1977) authorized charitable raffles.

¶ 10. In 1987 the constitution was amended twice more, to authorize pari-mutuel on-track betting and a state-operated lottery. The pari-mutuel betting amendment was the first to clearly depart from the historic concept of lottery.[5] The state-operated lottery amendment soon prompted questions about its scope, and its ramifications have been the subject of controversy ever since.

¶ 11. The year 1987 was also a watershed year in the history of tribal gaming because of a decision by the United States Supreme Court. The Court examined a state's authority to regulate tribal gaming within its

---

[5] "A lottery is a species of gaming, which may be defined as a scheme for the distribution of prizes by chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to obtain a prize." Monte M. Lemann, *Lotteries,* 25 *Cyclopedia of Law and Procedure* 1633 (William Mack & Howard P. Nash eds.) (1912). This definition is quoted in early opinions of attorneys general. *See, e.g.,* 5 Op. Att'y Gen. 380, 381 (1916).

borders and responded by setting ground rules on when a tribe may operate commercial gaming enterprises substantially free of state regulation and when a state may prohibit commercial gaming on tribal land. *California v. Cabazon Band of Mission Indians,* 480 U.S. 202 (1987).

¶ 12. In *Cabazon,* the Court reviewed a judgment that two Indian tribes obtained in federal court barring the State of California and one of its counties from enforcing their laws on bingo and certain card games on Indian land. *Id.* at 206. The Court noted that state laws may be applied on tribal reservations only when Congress so provides. It examined Pub. L. 280 in which Congress granted certain states—including California and Wisconsin[6]—jurisdiction over criminal offenses committed in Indian Country[7] "to the same extent that such State . . . has jurisdiction over offenses committed elsewhere within the State," 18 U.S.C. § 1162(a), and jurisdiction "over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed." 28 U.S.C. § 1360(a). The Court

---

[6] The Menominee Tribe of Indians is excepted from this grant of jurisdiction because of retrocession of jurisdiction by the State of Wisconsin.

[7] As the Court made clear in *California v. Cabazon Band of Mission Indians:*

> "Indian country," as defined at 18 U.S.C. § 1151, includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights–of–way running through the reservation." This definition applies to questions of both criminal and civil jurisdiction. *DeCoteau v. District County Court,* 420 U.S. 425, 427 n.2 (1975).

*California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207 n.5 (1987).

307

reaffirmed its earlier interpretation that distinguished between the effect of state criminal laws, which are fully applicable to certain reservations under Pub. L. 280, and state civil laws "applicable only as [they] may be relevant to private civil litigation in state court." *Cabazon*, 480 U.S. at 208. Thus, as a threshold step in determining whether a particular state law may be enforced on tribal lands under Pub. L. 280, the law must be characterized as either criminal or civil.

¶ 13. The Court applied this criminal/prohibitory, civil/regulatory dichotomy in determining whether the state bingo regulations and county gambling restrictions in California were criminal or civil. "The shorthand test is whether the conduct at issue violates the State's public policy." *Id.* at 209–10. Recognizing that the distinction between prohibiting and regulating "is not a bright-line rule," the Court substantially deferred to the decision of the Ninth Circuit Court of Appeals and concluded "that California regulates rather than prohibits gambling in general and bingo in particular." *Id.* at 210–11. This conclusion was founded on a statutory scheme suggesting moderation rather than prohibition:

> California does not prohibit all forms of gambling. California itself operates a state lottery, Cal.Govt. Code Ann. § 8880 *et seq.* (West Supp.1987), and daily encourages its citizens to participate in this state-run gambling. California also permits parimutuel horse-race betting. Cal.Bus. & Prof.Code Ann. §§ 19400–19667 (West 1964 and Supp.1987). Although certain enumerated gambling games are prohibited under Cal.Penal Code Ann. § 330 (West Supp.1987), games not enumerated, including the card games played in the Cabazon card club, are permissible.

*Id.* at 210. The Court ultimately held that neither the

state nor the county could enforce these particular gambling restrictions on tribal reservations. *Id.* at 222.

¶ 14. Shortly after *Cabazon,* Congress enacted legislation to establish standards for the operation of gaming by Indian tribes. *See* Indian Gaming Regulatory Act (IGRA), 25 U.S.C.A. §§ 2701–2721 (2001).[8] IGRA created three categories of gaming—Class I, Class II, and Class III. Class I gaming includes games of "minimal value" as well as traditional forms of Indian gaming. *Id.* § 2703(6). Class II gaming includes bingo and certain state-authorized or unregulated card games. *Id.* § 2703(7)(A). The Class I games are under the exclusive jurisdiction of Indian tribes. *Id.* § 2710(a)(1). The Class II games are under the jurisdiction of Indian tribes, *id.* § 2710(a)(2), with oversight by the National Indian Gaming Commission. *Id.* § 2706(b). Although tribes need not have compacts for Class II gaming, the permissibility of such gaming is a function of state law. *Id.* § 2710(b)(1)(A).[9]

¶ 15. Class III gaming is defined as "all forms of gaming that are not class I gaming or class II gaming." *Id.* § 2703(8). Under this definition, Class III gaming includes lotteries, pari-mutuel on-track betting, and casino-type games such as blackjack, roulette, craps, keno, and slot machines. Hence, Class III gaming covers the forms of gaming that are most likely to be heavily regulated or prohibited by states. IGRA follows the spirit of *Cabazon* by making the permissibility of Class III games a function of state law. Section 2710(d) makes

[8] IGRA became effective in October 1988.

[9] Class II gaming must be "located within a State that permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by Federal law)." 25 U.S.C. 2710(b)(1)(A).

Class III gaming activities lawful on Indian lands *only if* such activities are "located in a State that permits such gaming for any purpose by any person, organization, or entity." § 2710(d)(1)(B).

¶ 16. As noted above, there was uncertainty in Wisconsin about the interpretation of the 1987 constitutional amendment authorizing a state-operated lottery. Confusion cropped up in the state's negotiations with the tribes under IGRA, with the state initially indicating a willingness to permit tribes to engage in a number of casino-type games. Contemporaneously, however, the new Wisconsin Lottery requested a formal opinion on the scope of gaming it could conduct. It also asked the Attorney General: "[I]f the Wisconsin Lottery cannot legally offer a particular type of gaming or gambling operation as part of the lottery, can such type of game or gambling operation be lawfully included in a state/tribal gaming compact" under IGRA? Because of IGRA's deference to state law on permissible Class III gaming and because the state would presumably negotiate compacts with tribes in conformity with the Attorney General's opinion, the answer to the Lottery's question was of critical importance to the future of Indian gaming in Wisconsin.

¶ 17. In February 1990 Attorney General Donald Hanaway concluded that the 1987 amendment authorizing the state to conduct a lottery did not, by its terms, permit the Wisconsin Lottery to engage in any casino-type games. 79 Op. Wis. Att'y Gen. 14 (1990) ("Therefore I conclude that the games allowed to be conducted by the Wisconsin state lottery do not include any of the betting/banking games, such as roulette, blackjack, craps, baccarat, Chemin de fer, and similar casino gambling, and do not include any forms of gambling conducted by the playing of gambling ma-

chines such as slot machines, video gambling machines and similar machines and devices."). *Id.* at 27. Rather, the term "lottery" as it was used in the amendment, only referred to the narrow commonly understood meaning of lottery, which was a distinct type of gambling. *Id.* at 26.

¶ 18. At the same time, Attorney General Hanaway concluded that the Wisconsin Constitution did not prohibit casino-type games. These games, he said, were prohibited only by state criminal statutes. Consequently, the legislature could authorize casino-type games by changing the statutes, *Id.* at 28–29, and could authorize casino-type gambling . . . "just within Indian country." *Id.* at 31–32. The Attorney General added: "[I]t is not my responsibility to establish the public policy on gambling in Wisconsin. . . . [The] policy as it relates to gambling is within the role, responsibility and ability of the Legislature to address as it did in enacting chapters 945 and 565." *Id.* at 31.

¶ 19. The Hanaway opinion was a hot potato. It effectively precluded the state from agreeing to casino-type gambling for the tribes without explicit approval from the legislature. It simultaneously invited the legislature to approve casino-type gambling for Indians and non-Indians alike, or give the tribes a monopoly by approving casino-type gambling "just within Indian country." Either prospect was troubling to legislators opposed to expanded gambling in Wisconsin. A month later, the legislature approved a bill authored by Representative John Medinger giving the governor authority to negotiate and enter into gaming compacts with the tribes. The bill provided that "'The governor may, on behalf of this state, enter into any compact that has been negotiated under 25 USC 2710(d)." Wis. Stat. § 14.035. By its terms, the Medinger bill anticipated

compliance with IGRA but passed the negotiation and decision-making on gaming compacts to the governor. Before passage, both houses of the legislature rejected amendments requiring the legislature to ratify these compacts.

¶ 20. The Legislative Reference Bureau (LRB) attorney who drafted Representative Medinger's bill prepared a formal drafter's note in which he stated that any compact entered into must limit games to those authorized under ch. 945 of the Wisconsin Statutes, namely bingo, raffles, the lottery, pari-mutuel wagering, and "crane games" as well as other amusement devices.[10] The LRB attorney disagreed with Attorney General Hanaway because he stated that Article IV, Section 24 of the Wisconsin Constitution prohibited "casino-type gambling," and therefore no additional

---

[10] The Drafter's Note read in full:

> If the legislature enacts legislation approving an Indian gaming compact, the compact should not authorize the Indian tribe to conduct any gambling that is not authorized to be conducted by any person under ch. 945, stats. In other words, under current law, such a compact could only authorize an Indian tribe to conduct bingo, raffles, pari-mutuel wagering and lotteries and to operate crane games and certain other amusement devices. If the compact authorized other forms of gambling, then the legislation approving the compact would have to also include appropriate amendments to ch. 945.

> However, notwithstanding the recent Attorney General's opinion on the legality and constitutionality of casino-type gambling in Wisconsin (OAG 3–90), in my opinion, casino-type gambling is currently prohibited by Article IV, Section 24, of the Wisconsin Constitution and therefore cannot be authorized in ch. 945 without first amending the constitution.

Drafter's Note, Barry J. Stern, Legislative Attorney (March 8, 1990) (on file with drafting record of 1989 Wis. Act 196, Wisconsin Legislative Reference Bureau).

types of games could be authorized under ch. 945 without first amending the constitution. The attorney attached a similar note to an earlier bill, 1989 Senate Bill 331 authored by Senator Lloyd Kincaid. The Kincaid bill served as the model for the Medinger bill.

¶ 21. In November 1990 Attorney General Hanaway was defeated for re-election. In May 1991 his successor, Attorney General James E. Doyle, issued a new opinion. The Attorney General wrote:

> [T]he term "lottery" throughout article IV, section 24, refers to any game, scheme or plan comprising prize, chance and consideration.
>
> . . . .
>
> Under the constitution, the legislature may authorize any type of state-operated lottery subject only to the advertising, use-of-revenue and off-track wagering restrictions. The Legislature may not, however, authorize such lotteries if they are not operated by the state, or fall within the bingo, raffle or on-track, pari-mutuel exceptions. Any other lottery requires an amendment to the constitution.

80 Op. Wis. Att'y Gen. 53, 58 (1991).

¶ 22. The effect of Attorney General Doyle's opinion was to lay the groundwork for casino-type gambling by a state-operated lottery *if* such gambling were authorized by the legislature, and for casino-type gambling by Indian tribes *if* such gaming were included in a legislatively authorized or approved compact.

¶ 23. Following the earlier Hanaway opinion, Governor Tommy Thompson had refused to bargain with the tribes over casino games, video games, and slot machines, offering only traditional lotteries and pari-mutuel on-track betting. This led to an impasse. Six

weeks after Attorney General Doyle's opinion was issued, however, the District Court for the Western District of Wisconsin rendered a decision in a suit by two Chippewa bands challenging the state's refusal to bargain over casino games. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 770 F.Supp. 480 (W.D. Wis. 1991). Judge Barbara Crabb held that the amendments to Article IV, Section 24, in particular the 1987 amendment authorizing the state to operate a lottery, demonstrated "a state policy toward gaming that is now regulatory rather than prohibitory in nature." *Id.* at 486 (citing *Cabazon,* 480 U.S. at 211).

¶ 24. Judge Crabb's opinion drew upon the reasoning in the opinion of Attorney General Doyle. As noted, Attorney General Doyle theorized that when the voters of the state authorized the state to operate a "lottery," they removed any impediment to state operation of games involving the elements of prize, chance, and consideration.[11] Thus, the state could potentially

---

[11] In 1992 the Legislative Reference Bureau prepared a lengthy analysis of Article IV, Section 24 in an opinion memorandum. See Memorandum from Barry J. Stern, Legislative Attorney, to Senator Michael Ellis (Feb. 13, 1992) (on file with the Legislative Reference Bureau) (memorandum regarding "Constitutionality of 1991 Assembly Bill 469"). The memorandum criticized aspects of both the Hanaway and Doyle opinions. The memorandum argued that the meaning of the word "lottery" in Section 24(6) is different from the meaning in Section 24(1). The memorandum stated:

> The Doyle opinion appears to have given substantial weight . . . to the presumption that "lottery" means the same thing in s. 24 (6) as it does on s. 24 (1). It analyzed ways that the "ticket" language could make sense if "lottery" in s. 24 (6) refers to any form of gambling, including casino-type gambling, but did not consider any arguments to the contrary. It did not examine the legislative history of or contemporary news accounts relating to

operate casinos. 80 Op. Wis. Att'y Gen. 53, 58 (1991) ("There is nothing in the language of the amendment to prohibit legislative authorization of casino-type games."). With this analysis at hand, Judge Crabb concluded that "the state is required to negotiate with plaintiffs over the inclusion in a tribal-state compact of any activity that includes the elements of prize, chance

---

the approval of s. 24 (6), the referendum question submitted to the voters in April 1987 or the legislative history relating to the enactment of ch. 565. Instead, it identified certain language in ch. 565 that, in isolation from the rest of ch. 565, arguably supports a construction of "lottery" in s. 24 (6) to mean any form of gambling.

I am fairly certain that a Wisconsin state court would not accept the reasoning of the Doyle opinion in construing "lottery" in s. 24 (6). The literal meaning approach taken in the Doyle opinion is an approach that, to my knowledge, has never been taken by a Wisconsin state court in construing a . . . constitutional provision. As previously discussed in this memorandum, the literal meaning approach . . . is rarely followed by a court in construing a constitutional provision.

. . . .

In examining the legislative history relating to the approval of s. 24 (6) and the enactment of ch. 565, the court would be expected to examine the LRB drafting files and other documents prepared by legislative service agencies relating to those provisions. I have examined those drafting files and there is no mention in either file of anything related to casino-type gambling or of any intent for the legislature to authorize the state to operate any form of gambling other than the specific form of gambling that was being conducted by various other states and that involves the sale of lottery tickets and the selection of winning tickets through drawings or another method of chance.

*Id.* at 10–11, 12–13; *see also Leann v. Wisconsin,* 1993 Wisc. LEXIS 16, No. 92–1861–OA (January 20, 1993) (citing same memorandum).

and consideration and that is not prohibited expressly by the Wisconsin Constitution or state law." *Id.* at 488.[12]

¶ 25. By June of 1992, Governor Thompson reached compact agreements with all eleven federally recognized tribes and bands in the state. Among these compacts was the 1992 compact with the FCP Tribe, which addressed Class III gaming in the following manner:

AUTHORIZED CLASS III GAMING

A. The Tribe shall have the right to operate the

---

[12] The State appealed Judge Crabb's decision, but the Seventh Circuit Court of Appeals refused to review the merits of the action because the state failed to file a timely notice of appeal. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 957 F.2d 515 (7th Cir. 1992). The State filed its appeal before the district judge disposed of the tribe's motion to vacate the judgment, and as a result the State's appeal was dismissed. *Id.* at 516.

> Much as we regret visiting the effects of counsel's error on the State of Wisconsin in a case bearing on its governmental powers, the current version of Rule 4(a)(4) leaves no alternative. A timely notice of appeal is essential to this court's jurisdiction. The notice defendants filed is ineffectual. The appeal is dismissed for want of jurisdiction.

*Id.* at 517.

Four months after the Seventh Circuit dismissed the State's appeal, eight members of the Wisconsin legislature filed a petition to commence an original action in this court. *Leann v. Wisconsin,* 1993 Wisc. LEXIS 16, No. 92–1861–OA (January 20, 1993). This court denied the petition on the grounds that it presented no justiciable controversy. *Id.* at *2. Three members of the court, Justices Bablitch, Day, and Wilcox, would have heard the matter in order to clear up the confusion surrounding the meaning of the word lottery. *Id.* at *8–9 (Bablitch, J., dissenting).

following Class III games during the term of this Compact but only as provided in this Compact:

1. Electronic games of chance with video facsimile displays;

2. Electronic games of chance with mechanical displays;

3. Blackjack;[13] and

4. Pull-tabs or break-open tickets when not played at the same location where bingo is played.

B. The Tribe may not operate any Class III gaming not expressly enumerated in this section of this Compact unless this Compact is amended pursuant to section XXX [providing for amendment of the Compact].

¶ 26. The compact also specified the duration of the agreement. Section XXV states, in relevant part:

XXV. Duration

A. This Compact shall be in effect for a term of seven years after it becomes binding on the parties.

B. The duration of this Compact shall thereafter be automatically extended for terms of five years, unless either party serves written notice of nonrenewal on the other party not less than one hundred eighty days prior to the expiration of the original term of this Compact or any extension thereof.

C. In the event written notice of nonrenewal is given by either party as set forth in this section, the

---

[13] Under the terms of its 1992 compact, the FCP Tribe could operate blackjack games at two facilities but was not authorized to locate these games "on the land known as the 'Menomonee Valley land.' " XVI.B.1.

317

Tribe shall cease all Class III gaming under this Compact upon its expiration date or upon the date of the procedures in subsec. E. are concluded and a successor compact, if any is in effect.

D. The Tribe may operate Class III gaming only while this Compact, or any extension thereof under this section, is in effect.

¶ 27. The compact also provided that the Tribe and the State were not waiving their respective sovereign immunity:

Except as provided [in a section where the Tribe waived its sovereign immunity], neither the State nor the Tribe waive their sovereign immunity, under either state or federal law, by entering into this Compact and no provision of this Compact is intended to constitute a waiver of State or Tribal sovereign immunity.

The gaming compact with the FCP Tribe was completed June 3, 1992, and approved by the U.S. Department of the Interior on August 4, 1992.

¶ 28. In the meantime, work began in the legislature on a new amendment to the constitution to clarify the word "lottery." This amendment was passed by the legislature in 1992 and 1993, and approved by the people in April 1993.

¶ 29. The opening sentence of Article IV, Section 24, which had prohibited the legislature from authorizing any "lottery," was changed to provide that "[e]xcept as provided in this section, the legislature may not authorize *gambling* in any form" (emphasis added). Further, the potential scope of the state-operated lottery was expressly narrowed.

¶ 30. Subsection 6 of Article IV, Section 24, which defines the parameters of the state-operated lottery, is now arguably the most detailed provision in the constitution. Subsection 6(a) currently reads:

> (6)(a) The legislature may authorize the creation of a lottery to be operated by the state as provided by law. The expenditure of public funds or of revenues derived from lottery operations to engage in promotional advertising of the Wisconsin state lottery is prohibited. Any advertising of the state lottery shall indicate the odds of a specific lottery ticket to be selected as the winning ticket for each prize amount offered. The net proceeds of the state lottery shall be deposited in the treasury of the state, to be used for property tax relief for residents of this state as provided by law. The distribution of the net proceeds of the state lottery may not vary based on the income or age of the person provided the property tax relief. The distribution of the net proceeds of the state lottery shall not be subject to the uniformity requirement of section 1 of article VIII. In this paragraph, the distribution of the net proceeds of the state lottery shall include any earnings on the net proceeds of the state lottery.

Wis. Const. art. IV, § 6(a). This text predates the 1993 amendment, except for an insignificant modification in 1999.

¶ 31. The 1993 amendment added the following clarifying language:

> (b) The lottery authorized under par. (a) shall be an enterprise that entitles the player, by purchasing a ticket, to participate in a game of chance if: 1) the winning tickets are randomly predetermined and the player reveals preprinted numbers or symbols from which it can be immediately determined whether the ticket is a winning ticket entitling the player to win a prize as prescribed in the features and procedures for

the game, including an opportunity to win a prize in a secondary or subsequent chance drawing or game; or 2) the ticket is evidence of the numbers or symbols selected by the player or, at the player's option, selected by a computer, and the player becomes entitled to a prize as prescribed in the features and procedures for the game, including an opportunity to win a prize in a secondary or subsequent chance drawing or game if some or all of the player's symbols or numbers are selected in a chance drawing or game, if the player's ticket is randomly selected by the computer at the time of purchase or if the ticket is selected in a chance drawing.

(c) Notwithstanding the authorization of a state lottery under par. (a), the following games, or games simulating any of the following games, may not be conducted by the state as a lottery: 1) any game in which winners are selected based on the results of a race or sporting event; 2) any banking card game, including blackjack, baccarat or chemin de fer; 3) poker; 4) roulette; 5) craps or any other game that involves rolling dice; 6) keno; 7) bingo 21, bingo jack, bingolet or bingo craps; 8) any game of chance that is placed on a slot machine or any mechanical, electromechanical or electronic device that is generally available to be played at a gambling casino; 9) any game or device that is commonly known as a video game of chance or a video gaming machine or that is commonly considered to be a video gambling machine, unless such machine is a video device operated by the state in a game authorized under par. (a) to permit the sale of tickets through retail outlets under contract with the state and the device does not determine or indicate whether the player has won a prize, other than by verifying that the player's ticket or some or all of the player's symbols or numbers on the player's ticket have been selected in a chance drawing, or by verifying that the player's ticket has been randomly selected by a central system computer at the time of purchase; 10) any game that is

320

similar to a game listed in this paragraph; or 11) any other game that is commonly considered to be a form of gambling and is not, or is not substantially similar to, a game conducted by the state under par. (a). No game conducted by the state under par. (a) may permit a player of the game to purchase a ticket, or to otherwise participate in the game, from a residence by using a computer, telephone or other form of electronic, tele-communication, video or technological aid.

Wis. Const. art IV, § 6(b-c). The specificity of this language is self-evident.[14] Wis. Const. art. IV, § 24 (as amended 1965, 1973, 1977, 1987, 1993, and 1999).

---

[14] Sections 2 through 5, not addressed in the text, read as follows:

(2) Except as otherwise provided by law, the following activities do not constitute consideration as an element of gambling:

(a) To listen to or watch a television or radio program.

(b) To fill out a coupon or entry blank, whether or not proof of purchase is required.

(c) To visit a mercantile establishment or other place without being required to make a purchase or pay an admittance fee.

(3) The legislature may authorize the following bingo games licensed by the state, but all profits shall accrue to the licensed organization and no salaries, fees or profits may be paid to any other organization or person: bingo games operated by religious, charitable, service, fraternal or veterans' organizations or those to which contributions are deductible for federal or state income tax purposes. All moneys received by the state that are attributable to bingo games shall be used for property tax relief for residents of this state as provided by law. The distribution of moneys that are attributable to bingo games may not vary based on the income or age of the person provided the property tax relief. The distribution of moneys that are attributable to bingo games shall not be subject to the uniformity requirement of section 1 of article VIII. In this subsection, the distribution of all moneys attributable to bingo games shall include any earnings on the moneys received by the

¶ 32. The initial compacts were set to run out between February 1998 and March 1999. Governor Thompson reached agreements with the state's tribes to renew the compacts for five years. Acting pursuant to Wis. Stat. § 14.035, Governor Thompson also agreed to amend certain substantive provisions of the compacts. For instance, the 1998 amendments to the FCP Gaming Compact permitted the FCP Tribe to increase the number of slot machines from 200 to 1000 and permit blackjack at the Tribe's Menomonee Valley land location. However, the 1998 amendments did not grant the

state that are attributable to bingo games, but shall not include any moneys used for the regulation of, and enforcement of law relating to, bingo games.

(4) The legislature may authorize the following raffle games licensed by the state, but all profits shall accrue to the licensed local organization and no salaries, fees or profits may be paid to any other organization or person: raffle games operated by local religious, charitable, service, fraternal or veterans' organizations or those to which contributions are deductible for federal or state income tax purposes. The legislature shall limit the number of raffles conducted by any such organization.

(5) This section shall not prohibit pari-mutuel on-track betting as provided by law. The state may not own or operate any facility or enterprise for pari- mutuel betting, or lease any state-owned land to any other owner or operator for such purposes. All moneys received by the state that are attributable to pari-mutuel on-track betting shall be used for property tax relief for residents of this state as provided by law. The distribution of moneys that are attributable to pari-mutuel on-track betting may not vary based on the income or age of the person provided the property tax relief. The distribution of moneys that are attributable to pari-mutuel on-track betting shall not be subject to the uniformity requirement of section 1 of article VIII. In this subsection, the distribution of all moneys attributable to pari-mutuel on-track betting shall include any earnings on the moneys received by the state that are attributable to pari-mutuel on-track betting, but shall not include any moneys used for the regulation of, and enforcement of law relating to, pari- mutuel on-track betting.

FCP permission to operate additional *types* of games;[15] nor did they alter the sovereign immunity and renewal provisions of the compact providing for automatic rollover, or, conversely, an opportunity for either party to withdraw from the compact with proper notice.

¶ 33. On February 19, 2003, as the second term of the compact was nearing completion, Governor Doyle agreed to new amendments to the 1992 Gaming Compact (as amended in 1998) with the FCP Tribe. On April 2, 2003, the petitioners responded to some of these amendments by filing a petition for original action. Two days later, the Governor signed a second amendment.[16] On May 30, the Governor agreed to a third set of amendments—the so-called Technical Amendments.[17]

---

[15] The dissent notes that the 1998 amendments grant to the Tribe blackjack operations at its Menomonee Valley land location and suggests that this represents authorization of a new *type* of game. The Tribe was already authorized to operate blackjack games at two facilities. Consequently, permitting 25 additional blackjack tables at its site in Milwaukee did not constitute approval of a new *type* of game.

[16] The April 4, 2003, amendment's primary effect was to delete provisions tying the scope of the permissible "casino table games" the FCP Tribe could operate to whether other facilities within 75 miles of Wisconsin's border offered such games. If there were such "competitive" facilities, then the FCP Tribe could also conduct the casino table games those facilities offered. In this provision's place, the April 4, 2003, amendment simply permitted the tribe to conduct casino table games without qualification.

[17] The Technical Amendments altered a number of provisions in the Compact, including sections that the petitioners objected to in their petition for original action on sovereign immunity and future appropriations grounds. The petitioners' claims with respect to these provisions have evolved to keep pace with the subsequent alterations to the compact.

323

¶ 34. The sum effect of these amendments is substantial. First, the Compact as amended clears the way for the FCP Tribe to conduct a number of casino games that have never been legal in Wisconsin, such as keno, roulette, craps, and poker. The amendments add the following games to the enumerated list of Class III games found in the original version of the Gaming Compact:

> Variations on the game of Blackjack, including, but not limited to, Spanish 21 and additional wagers offered in the game of blackjack, including additional wagers, multiple action blackjack, bonus wagers, and progressive blackjack wagers;
>
> Pari-mutuel wagering on live simulcast horse, harness, and dog racing events;[18]
>
> Electronic keno; and
>
> The game of roulette, the game of craps, the game of poker and similar non-house banked card games, and games played at Blackjack style tables, such as Let it Ride, Casino Stud, and Casino War.

¶ 35. Second, the compact as amended repeals in its entirety the duration provisions that permitted an automatic rollover of the compact every five years, with either the State or the FCP having the right to nonrenew. The section replacing these deleted provisions now reads as follows:

> This Compact shall continue in effect *until terminated by mutual agreement of the parties,* or by a duly adopted ordinance or resolution of the Tribe revoking the

---

[18] Unlike the other games in this list, the Wisconsin Constitution and Wisconsin Statutes expressly allow pari-mutuel on-track betting, including wagering on simulcast events. *See* Wis. Const. art IV, § 24(5); Wis. Stat. § 562.057.

authority of the Tribe to conduct Class III gaming upon its lands, as provided for in Section 11(d)(2)(D) of [IGRA].

(Emphasis added).

¶ 36. Third, the compact as amended adds an entirely new dispute resolution process, including the following provision regarding liquidated damages:

If the State fails to comply with an award of the tribunal, other than an award to pay money to the Tribe, and asserts the State's sovereign immunity, then the tribunal, upon the application of the Tribe, may issue an order requiring the State to pay the Tribe a sum of money as liquidated damages that the tribunal determines is commensurate with the value of the loss to the Tribe due to the inability of the Tribe to obtain judicial enforcement of the Compact provision which is the subject of the award and that is commensurate with the State's failure to comply with the award. The sum due to the Tribe under the order is a debt of the State, which may be recovered by the Tribe, unless the State complies with the award or a federal court sets aside the award on grounds set forth in 9 U.S.C. § 10. This paragraph shall not apply if the legislature of the State of Wisconsin ratifies the State's waiver of sovereign immunity in Section XXIII or waives the State's sovereign immunity for judicial enforcement of all arbitration awards entered under Section XXII.

¶ 37. Fourth, the 1992 compact provision, explicitly providing that the state was *not* waiving its sovereign immunity, was replaced in part by the following section:

The Tribe and the State, to the extent the State or the Tribe may do so pursuant to law, expressly waive any and all sovereign immunity with respect to any claim brought by the State or the Tribe to enforce any

325

provision of this Compact. This waiver includes suits to collect money due to the State pursuant to the terms of the Compact; to obtain an order to specifically enforce the terms of any provision of the Compact, or to obtain a declaratory judgment and/or enjoin any act or conduct in violation of the Compact. Nothing contained herein shall be construed to waive the immunity of the Tribe, except for suits arising under the terms of this Compact. This waiver does not extend to other claims brought to enforce other obligations that do not arise under the Compact or to claims brought by parties other than the State and the Tribe. In addition, the State agrees that State officials and employees may not engage in unauthorized activity. State officials and employees are not authorized under law to engage in activity that violates the terms of the Compact; that violates an arbitration award entered under Section XXII; or with respect to subject matters governed by the Compact, that is not authorized by the Compact. The Tribe may maintain a suit against State officials, agents, or employees to prevent unauthorized activity without regard to whether or not the State has waived its sovereign immunity.[19]

---

[19] The technical amendments of May 30, 2003, altered the language of this term in a number ways. First, the parties agreed to add the qualifying language "to the extent the State or the Tribe may do so pursuant to law" to the first sentence. Second, the following sentence was removed: "This waiver also includes a suit to enforce the obligations in Section XXV. and a suit by the Tribe to restrain actions by State officials that are in excess of their authority under the Compact." Finally, the parties agreed to add the last three sentences, which state:

> In addition, the State agrees that State officials and employees may not engage in unauthorized activity. State officials and employees are not authorized under law to engage in activity that violates the terms of the Compact; that violates an arbitration award entered under Section XXII; or, with respect to subject matters governed by the Compact, that is not authorized by the Compact. The Tribe may maintain a suit against State officials,

## DISCUSSION

¶ 38. Several amicus curiae have filed briefs stressing the positive impact of Indian gaming on Wisconsin tribes as well as local economies and local governments. All the parties acknowledge that the amended FCP Gaming Compact is projected to generate additional revenue for the state at a time when additional revenue is needed.

¶ 39. This court does not decide cases on these grounds. Our duty is to interpret and apply the law. It is for the legislature "to make policy choices, ours to judge them based not on our preference but on legal principles and constitutional authority." *Flynn v. Department of Administration,* 216 Wis. 2d 521, 529, 576 N.W.2d 245 (1998).

¶ 40. This is not to say that the legal and practical consequences of our opinions are not considered. We are mindful that this decision will require both a renegotiation of certain compact terms and a reconsideration of the Wisconsin state budget. At the same time, the decision does not invalidate any gaming rights the FCP Tribe had as of the 1998 amendments. In addition to those rights, this decision permits pari-mutuel wagering on live simulcast horse, harness, and dog racing events and does not prohibit additional sites. Consequently, the dissent's forecast of gloom and doom is not well taken. In any event, we would be derelict if we were to reject a legitimate request to maintain the proper balance of power between and among the branches of our state government simply because of short-term

agents, or employees to prevent unauthorized activity without regard to whether or not the State has waived its sovereign immunity.

consequences. In the end, fundamental questions about Wisconsin constitutional law ought to be decided in Wisconsin's highest court.

A. Affirmative Defenses

¶ 41. The Governor seeks to shield petitioners' claims from review by interposing two procedural objections or "affirmative defenses." *See State ex rel. Wisconsin Senate v. Thompson,* 144 Wis. 2d 429, 436, 424 N.W.2d 385 (1988). Specifically, the Governor posits that (1) the petitioners lack standing to challenge his actions; and (2) this litigation should be dismissed for failure to join an indispensable party, namely, the FCP Tribe. Were we to accept either of the Governor's "defenses," we could not hear this case and would abdicate our "duty to resolve disputes regarding the constitutional functions of different branches of state government." *Id.*

■

¶ 42. As to standing, the crux of the petitioners' claim is that the Governor exceeded his authority and impinged upon the core power and function of the legislature. The petitioners are members of the legislative leadership. If Senator Panzer, as Majority Leader of the Senate, and Representative Gard, as Speaker of the Assembly, acting in concert with the Joint Committee on Legislative Organization, lack standing to assert a claim that the Governor acted to deprive the legislature of the ability to exercise its core function in a specific subject area, then no one in the legislature could make such a claim, and no one outside the legislature would have an equivalent stake in the issue. We disagree with the proposition that petitioners do not have a significant stake in representing the legislative branch when there is a claimed breach of the separation of powers.

This conclusion is consistent with our treatment of standing in *Wisconsin Senate v. Thompson.*

■

¶ 43. As to the ability to proceed in the absence of the FCP Tribe, it is undisputed that "[u]nless Congress provides otherwise, Indian tribes possess sovereign immunity against the judicial processes of states." *Saratoga County Chamber of Commerce v. Pataki,* 798 N.E.2d 1047, 1057 (N.Y. 2003) (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 15 (1978); *United States v. United States Fid. & Sav. Guar. Co.,* 309 U.S. 506, 512 (1940); *Turner v. United States,* 248 U.S. 354, 358 (1919)). As such, the FCP Tribe cannot be compelled to appear in these proceedings, and it has opted not to intervene.

¶ 44. The Tribe's decision not to participate as a party cannot deprive this court of its own core power to interpret the Wisconsin Constitution and resolve disputes between coequal branches of state government. The Tribe has been aware of this litigation from its inception. This court would have welcomed its intervention. We will not venture the delicate balance of shared power among our three branches of government on the chosen absence of a potential party.[20]

---

[20] This conclusion comports with the court of appeals scholarly analysis in *Dairyland Greyhound Park, Inc. v. McCallum,* 2002 WI App 259, 258 Wis. 2d 210, 655 N.W.2d 474, where the court concluded that litigation regarding the validity of Indian gaming compacts may proceed in the absence of Tribes with compacts at issue. This court denied a petition to review that decision. *Dairyland Greyhound Park, Inc. v. McCallum,* 2003 WI 1, 258 Wis. 2d 110, 655 N.W.2d 129 (denying petition to review); *see also Saratoga County Chamber of Commerce, Inc. v. Pataki,* 798 N.E.2d 1047, 1058–59 (N.Y. 2003) ("While sovereign immunity prevents the Tribe from being forced to participate in

¶ 45. The upshot of accepting the Governor's invitation to dispose of this case on procedural technicalities would be to insulate this agreement and any future agreement between a governor and a tribe from the powers of state judicial review. For over 200 years, it has been the province of the judiciary to interpret the constitution and say what the law is. *See Wisconsin Senate,* 144 Wis. 2d at 436 (citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, (1803)). We are responsible for resolving legal disputes among the three branches of our state government and, therefore, we proceed to the merits of the case.

## B. Scope of the Governor's Authority

¶ 46. The petitioners allege that the Governor violated the separation of powers. They assert that the Governor, the chief constitutional officer of Wisconsin's executive branch, was without authority (1) to commit the state to perpetual compacts with the FCP Tribe; (2) to agree to games prohibited by the 1993 amendment to the Wisconsin Constitution; (3) to waive the state's sovereign immunity; and (4) to commit the state to future appropriations. Each of these issues will be addressed in turn.

## 1. Separation of Powers Principles

¶ 47. The petitioners frame their cause as an effort to restore constitutional equipoise in the wake of the Governor's actions, which they contend are tantamount to a usurpation of legislative authority. The petitioners claim the Governor lacked either inherent

New York court proceedings, it does not require everyone else to forego the resolution of all disputes that could affect the Tribe.").

330

or delegated power to agree to certain compact terms on behalf of the state. The petitioners also imply that, if the legislature's delegation of power to Wisconsin governors is as broad as the Governor asserts, then the delegation is unconstitutional. Before addressing the substance of the arguments, we will set forth the applicable principles that guide our analysis.

¶ 48. Our state constitution has created three branches of government, each with distinct functions and powers. The separation of powers doctrine is implicit in this tripartite division of government. *Flynn,* 216 Wis. 2d at 545 (collecting cases). "There are zones of authority constitutionally established for each branch of government upon which any other branch of government is prohibited from intruding." *Fiedler v. Wisconsin Senate,* 155 Wis. 2d 94, 100, 454 N.W.2d 770 (1990).

¶ 49. In reality, governmental functions and powers are too complex and interrelated to be neatly compartmentalized. For this reason, we analyze separation of powers claims not under formulaic rules but under general principles that recognize both the independence and interdependence of the three branches of government.

¶ 50. The principles we turn to, when faced with a claim that one branch has seized power reserved to another, were stated in the *Flynn* case:

> Each branch has exclusive core constitutional powers, into which the other branches may not intrude. *See* [*State ex rel. Friedrich v. Dane County Cir. Ct.,* 192 Wis. 2d 1, 13, 531 N.W.2d 32 (1995)] (citing *State ex rel. Fiedler v. Wisconsin Senate,* 155 Wis. 2d 94, 100, 454 N.W.2d 770 (1990)). Beyond these core constitutional

powers lie " '[g]reat borderlands of power' " which are not exclusively judicial, legislative or executive. *See id.* at 14. While each branch jealously guards its exclusive powers, our system of government envisions the branches sharing the powers found in these great borderlands. *See id.* Ours is a system of " 'separateness but interdependence, autonomy but reciprocity.' " *Id.* (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 (1952)). When the powers of the branches overlap, one branch is prohibited from unduly burdening or substantially interfering with the other. *See Friedrich,* 192 Wis. 2d at 14.

*Flynn,* 216 Wis. 2d at 545–46.

■

¶ 51.　These principles acknowledge that under Wisconsin's constitution, powers may be shared between and among branches, so long as the power at issue is not a "core" power reserved to one branch alone. Thus, in a typical separation of powers dispute, the first order of business is to identify whether the power one branch is accused of usurping is a core power or a shared power.

■

¶ 52.　The seizure of power by one branch from another is not the only concern in the separation of powers. Under the nondelegation doctrine, one branch of government may delegate power to another branch, but it may not delegate too much, thereby fusing an overabundance of power in the recipient branch. The concern about excessive delegation is that an improper concentration of power in one branch will undermine the checks and balances built into our system of government. Checks and balances are designed to promote government accountability and deter abuse. The breakdown of checks and balances tends to make government

power unaccountable. The excessive delegation of power may also result in a ceding of power that the donor branch may be unable to reclaim.

¶ 53. This court addressed the issue of whether the legislature had delegated too much power to an executive branch agency in *Gilbert v. Medical Examining Board,* 119 Wis. 2d 168, 349 N.W.2d 68 (1984). The court recognized that "delegation of the power to make rules and effectively administer a given policy is a necessary ingredient of an efficiently functioning government," *id.* at 184 (collecting cases), and upheld an admittedly "broad grant of legislative power" to the Medical Examining Board, reversing a court of appeals' determination that the delegation lacked adequate standards. *Id.* at 190. In doing so, we reviewed the history of the nondelegation doctrine in Wisconsin.

¶ 54. In this court's early delegation cases, our focus was on the *nature* of the delegated power. *Id.* at 185 (citing *State ex rel. Wis. Inspection Bureau v. Whitman,* 196 Wis. 472, 505–06, 220 N.W. 929 (1928)). We indicated that the legislature delegated power lawfully when it "laid down the fundamentals of a law," such that the recipient of the delegated power was merely filling in the details. *Id.* (citing *Whitman,* 196 Wis. at 505–06). Recently, however, the court has focused less on the nature of the delegated power and more on the adequacy of procedural safeguards attending the delegation, so as to prevent arbitrariness in the exercise of the power.[21] *Id.* at 185–86.

---

[21] Recent commentators who have examined separation of powers questions under state constitutions on a national scale have categorized Wisconsin as among the states on the permissive end of the spectrum when it comes to legislatively delegated power. *See, e.g.,* Jim Rossi, *Institutional Design and the Lingering Legacy of Antifederalist Separation of Powers Ideals in the*

¶ 55. This is not to say that the nature of delegated power no longer plays a role in judicial review of legislative delegations. We normally review both the nature of delegated power and the presence of adequate procedural safeguards, giving less emphasis to the former when the latter is present. In a case involving delegation to an administrative agency, we said: "A delegation of legislative power to a subordinate agency will be upheld if the purpose of the delegating statute is ascertainable and there are procedural safeguards to insure that the board or agency acts within that legislative purpose." *Id.* (quoting *Westring v. James,* 71 Wis. 2d 462, 238 N.W.2d 695 (1976)). Thus, the nondelegation doctrine with respect to subordinate agencies is now primarily concerned with the presence of procedural safeguards that will adequately assure that discretionary power is not exercised unnecessarily or indiscriminately. *Id.* at 185 (citing 1 Kenneth Culp Davis, *Administrative Law Treatise* § 3.15 at 206–07 (2d ed. 1978)).

¶ 56. This deference is readily understandable when the legislature delegates power to an administrative agency because the agency is a creation of the legislature itself. *Id.* at 186 (citing *Schmidt v. Dep't of Res. Dev.,* 39 Wis. 2d 46, 56–57, 158 N.W.2d 306 (1968)). The "very existence" of the agency is dependent upon the will of the legislature. Its powers, duties, and scope of authority may be fixed and circumscribed by the legislature and made subject to legislative changes. *Id.*

*States,* 52 Vand. L. Rev. 1167 (1999) (placing Wisconsin among the "handful" of states to follow the "procedural safeguard" approach of Professor Kenneth Culp Davis); Gary J. Greco, Survey, *Standards or Safeguards: A Survey of the Delegation Doctrine in the States,* 8 Admin L.J. Am. U. 567, 598–99 (1994).

(citing *Schmidt,* 39 Wis. 2d at 56–57). Rules promulgated by the agency may be suspended by the legislature. Wis. Stat. § 227.26(2)(d). If the legislature attempts to change the authority of the agency but fails to do so because of a successful gubernatorial veto, the legislature may decline to confirm appointees and refuse to appropriate funds for the agency.

¶ 57. The court has adopted a stricter standard when the legislature delegates power directly to another branch of government. *Gilbert,* 119 Wis. 2d at 186 (citing *Schmidt,* 39 Wis. 2d at 56–57). What may seem an adequate procedural safeguard for a delegation of power to an administrative agency may be wholly inadequate when power is delegated directly to another branch of government.

¶ 58. The delegation of power to a sister branch of government must be scrutinized with heightened care to assure that the legislature retains control over the delegated power, much like the legislature exercises inherent control over state administrative agencies. In *Martinez v. DILHR,* we upheld a statute empowering the legislature's Joint Committee for Review of Administrative Rules to temporarily suspend an administrative rule pending legislative review and presentment of legislation to the governor. *Martinez v. DILHR,* 165 Wis. 2d 687, 691, 478 N.W.2d 582 (1992). In doing so, we noted that "it is incumbent on the legislature, pursuant to its constitutional grant of legislative power, *to maintain some legislative accountability over rule-making.* Such legislative responsibility adheres to the fundamental political principle and design of our democracy which makes elected officials accountable for rules governing the public welfare." *Id.* at 701 (emphasis

added). Examining this precedent in light of the added scrutiny for delegations directly to another branch of government, it is crucial for the legislature to preserve the right to exercise some degree of control over the delegated power.

¶ 59. The petitioners describe the Governor's action in agreeing to certain gaming amendments as a usurpation of legislative power. It is obvious, however, that by enacting Wis. Stat. § 14.035, the legislature assigned the task of entering into gaming compacts with Indian tribes to Wisconsin's governor. No one contests the applicability of this statute. Since this case involves a statute forthrightly delegating legislative authority to the Governor, the Governor's action should not be analyzed as an uninvited usurpation of legislative power. This case involves a legislative transfer of power to a different branch. Accordingly, the facts should be viewed through the prism of Wisconsin's nondelegation doctrine.

2. Delegation of Legislative Authority in Section 14.035

¶ 60. Wisconsin Stat. § 14.035 reads that: "The governor may, on behalf of this state, enter into any compact that has been negotiated under 25 USC 2710(d)." Petitioners have framed their argument in a manner that avoids challenging the constitutionality of this statute. At the same time, they imply that if we interpret the delegation in this statute as broadly as the Governor requests, the delegation is unconstitutional. Clearly, the validity of § 14.035 permeates this case. We acknowledge the legislature's exceptionally broad delegation of power to the Governor but conclude that,

subject to certain implicit limits, § 14.035 is not unconstitutional beyond a reasonable doubt.[22]

¶ 61. In reviewing the legislature's extremely broad delegation of power, it is important to identify who possessed the authority to enter into gaming compacts on behalf of the state *before* the enactment of § 14.035. If this authority was already vested in Wisconsin governors, then § 14.035 could not be an unconstitutional delegation, for it would be no delegation at all. The legislature cannot delegate a power that it does not have.

¶ 62. When courts in other jurisdictions have dealt with this question, most have concluded that, under state law, a governor does not possess unilateral authority to reach binding compacts with tribes on behalf of the state. *See American Greyhound Racing, Inc. v. Hull,* 146 F. Supp. 2d 1012, 1072 (D. Ariz. 2001), *vacated on other grounds,* 305 F.3d 1015, 1018 (9th Cir. 2002) (holding that under Arizona's strict constitutional separation of powers principles, legislature could not broadly delegate compacting authority to Arizona's governor);[23] *Kansas ex rel. Stephan v. Finney,* 836 P.2d 1169, 1185 (Kan. 1992) (holding that governor had neither inherent nor delegated authority to sign compacts on behalf of state); *New Mexico ex rel. Clark v. Johnson,* 904 P.2d 11, 23 (N.M. 1995) (same); *Pataki,* 798 N.E.2d at 1061 (same); *Narragansett Indian Tribe of Rhode Island v. Rhode Island,* 667 A.2d 280, 282 (R.I. 1995) (same). These courts concluded that entering into

---

[22] The dissent asserts that we are writing limits into the statute. In our view, we are simply recognizing limits to executive power that exist by virtue of the Wisconsin Constitution.

[23] This decision was vacated by the Ninth Circuit for failure to join certain indispensable Indian tribes.

a tribal-state compact under IGRA, thereby committing the state to a particular position with respect to Indian gaming, involves subtle and important decisions regarding state policy that are at the heart of legislative power.[24]

¶ 63. We believe these cases are better reasoned or distinguishable from two United States District Court cases holding that a governor may unilaterally sign a gaming compact and bind the state. *See Willis v. Fordice,* 850 F. Supp. 523 (S.D. Miss. 1994); *Langley v. Edwards,* 872 F. Supp. 1531 (W.D. La. 1995). Of course, Arizona, Kansas, New Mexico, New York, and Rhode Island may allocate power among the branches in a manner different from Wisconsin.

¶ 64. Nonetheless, we agree with the consensus among courts that have looked at the issue, that committing the state to policy choices negotiated in gaming compacts constitutes a legislative function. Consequently, we conclude that, in the absence of § 14.035,

---

[24] *American Greyhound Racing, Inc. v. Hull,* 146 F. Supp. 2d 1012, 1072 (reasoning that Governor engages in a "kind of legislative act by establishing state gaming policy"); *Stephan,* 836 P.2d at 1185 ("[M]any of the provisions in the compact would operate as enactment of new laws and the amendment of existing laws."); *State ex rel. Clark v. Johnson,* 904 P.2d 11, 23 (N.M. 1995) ("We also find the Governor's action to be disruptive of legislative authority because the compact strikes a detailed and specific balance between the respective roles of the State and the Tribe in [a number of respects]."); *Saratoga County,* 798 N.E.2d at 1060 ("Compacts addressing [the issues permitted to be addressed under IGRA] necessarily make fundamental policy choices that epitomize 'legislative power.' "); *Narragansett Indian Tribe of Rhode Island v. Rhode Island,* 667 A.2d 280, 281 (concluding that the legislative branch exercises exclusive authority over lotteries in the state).

the power to enter into compacts under IGRA would reside with Wisconsin's legislative branch.

¶ 65. Returning to the statute, § 14.035 indisputably delegates a broad and expansive power to the Governor. The statute is presumed constitutional. A court will strike down a statute only when it is shown to be unconstitutional beyond a reasonable doubt. *Friedrich,* 192 Wis. 2d at 13 (citing *State v. Holmes,* 106 Wis. 2d 31, 41, 315 N.W.2d 703 (1982)). Where the constitutionality of a statute is at issue, courts attempt to avoid an interpretation that creates constitutional infirmities. *See State v. Popanz,* 112 Wis. 2d 166, 172, 332 N.W.2d 750 (1983) (citing *State ex rel. Ft. Howard Paper v. Lake Dist. Board,* 82 Wis. 2d 491, 505, 263 N.W.2d 178 (1978)). Courts must apply a limiting construction to a statute, if available, to eliminate the statute's overreach, while maintaining the legislation's constitutional integrity. *Lounge Management, Ltd. v. Town of Trenton,* 219 Wis. 2d 13, 26, 580 N.W.2d 156 (1998).

¶ 66. On its surface, this statute does not express clear policy objectives or include explicit procedural safeguards. However, the court has an obligation to dig beneath the surface when the constitutionality of a statute hangs in the balance.

¶ 67. The ascertainable purpose of the statute is to designate our governor as the state's lead negotiator on Indian gaming compacts and to permit the governor to bind the state once agreement has been reached. The Governor acknowledges that "the power to execute a contract binding the state must be granted by the legislature," and § 14.035 constitutes that grant. This is an expedient solution to the quandary of who should act on behalf of the state in gaming negotiations. Legisla-

tive silence on this topic has led to litigation in other states. *Stephan,* 836 P.2d 1169; *Clark,* 904 P.2d 11; *Saratoga County,* 798 N.E.2d 1047; *Narragansett Indian Tribe,* 667 A.2d 280. Thus, the experience in other states suggests that the legislature acted logically by vesting the authority to act on behalf of the state in the governor.

¶ 68. The Governor reasons that the power delegated to him must be exercised in conformity with IGRA because § 14.035 incorporates 25 U.S.C. § 2710(d) by reference, and this IGRA provision lists various compact terms that may be included in the compact.

¶ 69. In addition, the Governor notes that the legislature has affirmed the governor's role in compact negotiations by creating a director of Indian gaming in the Department of Administration and providing that the director shall advise the governor "on any Indian compacts that may be entered into under § 14.035" and assist "the governor in determining the types of gaming that may be conducted on Indian lands and in entering into Indian gaming compacts." Wis. Stat. §§ 569.015 and 569.02(4). The Governor argues that these statutes affirm the prior delegation and demonstrate support of the Governor's delegated responsibility.

¶ 70. As we see it, the legislature did not provide guidance in § 14.035 as to terms it desired or terms it opposed, although limits to the gaming compacts are implied by the existence of other statutes. The absence of guidelines underscores the importance of procedural safeguards. So long as the legislature retains the power to act on Indian gaming, there are procedural safeguards to assure that the governor acts "within that legislative purpose." *Gilbert,* 119 Wis. 2d at 186 (quoting *Westring,* 71 Wis. 2d 462). What are the safeguards?

¶ 71. First, apart from the extraconstitutional techniques of leverage and communication between branches, the legislature retains the power to repeal § 14.035 if it is able to muster enough votes to override a gubernatorial veto. This blunt instrument could recapture the power delegated to the governor. Second, the legislature may seek to amend § 14.035 to require the ratification of compact extensions or amendments, direct the governor to seek specific terms, or express a desire to nonrenew. Finally, the legislature may appeal to public opinion. The governor of Wisconsin is a highly visible public official and the governor's decisions on Indian gaming will attract the attention of the public and the news media. If the governor makes a policy choice that is unacceptable to the people, the governor will be held accountable to the people.

¶ 72. In sum, although the statute is not a model of legislative delegation, its purpose is ascertainable, and in most situations there are safeguards available to alter the policy choices made by the governor. Consequently, the statute is not unconstitutional beyond a reasonable doubt.

3. Duration Provision

¶ 73. Upholding the constitutionality of the statute does not automatically validate every compact term negotiated by a governor under the statute.

¶ 74. Before the 2003 amendments, the FCP Gaming Compact provided that the state or the FCP Tribe could serve a written notice of nonrenewal on the other party, so long as it did so at least 180 days before the existing term expired. If the requisite notice of nonrenewal were provided, the FCP Gaming Compact

would expire at the end of that five-year term. Conversely, if no notice were given, the compact would automatically renew for another five years, with the parties capable of negotiating amendments.

¶ 75. The 2003 amendments repeal these provisions. Under the terms of the 2003 amendments, the state gives up the right to periodically withdraw from the FCP Gaming Compact.[25] In fact, if the new duration provision is found in some manner to be unenforceable or invalid—that is, if the state is legally able to repudiate the substance of the new duration provision—the state could become obligated to pay the tribe millions of dollars.[26] Because the state would pay a heavy financial price if it were able to lawfully and unilaterally repudiate the duration provision, the refund provision of the

[25] The FCP Tribe retains the ability to withdraw from the compact unilaterally. Under the amended terms the Governor agreed to in 2003, the FCP Tribe could, at any time, adopt an ordinance or resolution revoking the authority of the Tribe to conduct Class III gaming upon its lands and thereby terminate the compact.

[26] Section XXXIII of the Compact was amended to read:

In the event that Section XXV (Effective Date and Duration) of the 2003 Amendments is disapproved, in whole or in part, by the Secretary of the Interior or are found unenforceable or invalid by a court of competent jurisdiction, the State shall immediately refund any payments made by the Tribe to the State under Section XXXI.G.1.b., the Tribe shall not be required to make any further payments under Section XXXI.G.2., and the parties shall negotiate in good faith to reach agreement on substitute provisions for Sections XXV and XXXI.

Section XXXI.G.1.b. encompasses payments of $34.125 million on June 30, 2004 and $43.625 million June 30, 2005. Thus, if the state were to successfully challenge the duration provision five years from now, it would immediately owe the Tribe $77.75 million dollars under the term of the compact.

2003 amendments resembles a sort of poison pill, akin to what one might encounter in the world of corporate takeovers.[27] If the duration provision were somehow voidable, the financial penalty attending success in voiding it provides a serious barrier to pursuing that remedy.

¶ 76. The petitioners suggest that the Governor has irrevocably bound future legislatures and future governors, and as a result, has intruded upon the core powers of one branch and surrendered the core powers of the other to make or initiate policy, violating separation of powers principles. They assert that the Governor exercised power that he is constitutionally forbidden to exercise, even if the legislature intended to give him such power. According to the petitioners, the Governor has neither inherent nor delegated authority to agree to compact terms that place matters of public policy and statecraft outside of the legislature's ability to influence.

¶ 77. The Governor, however, asserts that giving up the periodic right to unilaterally withdraw from the FCP Gaming Compact does not offend the principles of separation of powers. The Governor relies on § 14.035 to support his position that the legislature intended him to exercise full discretion with respect to *any* Indian gaming compact negotiated under IGRA, and therefore also intended that he be given free rein to agree to compacts of whatever duration he deems reasonable. Moreover, the Governor points to similar

---

[27] A poison pill, used by corporations to defend against hostile takeovers, is a "conditional stock right that is triggered by a hostile takeover and makes the takeover prohibitively expensive." Thomas Lee Hazen, *The Law of Securities Regulation* § 11.20, at 575 (2d ed. 1990) *cited in Black's Law Dictionary* 1177 (7th ed. 1999).

agreements that demonstrate, as a general matter, that terms such as he negotiated in 2003 are not inherently unreasonable. For instance, the Governor directs our attention to interstate compacts as well as state-tribal gaming compacts from other states, both of which yield examples of states binding themselves to compacts of indefinite duration without any unilateral right to withdraw.

¶ 78. We agree with the petitioners that the Governor did not have the authority to commit the state to the type of duration term set forth in the 2003 amendments. However, we do not fully subscribe to the petitioners' rationale. The concern is not principally with the nature of the power given up.[28] The concern is that the Governor unexpectedly gave away power delegated to him so that the legislature cannot take it back. This action circumvents the procedural safeguards that insure that delegated power may be curtailed or reclaimed by future legislative action.

¶ 79. Under Wisconsin's contemporary nondelegation doctrine, the nature of the power delegated to another branch is not the primary focus of judicial review. The presence of adequate procedural safeguards is the paramount consideration.[29] If the Governor's

---

[28] The question whether the legislature itself could approve a gaming compact of indefinite duration is not presented by this case.

[29] However, the nature of the delegated power still plays a role in Wisconsin's nondelegation doctrine. Simply stated, there may be certain powers that are so fundamentally "legislative" that the legislature may never transfer those powers to another branch of government or, if they may, must be delegated with particular attention and specificity. *See, e.g., State ex rel. Unnamed Petitioners v. Connors,* 136 Wis. 2d 118, 121, 401 N.W.2d 782 (1987) (citing *State v. Lehtola,* 55 Wis. 2d 494, 498,

action with respect to the duration term were allowed to stand, all the procedural safeguards that might possibly rein in the Governor's authority would be ineffective. The legislature would be powerless to alter the course of the state's position on Indian gaming by repealing or amending § 14.035.[30] The electorate might be able to voice its displeasure, and the Governor might in theory pay a heavy political price, but the voters would be powerless to elect a governor who could impact the terms that had already been agreed to.

¶ 80. The Governor responds that other states have agreed to compacts with indefinite terms in which states have given up the right to unilaterally withdraw.

---

198 N.W.2d 354 (1972)), *reversed on other grounds, State v. Unnamed Defendant,* 150 Wis.2d 352, 441 N.W.2d 696 (1989); *Lister v. Board of Regents,* 72 Wis. 2d 282, 291, 240 N.W.2d 610 (1976); see also the section of this opinion addressing sovereign immunity, *infra.*

[30] The legislature twice attempted to amend § 14.035 to include a requirement that the legislature must approve any change to the gaming compacts, once on February 24, 2003, and again on March 14, 2003. The Governor vetoed both bills, and an attempt by the legislature to override one veto failed. If the legislature had succeeded in overriding the Governor's veto and amending § 14.035 to include a legislative-approval requirement; this change would have been ineffectual with respect to the 2003 amendments to the FCP Compact. The Governor and the Tribe reached agreement on February 19, 2003, five days *before* the legislature gave approval to the first attempt to amend § 14.035. In the absence of judicial review, the compacts would have continued until *both* the State *and* the Tribe mutually agreed to termination of the agreement, or until the Tribe exercised its unique ability to unilaterally withdraw. Thus, even having amended § 14.035, the legislature would be without the ability to require withdrawal from the compact without the assent of the Tribe. This paradigm lies at the heart of petitioners' claim with respect to the duration provision.

The parties have stipulated that Colorado, Connecticut, Idaho, Kansas, Minnesota, and Mississippi all have such provisions. However, without appellate decisions from these states approving of the process by which these terms were reached, we are unable to speculate as to whether these indefinite compacts comport with the law of their respective jurisdictions, much less Wisconsin. Simply stated, without more information, it is impossible to conclude that the processes by which these compacts were agreed to would withstand scrutiny in this state.

¶ 81. The Governor also compares compacts under IGRA to interstate compacts, many of which have binding terms of indefinite duration. Indeed, "[a]n interstate compact is an exception to the rule that one legislature may not restrict its successors." Jill Elaine Hasday, *Interstate Compacts in a Democratic Society: The Problem of Permanency,* 49 Fla. L. Rev. 1, 2 (1997). However appropriate or inappropriate it is to import the principles of interstate compacts into the tribal gaming compact area,[31] the fact that a *state* may, under the federal constitution, bind itself to another *state* as a matter of federal law,[32] does not mean that a *governor* may bind the state to a gaming compact with an Indian tribe indefinitely and without notice to or approval by the legislature. Further, while the Governor notes that

[31] For a thorough discussion of the similarities and differences between interstate compacts and state-tribal compacts under IGRA, see Rebecca Tsosie, *Negotiating Economic Survival: The Consent Principle and Tribal-State Compacts Under the Indian Gaming Regulatory Act,* 29 Ariz. St. L. J. 25, 55–63 (1997) (advocating that state-tribal compacts be examined under similar rationales as interstate compacts).

[32] *See generally State ex rel. Dyer v. Sims,* 341 U.S. 22 (1951).

"Wisconsin itself is a signatory to an interstate compact of indefinite duration, the Midwest Interstate Low-level Radiation Waste Compact," we understand that the legislature ratified this compact. Wis. Stat. § 16.10; *see also* § 14.76 (authorizing state agencies to "agree" to "compacts" not affecting the sovereignty of the United States, but subjecting such agreements to a legislative approval requirement before the agreements become effective); 5 *Wisconsin Statutes: Appendix* 6123 (2001–02) (listing active Interstate Compacts to which Wisconsin is a party, all of which have been ratified by the legislature).

¶ 82. We conclude that the legislature has not delegated to the Governor the authority to agree to a duration provision that circumvents the procedural safeguards that sustain the legislature's ability to delegate that power in the first place. We think it is extremely unlikely that, in the factual and legal atmosphere in which § 14.035 was enacted, the legislature intended to make a delegation that could terminate its ability to make law in an important subject area. *See* ¶¶ 19–20, *supra.*[33] If such a far-reaching delegation

---

[33] At oral argument, the Governor's counsel argued that by March of 1990, when the legislature enacted § 14.035, Minnesota had entered into at least one compact with an indefinite duration provision, thus alerting our legislature to the possibility of an indefinite-duration compact. The Governor has not, however, provided any documentary evidence of such a compact, or authority that indicates our legislature considered the Minnesota experience.

In fact, the earliest Minnesota gaming compacts we have located, from early 1990, were passed under the authority of Minn. Stat. § 3.9221. *See* http://www.ncai.org/main/pages/issues/governance/agreements/gaming_agreements.asp

were in fact intended, the delegation would be unconstitutional. The power to enter into tribal-state compacts under IGRA is legislative, and the Governor has no inherent authority to agree to bind the state. Without inherent authority, and in the absence of legislative delegation, the Governor was without authority to agree to the duration provision under the 2003 amendments.

4. Expansion of Permissible Class III Gaming

¶ 83. Under the 2003 amendments, the Governor agreed to several new Class III games such as keno, roulette, craps, and poker. The petitioners assert that the Governor lacked the authority to agree to new games that are expressly prohibited to the Wisconsin Lottery by the 1993 constitutional amendment to Article IV, Section 24.

¶ 84. Originally, petitioners argued that the Governor, acting alone under § 14.035, could not agree to the expansion of games in the FCP Gaming Compact. This was a traditional separation of powers argument. They expressly declined to take a position on whether the legislature alone, or acting in concert with the

---

(National Congress of American Indians website listing tribal-state gaming compacts). This statute provides in part:

> A compact agreed to on behalf of the state under this section *must* contain:
>
> (1) a provision recognizing the right of each party to the agreement, including the legislature by joint resolution, to request that the agreement be renegotiated or replaced by a new compact, and providing the terms under which either party, including the legislature, can request a renegotiation or the negotiation of a new compact.

Minn. Stat. Ann. § 3.9221 (emphasis added).

348

Governor, could have agreed to games prohibited to the Wisconsin Lottery under the 1993 constitutional amendment. Although we understand that petitioners did not want to constrain the legislature vis-à-vis future gaming negotiations in which it might participate, petitioners' reluctance to take a position prompted us to request additional briefs on the question whether Article IV, Section 24 made certain games uncompactable as a matter of Wisconsin law, thereby prohibiting *any* Wisconsin actor from agreeing to such games in an Indian gaming compact. Petitioners now concede that Article IV, Section 24 acts as a limitation on both the legislature and the governor, so that if one is prohibited by the provision, so is the other.

¶ 85. The Governor makes this same concession, stating "[I]f the Constitution prohibits the state from entering into compacts allowing certain games, it matters not whether the compact is approved by the executive branch or the legislative branch—or both, acting together. No branch of government may violate the Constitution."

¶ 86. The text of the constitution is absolutely clear: "Except as provided in this section, the legislature may not authorize *gambling* in any form." Wis. Const. art. IV, § 24 (emphasis added). Nothing in section 24 authorizes electronic keno, roulette, craps, and poker. These games are specifically denied to the Wisconsin Lottery. Wis. Const. art. IV, § 24(6)(c).[34]

---

[34] These games are also denied to the Wisconsin Lottery by statute. In 1992, prior to the 1993 amendment to Article IV, Section 24(6), the legislature amended the definition of "lottery" in chapter 565 of the Wisconsin statutes, portending the identical change that was to come in the constitutional amendment. At the time, after Judge Crabb's decision in *Lac du Flambeau* but before the 1993 constitutional amendment, two state rep-

¶ 87. Nonetheless, the Governor believes that Article IV, Section 24 does not prevent the state from

resentatives asked Attorney General Doyle his opinion as to the effect of such a change in statutory law on Indian gaming in general and the compacting process in particular. Letter from James E. Doyle, Attorney General, to Walter Kunicki, Speaker of the Wisconsin Assembly, and John Medinger, Chairperson of the Assembly Committee on State Affairs 1 (April 29, 1992) (on file with the Wisconsin Historical Society Archives, John D. Medinger Papers, Box 6, Folder 1).

Representatives Kunicki and Medinger posed a number of questions. For instance, they asked whether "the legislation prevent[s] the Governor from entering into compacts that authorize blackjack and electronic games with the three tribes that currently do not have compacts, if such compacts are not entered into [after the change in definition becomes effective]." Attorney General Doyle responded in part:

> The legislation will change, on its effective date, those games which are permitted in Wisconsin. After the effective date of the legislation the enumerated games, roulette, craps, banking card games, etc., will no longer be permitted in Wisconsin except as provided in the grandfather provision [pursuant to proposed § 565.01(6m)(c) regarding state-tribal gaming compacts]. At that point it will be unlawful for tribes to whom the statute applies to conduct those games and since their conduct is unlawful, the Governor is not required to negotiate over them.

*Id.* at 2.

The legislators also asked about existing compacts that "grant to the tribes the right to request that compacts be revised to permit additional games." They ask the prescient question: "Does the legislation prevent the Governor, through the negotiation process, from authorizing Indian tribes to conduct additional games?" Attorney General Doyle responded:

> The current legislation would not prevent the Governor from negotiating with the tribes over the adding of additional games to the compact so long as those games are permitted after the effective date of the legislation, or the additional games were

entering into a compact for additional types of games.[35] He contends that state law is not the last word on permissible Class III gaming. State law, he argues, exerts only an indirect influence on Indian gaming, that being the games the state is *required* to negotiate. As we understand the Governor's position, he believes Congress has empowered states to agree to games beyond the games the state is required to negotiate.

¶ 88. In *American Greyhound,* a United States District Court concluded that IGRA does not permit a

---

added prior to the effective date of the legislation. *If the games are not permitted after the effective date, the Governor would not be able to add them.*

*Id.* at 4 (emphasis added).

[35] In July of 1997, Attorney General Doyle spoke at a Federal Indian Law Seminar in San Diego, California. Attorney General James E. Doyle, Address at the Federal Indian Law Seminar, handout materials (July 30, 1997) (on file with the Wisconsin Historical Society Archives, Executive Staff of the Attorney General Working Files, 1970–1998, Series 2832). The focus of his speech was to update significant developments in Indian gaming law generally, and IGRA specifically. *Id.* at 1. The materials that were provided to attendees included a section entitled "Issues on the Horizon." Attorney General Doyle discussed one such looming issue as follows:

Changes in State Law Subsequent to Implementation of Compacts. *See e.g., Wisconsin Constitutional Amendment, Article IV, section 24(6)* (April, 1993).

This is an especially important issue when states and tribes are faced with renegotiation of expiring compacts. Does the new law apply to limit scope of gaming, or are the parties forced to negotiate under the law as it existed in 1988, when IGRA was passed into law?

*Id.* at 5. This text suggests that the effect courts would give to subsequent changes in state law remained an open question.

state to enter into compacts authorizing tribes to engage in gaming otherwise prohibited by state law. 146 F. Supp. 2d at 1067–68. Although this decision was subsequently vacated by the Ninth Circuit on other grounds, 305 F.3d 1015 (9th Cir. 2002), its analysis is persuasive. The court said:

> The court reads the [Arizona governor's] brief to assert that IGRA should be understood to require, at a minimum, a compact permitting tribes to engage in any class III gaming the State permits "for any person for any purpose." The minimum idea is crucial. The Plaintiffs, on the other hand, maintain that IGRA prohibits gaming under tribal-state compacts if such gaming is not permitted under state law. The Plaintiffs argue that Congress did not intend to create "jurisdictional islands" where community norms—as expressed in state law—are not enforced.
>
> The court conceives this question as whether IGRA establishes a ceiling for compact terms, or a floor. That is, whether IGRA permits states to offer only such games that are legal for any person for any purpose (a ceiling), or whether IGRA requires states to offer tribes terms equal to those granted their own citizens, plus allows states to agree to any additional gaming (a floor). For the reasons that follow, the court believes a ceiling view is mandated.

146 F. Supp. 2d at 1067 (record citations and footnote omitted).

¶ 89. The court discussed the structure of IGRA, then stated: "According to the structure of § 2710(d)(1) and its plain terms, a compact cannot make legal class III gaming not otherwise permitted by state law. The State must first legalize a game, *even if only for tribes,* before it can become a compact term." *Id.* (emphasis added). Other courts have come to similar conclusions.

*See United States v. Santee Sioux Tribe of Nebraska,* 135 F.3d 558, 564 (8th Cir. 1998); *Citizen Band Potawatomi Indian Tribe v. Green,* 995 F.2d 179, 181 (10th Cir. 1993); *United States v. Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation,* 33 F. Supp. 2d 862 (C.D. Cal. 1998)); *Hotel Employees and Restaurant Employees International Union v. Davis,* 981 P.2d 990 (Cal. 1999).

¶ 90. This conclusion is consistent with the 1990 opinion of Attorney General Hanaway, who opined that the Wisconsin constitution, in 1990, permitted the legislature to approve casino-type gambling "just within Indian country." Of course, *any* legislative authority the legislature had in 1990 was sharply curtailed by the 1993 amendment.

¶ 91. Neither the "ceiling" view nor the "floor" view of IGRA authorizes *any* state actor to create a monopoly for Indian tribes by superseding, disregarding, or violating fundamental state law. The only *obligation* that states have under IGRA springs from 25 U.S.C. § 2710(d)(1)(B), which is the same provision setting forth the scope of lawful gaming activity on Indian lands. Section 2710(d)(1)(B) provides that "[c]lass III gaming activities *shall be lawful* on Indian lands *only if* such activities are [among other requirements] (B) located in a State that *permits such gaming* for any purpose by any person, organization, or entity" *Id.* (emphasis added). Thus, under IGRA, there are in essence two categories of Class III games: those over which a state *must* negotiate with a tribe and those that are illegal to negotiate. Those games over which a state *must* negotiate are games permitted "for any purpose by any person, organization, or entity," including games permitted, *by law,* exclusively for tribes.

¶ 92. Thus, regardless of how one frames the question, the ultimate inquiry focuses on the "permits such gaming" language in 25 U.S.C. § 2710(d)(1)(B). Until very recently, the *Lac du Flambeau* case was the only case concluding that, once a state regulates one form of Class III gaming, the state must negotiate over all forms of Class III gaming.[36] *Compare Lac du Flam-*

[36] In *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. United States,* 2004 WL 909159, 367 F.3d 650 (7th Cir. April 29, 2004), the Seventh Circuit Court of Appeals upheld the constitutionality of the gubernatorial concurrence provision of IGRA. 25 U.S.C. § 2719(b)(1)(A). Near the end of its opinion, the court reprised the themes in *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin,* 770 F.Supp. 480, 487 (W.D. Wis. 1991), *appeal dismissed for want of jurisdiction,* 957 F.2d 515 (7th Cir. 1992), concerning *Cabazon,* § 2710(d)(1)(B), and Wisconsin public policy on gaming. *Id.* at 12.

The court's brief discussion was not central to its decision and did not analyze the many events that have transpired since the 1991 *Lac du Flambeau* case, including the multiple federal decisions that are contrary to that case. As we see it, *Cabazon* interpreted the effect of Pub. L. 280 on Indian gaming. IGRA superseded both Public L. 280 and *Cabazon* when it prescribed in detail the states' role in Indian gaming. Putting to one side the constitutional protections against the impairment of contracts, we do not understand IGRA to grant Indian tribes in Wisconsin the right to engage in gambling activities that are prohibited by the Wisconsin constitution and Wisconsin criminal statutes to all persons, organizations, and entities in the state.

The Seventh Circuit opinion appears to suggest that Wisconsin would have to amend its constitution to abolish the state-operated lottery and pari-mutuel betting and criminalize *all* Class III gaming in the state in order to regain some authority to prohibit any Class III gaming on Indian lands. The dissent in the present case goes further, taking the position that

*beau,* 770 F. Supp. at 486 *with Rumsey Indian Ranche-ria of Wintun Indians v. Wilson,* 41 F.3d 421, 427 (9th Cir. 1994), *amended,* 64 F.3d 1250 (9th Cir. 1995) and 99 F.3d 321 (9th cir. 1996) ("IGRA does not require a state to negotiate over one form of Class III gaming activity simply because it has legalized another, albeit similar form of gaming."); *Cheyenne River Sioux Tribe v. South Dakota,* 3 F.3d 273, 279 (8th Cir. 1993) ("The 'such gaming' language of 25 U.S.C. § 2710(d)(1)(B) does not require the state to negotiate with respect to forms of gaming it does not presently permit. Because video keno and traditional keno are not the same and video keno is the only form of keno allowed under state law, it would be illegal, in addition to being unfair to the other tribes, for the tribe to offer traditional keno to its patrons."); *Hull,* 146 F. Supp. at 1067, *vacated on other grounds,* 305 F.3d 1015, 1018 (9th Cir. 2002) (holding that compact cannot authorize forms of gaming not otherwise legal in state); *Coeur d'Alene Tribe v. Idaho,* 842 F. Supp. 1268, *affirmed,* 51 F.3d 876, 876 (9th Cir. 1995) (holding that state was required to negotiate only with respect to specific Class III games that were permitted in the state). Accordingly, the continued vitality of *Lac du Flambeau's* holding is very doubtful, and the decision's statements regarding Wisconsin's policy toward gaming have been seriously undercut by the 1993 amendment to Article IV, Section 24.[37]

even this step would be unavailing because the 1992 Compact's amendment provisions are uninhibited and unaffected by *any* subsequent change in state law, including constitutional amendments. The vindication of either of these views would emasculate state sovereignty in our federal system.

[37] Other developments in this area of law contribute to the erosion of the legal and factual framework that existed in 1992 when Judge Crabb issued the *Lac du Flambeau* decision. For

¶ 93. Unlike the expansive interpretation of the term "lottery" that was at least plausible before 1993, *see Lac du Flambeau,* 770 F. Supp. at 486, our constitution is now quite clear that the legislature may not authorize any *gambling* except that permitted by Article IV, Section 24, and is very clear that certain games do not fall under the term "lottery" in Article IV, Section 24(6). The constitution is now specific about what the state-operated lottery may do and what it may not do. Blackjack and other varieties of banking card games, poker, roulette, craps, keno and slot machines are all games specifically outside the scope of Section 24(6)'s authorized exception, and they do not come within any other exception. Wis. Const. Art. IV, § 24(6)(c). Thus, the legislature may not authorize new casino-type gambling in any form. No exception to the state constitution can be marshaled to support legislative authorization of new casino-type gambling to Indian tribes. The Tribe's existing games such as slot machines and blackjack must be sustained on the basis of the validity of the original compacts, which were negotiated pursuant to court order before the 1993 constitutional amendment, as well as constitutional and contract law.

instance, in 1996, the United States Supreme Court handed down a landmark sovereign immunity decision in *Seminole Tribe v. Florida,* 517 U.S. 44 (1996). In that case, the Court held among other things that the Indian Commerce Clause, the authority under which Congress enacted IGRA, does not empower Congress to abrogate a state's Eleventh Amendment immunity. As a result, unless a state consents to suit, an Indian tribe may not enforce IGRA against states in federal court. This decision continues to color our understanding of the dynamics of federalism at play under IGRA.

¶ 94. Article IV, Section 24 embodies a strong state policy against gambling. It prohibits the legislature from authorizing gambling in any form except as permitted in the constitution. Wis. Const. Art. IV, § 24(1). This policy is enforced in ch. 945's criminal statutes.

¶ 95. We might engage in analysis of whether Article IV, Section 24 is self-executing. *See Kayden,* 34 Wis. 2d at 724. That is, does the constitutional limitation on legislative power to authorize gambling create barriers to gambling activities of our state's citizens without concomitant legislative enactments? Suffice it to say that repealing *all* criminal gambling statutes in order to *permit* expanded gambling might not be consistent with the constitutional limitation on legislative power to authorize gambling, because the current criminal statutes on gambling predate the 1993 amendment and repeal of these statutes now might be viewed as tantamount to authorization. Thus, it might be argued that our state's criminal prohibitions have remained in place since 1993 not only by legislative will but also because the state constitution forbids the legislature from rolling back these criminal prohibitions.

¶ 96. In any event, the legislature has not repealed the gambling statutes in ch. 945. Hence, the Governor's agreement to the additional games of keno, roulette, craps, and poker in 2003 was contrary to criminal/prohibitory sections of state law in addition to the constitution. It is beyond the power of any state actor or any single branch of government to unilaterally authorize gaming activity in violation of the policy in Wisconsin's criminal code. The governor may not carve out exceptions to the state's criminal statutes unilater-

ally. We are unable to conclude that the legislature delegated such power or could delegate such power in light of the 1993 constitutional amendment.

¶ 97. Article V, Section 4 of the constitution directs that the governor "take care that the laws be faithfully executed." Accordingly, we conclude that the Governor acted without authority by agreeing to games that are, as reflected in our state's criminal statutes and reinforced by its constitution, prohibited to everyone in the state. The new casino-style games the Governor agreed to in 2003 are expressly forbidden by statute. Thus, the Governor was without authority to agree, on behalf of the state, to add variations on blackjack, electronic keno, roulette, craps, poker, and other non-house banked card games under the 2003 Amendments to the FCP Gaming Compact. By contrast, the Governor was clearly authorized to agree to pari-mutuel wagering on live simulcast horse, harness and dog racing, because this is an activity permitted in Wisconsin. *See* Wis. Stat. § 562.057.

¶ 98. Our holding today raises inevitable questions about the validity of the original 1992 FCP Gaming Compact and the 1998 amendments thereto. Clearly, the 1992 Compact encompasses games that were and are precluded under our state's criminal statutes.[38]

¶ 99. The 1992 Gaming Compact was negotiated under a constitutional § 14.035, and pursuant to an order of the United States District Court. An action to challenge the substance of the *Lac du Flambeau* decision in this court was unavailing, and that case is over.

---

[38] The petitioners concede the validity of the 1992 compact and the 1998 amendments, and we have not as yet been presented with a persuasive case to conclude otherwise.

Both the tribes and the state have relied on the validity of the original compacts. Any attempt at this point to impair these compacts would create serious constitutional questions.

¶ 100. Two pieces of legislation signal legislative approval of the original compacts. Wisconsin Stat. § 992.20(1) validates "[a]ll contracts for the . . . joint exercise of any power or duty required or authorized by law entered into by a municipality, as defined in s. 66.0301(1)(a), and a federally recognized Indian tribe or band in this state before May 6, 1994." Wis. Stat. § 992.20(1). The term "municipality" expressly includes the state of Wisconsin, and we think it axiomatic that a compact is a form of contract. Wis. Stat. § 66.0301(1)(a).[39] Furthermore, IGRA expressly contemplates that tribal-state gaming compacts "may include provisions relating to . . . the allocation of criminal and civil jurisdiction between the State and the

---

[39] Section 66.0301(1)(a) provides that

*"municipality" means the state* or any department or agency thereof, or any city, village, town, county, school district, public library system, public inland lake protection and rehabilitation district, sanitary district, farm drainage district, metropolitan sewerage district, sewer utility district, solid waste management system created under s. 59.70(2), local exposition district created under subch. II of ch. 229, local professional baseball park district created under subch. III of ch. 229, local professional football stadium district created under subch. IV of ch. 229, a local cultural arts district created under subch. V of ch. 229, family care district under s. 46.2895, water utility district, mosquito control district, municipal electric company, county or city transit commission, commission created by contract under this section, taxation district, regional planning commission, or city-county health department.

Wis. Stat. § 66.0301(1)(a) (emphasis added).

Indian tribe," and the compact thus involves a joint exercise of power authorized by law. 25 U.S.C. § 2710(d)(3)(C)(ii).

¶ 101. The legislature also demonstrated an intention to recognize the original compacts by virtue of Wis. Stat. § 565.01(6m), in which the legislature excepted tribal compacts from the definition of "lottery" as narrowed in the statutes *prior* to the passage of the 1993 constitutional amendment. Wis. Stat. § 565.01(6m)(c).[40] In 1992, the legislature was, in theory, able to authorize the Wisconsin Lottery to operate any game that contained the elements of prize, chance, and consideration. Had it done so, the state would have been obligated to negotiate these games under IGRA.

¶ 102. Thus, we do not believe the 1992 compact suffered from any infirmity under state law when it was entered into. Whether the 1992 compact is durable enough to withstand a change in state law that alters our understanding of what is "permitted" in Wisconsin is a separate question. The resolution of this question is likely to turn, at least in part, on the application of the impairment of contracts clauses in the United States and Wisconsin Constitutions as well as IGRA. Because these issues are not before us, and because they may turn in large measure on unresolved questions of federal law, our decision stops short of resolving these important questions.[41]

---

[40] Wisconsin Stat. § 565.01(6m)(c) provides: "This subsection shall not affect the provisions of any Indian gaming compact entered into before January 1, 1993, under section 14.035."

[41] The Supreme Court's decision in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44 (Fla. 1996), changes the dynamics of a gaming dispute between a tribe and a state. Such a

## 5. Sovereign Immunity

¶ 103. The petitioners assert that, in addition to amending the duration and scope of gaming provisions of the FCP Gaming Compact, the Governor intruded into the legislative domain by agreeing to waive Wisconsin's sovereign immunity. *See* Wis. Const. art. IV, § 27 ("The legislature shall direct by law in what manner and in what courts suits may be brought against the state."). The Governor concedes that only the legislature may waive the state's sovereign immunity but argues that the state's sovereign immunity remains intact under the 2003 Amendments.[42]

¶ 104. The operative provision of the Compact in this regard is Section XXIII.C, entitled "Sovereign Immunity; Compact Enforcement." In 1992, this provision read: "Except as provided [in a section where the Tribe waived its sovereign immunity], neither the State nor

dispute is now more likely to be resolved in a state court than before the *Seminole Tribe* decision. We believe this case is dominated by questions of state law, which the Wisconsin Supreme Court has the right and duty to resolve. The dissent disagrees. The dissent can take solace in the fact that if the Governor believes this case improperly raises or incorrectly decides questions of federal law, the Governor may seek review in the United States Supreme Court.

[42] The Governor asserts that irrespective of whether he waived the state's sovereign immunity in the 2003 Amendments, that claim would not ripen until the Tribe attempted to employ the challenged provision. However, given the dissent's belief that the current action represents only a layover on the journey to federal court, it is important that this court take the opportunity to decide this important question of state law. If this court were to wait until this dispute gets into federal court, as the dissent predicts it will, then this court would be denied the opportunity to examine and interpret Wisconsin's constitution.

the Tribe waive their sovereign immunity, under either state or federal law, by entering into this Compact and no provision of this Compact is intended to constitute a waiver of State or Tribal sovereign immunity." In 2003 the Governor and the Tribe agreed to amend this provision to read: "The Tribe and the State *expressly waive any and all sovereign immunity* with respect to any claims brought by the State or the Tribe to enforce any provision of this Compact." This initial version of the 2003 Amendments with respect to sovereign immunity constituted a 180° change in course.

¶ 105. After the petitioners filed their petition for an original action, which challenged the Governor's authority to commit the state to the above waiver, the compact was amended to read "The Tribe and the State, *to the extent the State or the Tribe may do so pursuant to law,* expressly waive any and all sovereign immunity with respect to any claim brought by the State or the Tribe to enforce any provision of this Compact." The Governor contends that the additional subordinate clause sufficiently mitigates the thrust of the sentence's original subject and predicate to negate the waiver that resulted before the language was added.

¶ 106. We disagree. If the parties intended to negate entirely the initial waiver, they failed.

¶ 107. The qualifying language does *not* read "to the extent the *Governor* may waive sovereign immunity pursuant to law." If it did, we would agree that the parties had effectuated a significant linguistic restriction to the body of the sentence. This is not how the language reads. The qualifying language—"to the extent the State or Tribe may do so pursuant to law"— does little, if anything, to alter the meaning of the original sentence. Because the state may waive sovereign immunity pursuant to law, the added language

does not change the meaning of the sentence. The latest version of Section XXIII.C still purports to waive the state's sovereign immunity, and its qualifying language is nugatory.

¶ 108. Only the legislature may exercise the authority to waive sovereign immunity on behalf of the state. *State v. P.G. Miron Const. Co.,* Inc., 181 Wis. 2d 1045, 1052, 512 N.W.2d 499 (1994); *Lister v. Board of Regents,* 72 Wis. 2d 282, 291, 240 N.W.2d 610 (1976); *State ex. rel. Teaching Assistants Association v. The University of Wisconsin-Madison,* 96 Wis. 2d 492, 509, 292 N.W.2d 657 (Ct. App. 1980) (citing *Fiala v. Voight,* 93 Wis. 2d 337, 342, 286 N.W.2d 824 (1980)). Such legislative consent to suit must be express. *Miron,* 181 Wis. 2d at 1052–53; *Fiala,* 93 Wis. 2d at 342–43.

¶ 109. There is a fundamental legislative character to an action waiving sovereign immunity under our constitution. Consequently, our case law has made clear that the legislature may not inadvertently dispossess itself of this power. *Teaching Assistants Association,* 96 Wis. 2d at 514. When the legislature wishes to authorize a designated agent to waive the state's sovereign immunity, it must do so clearly and expressly. *See Lister,* 72 Wis. 2d at 282. "[T]he legislature is the proper body to authorize suits against the state. An agency or officer of the state may not waive the state's immunity from suit unless *specifically* authorized to do so." *Id.* at 294 (emphasis added); *see also Teaching Assistants Association,* 96 Wis. 2d at 515.

¶ 110. In the absence of a clear grant of authority from the legislature, the Governor exercised a core

power of the legislature, and as such his action cannot stand. The Governor lacked any inherent authority to waive the state's sovereign immunity. Thus, under state law, Section XXIII.C is void.[43]

¶ 111. Section XXIII.D provides that "[t]hese enforcement mechanism are an essential part of this Compact, and if they are found unenforceable against the Tribe or the State, or should the courts otherwise determine they lack jurisdiction to enforce the Compact, the parties will immediately resume negotiations to create a new enforcement mechanism." This statement is telling. Because we have found that one component of the Compact's sovereign immunity/enforcement mechanism provision is unenforceable against the state, the parties have agreed that they will return to the bargaining table to craft a new enforcement mechanism.[44]

---

[43] The petitioners have also raised a claim with respect to the provision in the Compact providing that

> If the State fails to comply with an award of the tribunal, other than an award to pay money to the Tribe, and asserts the State's sovereign immunity, then the tribunal, upon the application of the Tribe, may issue an order requiring the State to pay the Tribe a sum of money as liquidated damages.

We do not address this provision directly today. Suffice it to say that, like Section XXIII.C addressed in the text, it is invalid if it waives the state's sovereign immunity.

[44] The Governor also agreed to other provisions relating to sovereign immunity. Section XXIII.A provides:

> This Compact does not alter any waiver of either State or Tribal immunity which may have been effectuated by Congress in passing the Act. This Compact in no way limits the application of 25 U.S.C. sec. 2710(d)(7)(A) [1991] which the parties believe provides an enforcement mechanism for violation of this Compact.

## 6. Future Appropriations

¶ 112. The petitioners assert that certain terms of the 2003 Amendments intrude into the domain of the legislature in that they appropriate state funds in violation of separation-of-powers principles. Because we have declared that the Governor acted outside his authority in agreeing to certain provisions in the 2003 Amendments to the FCP compacts, we anticipate that the parties will, as a result of this decision, renegotiate the terms of any amendments to the FCP Gaming Compact, which will roll over automatically. Given the centrality of the duration, additional games, and sovereign immunity provisions in the scheme of the 2003 amendments, it is likely that any subsequent amendments will have different terms,[45] including the re-

This provision is not problematic insofar as it does not independently waive sovereign immunity.

We note that, in view of the United States Supreme Court's decision in *Seminole Tribe v. Florida,* 517 U.S. 44 (1996), Section XXIII.A states a view of the law contrary to that case. In *Seminole Tribe,* the Court concluded that Congress could not abrogate a state's sovereign immunity. A Tribe could not force a state into federal court under 25 U.S.C. § 2710(d)(7). The parties are free to agree that they believe that ruling does not exist, but *Seminole Tribe* is still good law.

[45] We note the evolving nature of these provisions in response to litigation up to today. Shortly after the petitioners filed suit, for instance, the sovereign immunity provision was changed. Before the suit, the sovereign immunity section read "The Tribe and the State expressly waive any and all sovereign immunity with respect to any claims brought by the State or the Tribe to enforce any provision of this Compact." After the suit, the compact was amended to read "The Tribe and the State, *to the extent the State or the Tribe may do so pursuant to law,*

maining disputed provision. We therefore do not address this issue at this time.[46]

## CONCLUSION

¶ 113. We agree with the petitioners that the Governor, in agreeing to a provision in the 2003 amendments to the FCP Gaming Compact that precluded any periodic opportunity for the state to withdraw from the compact, violated the principles of separation of powers. The Governor was without authority to agree to Section XXV of the February 2003 amendment to the FCP Gaming Compact because it created in effect a perpetual compact. We also find that several of the additional games included in the February 2003 and April 2003 Amendments to the FCP Gaming Compact are not compactable as a matter of state law, because they violate both the constitution and the criminal code, and accordingly we declare that the Governor had no authority to agree to Section IV.A.5, IV.A.7, and IV.A.8 as set forth in those 2003 amendments. Finally, we conclude that the Governor agreed to waive the state's sovereign immunity in Section XXIII.C, an action which he did not possess inherent or delegated power to undertake. Although the petitioners raise

expressly waive any and all sovereign immunity with respect to any claim brought by the State or the Tribe to enforce any provision of this Compact."

[46] This decision does not invalidate any games authorized by the 1992 compact or the 1998 amendments thereto. It does not formally resolve one issue raised by the petitioners in this case. In its Appendix, the dissent addresses this issue and many others. The dissent's discussion does not settle issues not addressed by a majority of the court.

366

other challenges, we defer decision on those challenges because the amendments to the compact are likely to be renegotiated.

*By the Court.*—Rights declared; declaratory relief granted, injunctive relief denied.

¶ 114. SHIRLEY S. ABRAHAMSON, C.J., ANN WALSH BRADLEY, J., and N. PATRICK CROOKS, J. *(dissenting).* The sum total of the majority opinion is to deliver the following bad news to the people of the State: all bets are off. Or at least, all new bets in the 2003 amendments are off.

¶ 115. A majority of the court devotes more than a third of its lengthy opinion to recounting the long history of gaming in the State of Wisconsin. Its factual diversions mask its inconsistent patchwork of legal analysis.

¶ 116. The practical consequences of the majority opinion are as breathtaking as its legal analysis.

### I. Summation: All Bets Are Off

¶ 117. As a result of the majority opinion, the Tribe's payment to the State of $34.125 million due on June 30, 2004, need not be paid.[1] Almost $207 million of direct tribal payments to the State, upon which the legislature relied in adopting the budget, are in jeopardy, as is approximately $100 million annually thereafter.[2] Employment in the State will also be dramatically affected by the majority opinion. The Tribe estimates that gaming compacts have created 35,000

---

[1] *See Forest County Potawatomi Community of Wisconsin & State of Wisconsin Gaming Compact of 1992* (hereinafter "*Compact*") Section XXXI.G.1.b. *as amended* by No. 8 (5/30/03).

[2] Stipulation, ¶ 28.

jobs in the State to date and that the 2003 amendments will add 20,000 more jobs and a billion dollars in new investments.

¶ 118. The majority opinion's ruling against Indian gaming not only will have an enormous effect on the state and local economies but also will interfere with federal and state policies promoting the economic welfare of the Indian tribes and Indian education.[3]

¶ 119. In its desperation to save the 1992 compact and the 1998 amendments, and yet to invalidate the 2003 amendments, the majority has gone well beyond the issues originally presented in this case.

¶ 120. The majority has imported the *Dairyland Greyhound Park, Inc. v. Doyle*[4] issue into the case at hand, namely whether Wisconsin Constitution Article IV, § 24 prohibits the 1998 amendments as well as any extension or renewal of the 1992 compact. The majority opinion swings from saying it does not decide this issue[5] to nearly saying that the 1998 amendments negotiated by Governor Thompson are valid.[6] The majority opinion states that no persuasive argument has been presented invalidating the 1992 compacts and the 1998

---

[3] *See* 25 U.S.C. §§ 2701, 2702; Brief of the Green Bay area Wisconsin Citizen Action and Bay Area Workforce Development Board; Brief of City of Milwaukee and Milwaukee County Opposing Amended Petition for Original Jurisdiction; Joint Brief of Milwaukee Building & Construction Trades Council, Teamsters Local Union Nos. 200 and 344, Menomonee Valley Partners, Inc., Professional Firefighters of Wisconsin, Inc., and Indian Community School of Milwaukee, Inc.

[4] 2004 WI 34, 270 Wis. 2d 267, 677 N.W.2d 275.

[5] Majority op. ¶ 102.

[6] *Id.,* ¶ 93.

amendments,[7] but also states that the durability of the 1992 compact is a separate unanswered question, turning in part on the impairment of contracts clauses and IGRA.[8]

¶ 121. It is difficult to reconcile the opinion of the justices in the majority in the present case with their position in *Dairyland*.[9] Dairyland attacked the continued validity of the 1992 compact and 1998 amendments in light of the 1993 constitutional amendment.[10] The circuit court in *Dairyland* concluded that the compacts and 1998 extensions were still valid despite the 1993 constitutional amendment.[11] When the *Dairyland* case reached this court, three members of the majority voted

---

[7] *Id.,* ¶ 98, n. 37.

[8] *Id.,* ¶ 102.

[9] *See Dairyland Greyhound Park v. Doyle,* 270 Wis. 2d 267.

[10] The issue in the present case is different from that in *Dairyland.* The petitioners' brief clearly makes this point: "Gaming as permitted by the older compacts would not be eliminated by this lawsuit. This petition and challenge to the Governor's actions is unlike the remedy sought in the *Dairyland* [case]. . . an action being considered alongside this petition."

The petitioners further wrote in supplemental briefing: "The appellants in *Dairyland* address the broader question or issue that includes whether the initial games approved in the 1992 Compacts such as blackjack and slot machines must be prohibited due to the substantial policy change that occurred with the 1993 constitutional amendment."

[11] The order of the circuit court was entered on February 11, 2003, before the 2003 amendments were adopted. The circuit court denied Dairyland "injunctive relief preventing the Governor from extending or renewing the compacts presently in place." *Dairyland Greyhound Park v. Doyle,* No. 01–CV-2906, unpublished order (Dane Co. Cir. Ct. Feb. 11, 2003) at 18.

In the certification to this court the court of appeals states:

369

to reverse the judgment of the circuit court, and one member in the majority recused himself altogether. Those same justices now appear to be reversing their reversal and signaling that the compacts and the 1998 amendments are still permissible. Yet the reasoning of the majority opinion invalidating the 2003 amendments invalidates the 1992 compact and 1998 amendments. Where do these contradictory signals emitted by the majority leave the court of appeals when on remand it must decide *Dairyland?*

¶ 122. In sum, the majority's analysis cannot withstand scrutiny. Why is it unconstitutional for Governor Doyle to negotiate the 2003 amendments authorizing games outlawed by the 1993 Wisconsin constitutional amendment and yet it was constitutional for Governor Thompson to have negotiated the 1998 amendments authorizing games similarly outlawed? In light of the majority opinion, if any Indian gaming

In this lawsuit, Dairyland Greyhound Park seeks to enjoin Governor Doyle from renewing or extending any of the gaming compacts beyond their five-year terms. It contends that Wisconsin withdrew the necessary permission for Class III gaming activities by amending the constitution in 1993, such that the *Lac du Flambeau* decision no longer controls. The trial court disagreed and held that the amendments to article IV did not affect the gaming compacts or their extension. Applying *Lac du Flambeau,* the court ruled that permission for Class III gaming still flowed from the State's lottery and dog track betting. That holding is the subject of Dairyland's appeal.

Dairyland's brief before this court states the issue as follows: "whether the Governor has authority to amend or extend Indian gaming compacts which allow forms of gambling that are illegal under Wisconsin law." Dairyland concludes its brief that "the interests of all Wisconsin's citizens demand that the trial court's decision be reversed."

whatsoever is to be permitted in Wisconsin in the future, it may be only because of the intervention of the federal courts.

¶ 123. The majority opinion correctly concludes that Wis. Stat. § 14.035, which authorizes the Governor to compact with the tribes, is constitutional. Nevertheless, ignoring the fact that the Wisconsin Constitution charges the governor with the responsibility to expedite matters as may be resolved by the legislature and to ensure that the laws be faithfully executed, the majority strikes down three provisions of the compact: the duration of the compact; the addition of new games; and the provision regarding sovereign immunity.

¶ 124. In contrast, we conclude that the Governor properly exercised his power pursuant to Wis. Stat. § 14.035. Likewise, the duration provision is valid, as similar provisions are commonplace and recognize the government's need to enter into long-term contracts. Furthermore, the majority's application of the 1993 Wisconsin constitutional amendment to outlaw certain gaming substantially impairs the contractual relationship between the State and the Tribe and violates the federal and state constitutional impairment of contracts clause. Finally, the issue of sovereign immunity is not ripe and fails on the merits. Thus we conclude that the 2003 amendments are valid and that the majority opinion raises substantial federal issues, rendering this court a stopping point on the parties' way to the federal courts.

¶ 125. To assist the reader we set forth a table of contents to this dissent:

II. Facts: ¶¶ 13–15

III. Constitutionality of Wis. Stat. § 14.035: Delegation of Power: ¶¶ 16–57

371

IV. Validity of Duration Provision: ¶¶ 58–80

V. Validity of Adding Games: Wis. Const. Art. IV,
 § 24 & the Impairment of Contracts: ¶¶ 81–122

VI. Federal Issues: ¶¶ 123–137

VII. Sovereign Immunity: ¶¶ 138–142

VIII. Conclusion: ¶ 143

Appendix:

IX. Severability: ¶¶ 144–156

X. Appropriations: ¶¶ 157–165

## II. Facts

¶ 126. It is important first to state the significant relevant facts to understand the majority opinion's limited legal analysis. When the facts are clearly and concisely set forth, it is readily seen that the majority opinion has exaggerated and mischaracterized the differences among the 1992 compact, the 1998 amendments, and the 2003 amendments. Furthermore, it is evident that the 2003 amendments are valid.

¶ 127. Simply stated, the following are the facts relevant to the resolution of this case:

- **1987 Wisconsin Constitutional Amendment**. In 1987, the Wisconsin Constitution was amended to authorize pari-mutuel betting and a state-operated lottery.[12]

---

[12] Wis. Const. Art. IV, § 24(6)(a)&(b).

- *California v. Cabazon Band of Mission Indians*.[13] The United States Supreme Court held that states lack authority over tribal gaming within Indian reservations if the state's policy was to regulate gaming rather than prohibit it outright.

- **1988 Indian Gaming Regulatory Act (IGRA)**.[14] Congress declared Class III gaming on Indian lands valid if such activities are located in a state that permits such gaming for any purpose by any person.

- **Wisconsin Stat. § 14.035 (1989)**. The Wisconsin legislature authorized the governor to enter into compacts with tribes negotiated under IRGA as follows:

 > Wis. Stat. § 14.035. The governor may, on behalf of this state, enter into any compact that has been negotiated under 25 USC 2710(d).[15]

 The legislature rejected proposed amendments to Wis. Stat. § 14.035 that would have required legislative ratification of compacts negotiated by the governor.[16]

---

[13] 480 U.S. 202 (1987).

[14] 25 U.S.C. §§ 2701–2721.

[15] 1989 Wis. Act 196. Both of the petitioners in this case voted in favor of enacting this statute.

[16] *See* Proposed Assembly Amendment 1 to 1989 Assembly Bill 927; Proposed Senate Amendment 1 to 1989 Assembly Bill 927.

373

- **1991 *Lac du Flambeau* case.**[17] In 1991, the federal district court for the Western District of Wisconsin concluded that by authorizing a lottery in the State, Wisconsin had adopted a regulatory, rather than prohibitive, approach to gambling and that the State was required to negotiate in good faith with the tribes over Class III gaming activities.

- **Governor Thompson's 1992 compact.** The 1992 compact with the Forest County Potawatomi Tribe (hereinafter Tribe) included the following provisions relating to the duration of the compact, the games, and the effect of future changes of state or tribal law on the compact:

 1. The Tribe may operate Class III gaming only while the compact or any extension is in effect.[18]

 2. The compact continues for an indefinite term.[19]

 3. The compact shall not be modified, amended or altered without the prior written agreement of both the State and the Tribe.[20]

---

[17] *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 770 F. Supp. 480, 486 (W.D. Wis. 1991).

Prior to this decision, Governor Thompson refused to negotiate compacts with the Tribes.

[18] *Compact* Section XXV.D.

[19] *Compact* Section XXV.B.

[20] *Compact* Section XXX.

4. The compact may cease if either party serves the other with written notice of nonrenewal at prescribed five-year intervals.[21]

5. In the event of nonrenewal, the Tribe may request the State to enter into negotiations, and the State shall negotiate with the Tribe in good faith under IGRA.[22]

6. If a successor compact is not concluded, the Tribe may sue the State in federal court,[23] and the compact remains in effect until the procedures set forth in IGRA are exhausted.[24]

7. The Tribe may operate certain electronic games of chance with video facsimile or mechanical displays, blackjack, and pull-tabs or break-open tickets, each of which is a Class III game.[25]

8. The compact provides for change of state law: "To the extent that State law or Tribal ordinances, or *any amendments thereto,* are inconsistent with any provision of this Compact, this Compact shall control."[26]

- **1993 Wisconsin Constitutional Amendment:** The Wisconsin Constitution was amended to prohibit the legislature's authoriza-

---

[21] *Compact* Section XXV.B.

[22] *Compact* Section XXV.E.

[23] *Id.*

[24] *Id.*

[25] *Compact* Section IV.

[26] *Compact* Section XXVI (emphasis added).

375

tion of gaming except in certain forms.[27] The application of the constitutional amendment to existing Indian gaming compacts is not clear from either the text of the amendment or the debate on the amendment during its adoption.

- **Governor Thompson's 1998 amendments to the compact**. In 1998, pursuant to Section XXX, Governor Thompson and the Tribe amended the 1992 compact, principally adding games and increasing tribal payments to the State. Significant provisions include:

 1. Blackjack tables were authorized on Menomonee Valley Land where they had been explicitly prohibited by the 1992 compact.[28]

 2. The number of electronic games of chance was increased from 200 to 1,000.[29]

- **Governor Doyle's 2003 amendments to the compact**. In 2003, pursuant to Section XXX, Governor Doyle and the Tribe further amended the 1992 compact as follows regarding the duration of the compact, the addition of games, and the State's sovereign immunity:

 1. The compact continues for an indefinite term.[30]

---

[27] Wis. Const. Art. IV, § 24.

[28] *See Compact* Section XVI.B.1. (original) and *as amended* by No. 5 (1998). Thus, contrary to the majority op., ¶ 32, the 1998 amendments did grant the Tribe permission to operate an additional type of game at one of its sites.

[29] *See Compact* Section XV.H. (original) and *as amended* by No. 3 (1998).

[30] *Compact* Section XXV.A. *as amended* by No. 13 (2/19/03).

2. Amendments to the compact may be proposed at each fifth annual anniversary "to enhance the regulation of gaming."[31]

3. Amendments to "any provision of the compact" may be proposed at each 25th annual anniversary by the Tribe or the governor as directed by a session law of the Wisconsin legislature.[32]

4. The compact may be terminated by mutual agreement of the parties.[33]

5. The Tribe and the State shall enter into good faith negotiations about any proposed amendment about which they do not reach agreement, and disputes over the obligation to negotiate in good faith may be resolved by binding arbitration under Section XXII.A. of the compact.[34]

6. Several Class III games were added, including, for example, electronic keno, variations on the game of blackjack, pari-mutuel wagering on live simulcast racing events, roulette, and poker.[35]

7. The Tribe and State agreed to waive sovereign immunity with respect to any claim

---

[31] *Compact* Section XXX.D.1. *as amended* by No. 14 (2/19/03).

[32] *Compact* Section XXX.D.2. *as amended* by No. 14 (2/19/03).

[33] *Compact* Section XXV.B. *as amended* by No. 13 (2/19/03).

[34] *Compact* Section XXX.D. *as amended* by No. 14 (2/19/03).

[35] *Compact* Section IV.A. *as amended* by No. 2 (2/19/03).

brought to enforce the compact to the extent that the Tribe and State could do so pursuant to law.[36]

- **Legislative ratification of compacts**. The legislature initially ratified the 1992 compact and 1998 amendments through its actions of establishing and continuing a director of Indian gaming. It then ratified the 2003 amendments by approving the biennium budget, which includes funds generated by the new provisions. The legislature did all of this without objection.[37]

- **Legislative attempts to amend Wis. Stat. § 14.035**. In 2003, the legislature twice attempted to amend Wis. Stat. § 14.035, but was unable to obtain the requisite votes to override the governor's veto.[38]

¶ 128. We examine each legal argument presented by the majority opinion in turn: the constitutionality of Wis. Stat. § 14.035 as a violation of the delegation of power doctrine; the validity of the duration provision of the 2003 amendments to the compact; the validity of the games added by the 2003 amendments to the compact; and the validity of the provision concerning sovereign immunity. We conclude that the 2003 amend-

---

[36] *Compact* Section XXIII.C. *as amended* by No. 6 (5/28/03).

[37] 2003 Senate Bill 44. Both petitioners voted for this, which relies on payments from all Wisconsin Tribes totaling $206,938,200 over the biennium.

[38] 2003 Senate Bill 41. Vetoed on February 28, 2003. Failed override vote on March 4, 2003.

2003 Assembly Bill 144. Vetoed on March 18, 2003. No legislative attempt to override the veto.

ments are valid and that the majority opinion raises substantial federal questions.

### III. Constitutionality of Wis. Stat. § 14.035: Delegation of Power

¶ 129. We turn first to the issue of whether Wis. Stat. § 14.035 violates the Wisconsin Constitution. We conclude, as does the majority opinion, that the statute is constitutional. We disagree with the majority's reading "implicit limits" into Wis. Stat. § 14.035, and are perplexed as the majority shifts between reading in these "implicit limits" as a matter of constitutional necessity[39] and as a matter of statutory interpretation of legislative intent.[40]

¶ 130. The petitioners, Senator Panzer and Representative Gard, ask this court to declare Wis. Stat. § 14.035 an invalid delegation of legislative power to the Governor; to declare that the Governor "lacked authority to agree to the Compact with the Potawatomi Tribe;" and to declare the compact "invalid." In sum, they contest the Governor's authority to make binding compacts without a more substantial legislative analysis and blessing than contained in Wis. Stat. § 14.035.

¶ 131. The issues raised by the petitioners pose a basic dilemma for the majority, a dilemma the majority opinion fails to disclose: Senator Panzer and Representative Gard challenge the constitutionality of Wis. Stat. § 14.035, yet they have no authority to do so. The general rule is that Wisconsin public officers "cannot question the constitutionality of a statute unless it is their official duty to do so, or they will be personally affected if they fail to do so and the statute is held

---

[39] Majority op., ¶ 60, n. 22.

[40] *Id.*, ¶ 82.

379

invalid."[41] These petitioners have no official duty to question the constitutionality of the statute; their private rights are not involved.[42] The petitioners' duty as legislators is to enact constitutional laws. Under our precedents, the petitioners do not now get a chance to challenge the constitutionality of a law enacted by the legislature or the Governor's exercise of power under that law.[43]

¶ 132. The majority opinion tries to mask this problem by presenting the issue in a narrower way than the one presented by the petitioners. According to the majority opinion, the petitioners' challenge is not to

_____

[41] *State v. City of Oak Creek,* 2000 WI 9, ¶ 38, 232 Wis. 2d 612, 605 N.W.2d 526 (citation omitted).

[42] *Id.*

[43] *See Sears v. Hull,* 961 P.2d 1013, 1020 (Ariz. 1998) (rejecting argument that legislators had standing to attack compact when legislature expressly authorized the governor to enter into gaming contracts; under these circumstances this case no longer presented issues of constitutional moment requiring court to waive standing requirement); *State ex rel. Coll v. Johnson,* 990 P.2d 1277, 1284 (N.M. 1999) (same); *Cf. Illinois v. Chicago,* 137 F.3d 474, 478 (7th Cir. 1998) (after legislative delegation to cities to participate in intergovernmental compacts, Illinois's attempt to litigate the validity of the statute and the compact executed thereunder was not justiciable).

This case differs from *State ex rel. Wisconsin Senate v. Thompson,* 144 Wis. 2d 429, 424 N.W.2d 385 (1988), the governor's veto case cited by the majority. Majority op., ¶ 41. In the veto case, the legislator petitioners challenged Governor Thompson's acts as violating the powers granted the governor under the constitution relating to approval of laws and as impacting the legislature's constitutional powers to enact statutes. In this case, the challenge is to the Governor's actions under a legislatively granted power. The governor's role in compacting involves the governor's role in executing a statute.

Wis. Stat. § 14.035 but to particular provisions of the 2003 amendments adopted by the Governor. Yet after apparently denying that the petitioners' challenge is to the constitutionality of Wis. Stat. § 14.035, the majority unabashedly admits that "the validity of § 14.035 permeates this case."[44]

¶ 133. After meandering through the thickets of the doctrines of separation of power[45] and delegation of power to determine the validity of Wis. Stat. § 14.035, the majority opinion begrudgingly concludes that "the statute is not unconstitutional beyond a reasonable doubt."[46] This conclusion is sound, and we agree with it.

¶ 134. Even though Wis. Stat. § 14.035 is constitutional, the majority opines that "the constitutionality of the statute does not automatically validate every

---

[44] Majority op., ¶ 60.

[45] The majority opinion sets forth the following principles of separation of power that we do not debate for purposes of this action: There are three branches of government. *Id.,* ¶ 48. The powers of each branch are not "neatly compartmentalized." *Id.,* ¶ 49. Many powers lie in the vast borderlands that may be shared between and among the branches (except for core powers). *Id.,* ¶ 51. Committing policy choices to be negotiated in gaming compacts constitutes a legislative function. *Id.,* ¶ 64. The legislature has vested authority in the governor to contract with Tribes on behalf of the State. *Id.,* ¶ 67. The legislature has affirmed the governor's role in compact negotiations by creating a director of Indian gaming in the Department of Administration to assist the governor into entering into Indian gaming compacts. *Id.,* ¶ 69.

The majority opinion appears to turn on the delegation of powers issue.

[46] *Id.,* ¶ 72.

compact term negotiated by the governor under the statute."[47]

¶ 135. Furthermore, the majority opinion asserts that if certain provisions of the compact are valid, then Wis. Stat. § 14.035 is unconstitutional. Thus, the majority reads "implicit limits" into Wis. Stat. § 14.035 to invalidate provisions of the 2003 amendments.[48] The majority opinion muddles whether the "implicit limits" are required to render the statute constitutional or are required as a matter of statutory interpretation to comport with legislative intent.[49] So, even though it declares the statute constitutional, and even though the petitioners never mustered enough votes in the legislature to rewrite Wis. Stat. § 14.035, the majority opinion rewrites Wis. Stat. § 14.035 for the petitioners.

¶ 136. The majority opinion rewrites Wis. Stat. § 14.035 to read as follows: "The governor may, on behalf of this state, enter into any compact that has been negotiated under 25 USC 2710(d), *and that complies with implicit limits.*"

¶ 137. The "implicit limits" that the majority reads into the statute are then used to invalidate certain provisions of the compact.

¶ 138. It is not clear from whence cometh these "implicit limits" in Wis. Stat. § 14.035. At times, the majority opinion seems to find them in the doctrine of delegation of powers, a doctrine "long moribund."[50] The

[47] *Id.,* ¶ 73.

[48] *Id.,* ¶ 60.

[49] *Id.*

[50] *Loving v. United States,* 517 U.S. 748, 771 (1996).

382

majority opinion revives the doctrine with great effort and transparent manipulation of authority. The majority seems to boil the delegation doctrine down to the theory that "in the absence of guidelines" the delegation must have "procedural safeguards."[51]

¶ 139. We are not persuaded by the analysis set forth in the majority opinion. We conclude that no delegation of power doctrine invalidates Wis. Stat. § 14.035 or requires that we read words into the statute. The governor's powers under Wis. Stat. § 14.035 are limited, of course, by the statute itself, the federal constitution, IGRA and other federal laws, and the state constitution and laws.

¶ 140. The majority opinion's analysis of the "absence of guidelines," and "procedural safeguards," is not persuasive to declare Wis. Stat. § 14.035 unconstitutional, to read "implicit limits" into it, or to declare certain provisions of the 2003 amendments invalid. Our reasoning is as follows:

---

The majority opinion restricts legislative power, forgetting that this court "has consistently held that the legislative power is not derived from either the state or federal constitution. The constitutional provisions are only limitations upon the legislative power." *State ex rel. McCormack v. Foley,* 18 Wis. 2d 274, 280, 118 N.W.2d 211 (1962). The court stated as early as 1860 that it is "a well settled political principle that the constitution of the state is to be regarded not as a grant of power, but rather as a limitation upon the powers of the legislature, and that it is competent for the legislature to exercise all legislative power not forbidden by the constitution or delegated to the general government, or prohibited by the constitution of the United States. The legislature, subject to a qualified veto of the executive, possesses all the legislative power of the state." *Bushnell v. Beloit,* 10 Wis. 155, 168–69 (1860).

[51] Majority op., ¶ 70.

¶ 141. First, there *are* guidelines for a governor's exercise of power. A governor does not have unfettered power to execute compacts. As the majority opinion recognizes, a governor's authority is limited by the existence of other statutes.[52]

¶ 142. Furthermore, Wis. Stat. § 14.035 explicitly requires compacts "to be negotiated under 25 USC § 2710(d) [IGRA]." IGRA sets forth limitations, guidelines, and procedural safeguards.[53]

¶ 143. Second, there are safeguards, as the majority opinion concedes, to alter the policy choices made by a governor.[54]

¶ 144. Third, the majority opinion cites no case in which a tribal compact was struck down in any state when the legislature authorized the governor to enter into the compact.[55] In contrast, compacts executed by a

---

[52] *Id.,* ¶ 70.

[53] *See, e.g.,* 25 U.S.C. § 2710(d)(3)(A) (a state is required to negotiate a compact in good faith when a tribe requests a compact be negotiated); § 2710(d)(3)(C)(i)-(vii) (listing subjects that may be included in the compacts including remedies for breach of contract; applicability of state laws at the casinos; standards for operation and maintenance of gaming facility); § 2710(d)(4) (prohibiting taxes or fees on tribes); § 2710(d)(7)(A)(i) (if a state refuses to enter into negotiations regarding Class III gaming, action may be initiated for mediation and ultimately decision-making by the Secretary of the Interior).

[54] *See* majority op., ¶¶ 70–72.

[55] Rather cases validate compacts entered into by a governor who has legislative authority to negotiate and execute contracts. *See, e.g., Willis v. Fordice,* 850 F. Supp. 523, 532–33 (S.D. Miss. 1994), *aff'd* 55 F.3d 633 (1995). *Cf. Sears v. Hull,* 961 P.2d at 1020 (no serious constitutional issues when legislature authorizes governor to enter into compacts).

governor have been invalidated when the legislature has not authorized the governor to act.[56]

¶ 145. Fourth, the majority opinion fails to cite any authority in this State (or in any other jurisdiction) declaring that the "procedural safeguards" applicable to legislative delegation to administrative agencies apply here. Nevertheless, the majority opinion relies on the assumption that such concepts relate to a statute like Wis. Stat. § 14.035, which explicitly authorizes a governor to enter into a specific type of contract.[57]

¶ 146. Fifth, reversing course from relying on concepts in the delegation of power to administrative agencies, the majority opinion concludes that the rules governing the legislature's delegation of authority to administrative agencies do not apply to the delegation of legislative authority to a sister branch of government. Instead the majority opinion announces that "the court has adopted a stricter standard when the legisla-

---

[56] *See, e.g., State ex rel. Stephan v. Finney,* 836 P.2d 1169, 1178–79 (Kan. 1992) (no statutory authority); *State ex rel. Clark v. Johnson,* 904 P.2d 11, 25 (N.M. 1995) (no statutory authority); *Saratoga County Chamber of Commerce, Inc. v. Pataki,* 798 N.E.2d 1047, 1061 (N.Y. 2003) (not only was there no statutory authority for the governor to execute a compact but also the assembly adopted a resolution opposing unilateral gubernatorial action); *Narrangansett Indian Tribe of Rhode Island v. Rhode Island,* 667 A.2d 280, 282 (R.I. 1995) (absent specific authorization from the general assembly, the governor had no express or implied constitutional right or statutory authority to execute a compact).

*But see American Greyhound Racing, Inc. v. Hull,* 146 F. Supp. 2d 1012, 1066–67 (D. Ariz. 2001) (invalidating broad delegation of legislative authority to the governor to enter gaming compacts), *vacated on other grounds and remanded,* 305 F.3d 1015 (9th Cir. 2002).

[57] Majority op., ¶¶ 53, 54 n. 21, 55.

ture delegates power directly to another branch of government."[58] The majority does not explain what this stricter standard is.

¶ 147. Furthermore, the cases upon which the majority relies do not support a stricter standard for delegation from the legislature to the governor. These cases involve the legislature's uniting in the judiciary political, quasi-legislative power with the adjudicative function.[59] The court held that such unification of functions expands the powers of the judiciary beyond its constitutional powers, which are limited to "judicial power."[60] Political policymaking is not to be mixed with judicial power.

¶ 148. In contrast to these cases imposing non-judicial functions on the judicial branch, we are asked in the case at hand whether the compact power set forth in Wis. Stat. § 14.035 extends beyond the "executive power" that the state constitution explicitly vests in

---

[58] *Id.*, ¶ 57.

[59] The majority opinion relies on *Gilbert v. Medical Examining Board*, 119 Wis. 2d 168, 349 N.W.2d 68 (1984), which in turn cites *Schmidt v. Local Affairs & Development Dept.*, 39 Wis. 2d 46, 158 N.W.2d 306 (1968). *Schmidt* in turn relies on *In re Incorporation of Village of North Milwaukee*, 93 Wis. 616, 67 N.W. 1033 (1896), and *In re City of Beloit*, 37 Wis. 2d 637, 155 N.W. 633 (1968). *North Milwaukee* and *Beloit* invalidated legislative delegation of policymaking power to the judiciary. In *Beloit* that delegation to the judiciary was invalid even though, as the court recognized, the same delegation of policymaking power to an administrative agency would have passed muster as having sufficient standards.

[60] *See generally Village of North Milwaukee*, 93 Wis. at 624; and *City of Beloit*, 37 Wis. 2d at 637. *See also Schmidt*, 39 Wis. 2d at 53 (explaining these two cases).

the governor.[61] The majority opinion never analyzes executive power. If it had, it would not reach the result it does.

¶ 149. The Wisconsin Constitution does not define the words "executive power" but does set forth the powers and duties of a governor.[62] The constitutional powers and duties of a governor are exactly the same today as those enacted in 1848. The constitution provides that a governor "shall transact all necessary business with the officers of the government, civil and military."[63] The constitution gives a governor powers relating to the legislature and lawmaking: a governor has the power to convene the legislature, communicate to the legislature in every session, recommend matters for the legislature's consideration, approve and sign bills, and approve appropriation bills in whole or in part.[64] The constitution by vesting executive power in the governor and by its listing the powers and duties of a governor thus expressly blends both executive and legislative powers in a governor and grants a governor policymaking functions.

¶ 150. Finally, the constitution explicitly impresses on a governor the responsibility to expedite matters resolved by the legislature and to take care that laws be faithfully executed, declaring: a governor "shall expedite all such matters as may be resolved upon by the legislature, and shall take care that the laws be faithfully executed."[65] This constitutional mandate

---

[61] Wis. Const. Art. V, § 1.

[62] Wis. Const. Art. V, § 4.

[63] *Id.*

[64] *Id.*

[65] *Id.*

vests broad powers in a governor and charges him with far-reaching responsibilities to effectuate the laws.

¶ 151. The exercise of judgment and discretion in the making of a compact is not, as the majority opinion acknowledges, exclusively a legislative duty.[66] The governor's exercise of the power granted by the legislature to enter into a compact is a valid discharge of executive power and responsibility under Wis. Stat. § 14.035 and the constitution.[67] The constitutional executive powers and duties vested in the governor, as we stated earlier, includes a policymaking component. As the United States Supreme Court has stated, "[e]xecutive action that has utterly no policymaking component is rare, particularly at an executive level as high as a jurisdiction's chief law enforcement officer."[68]

¶ 152. Wisconsin Stat. § 14.035 and the compact fall within the range of authority and responsibility reserved to a governor as chief executive officer of the state with the constitutional responsibility to expedite matters as may be resolved by the legislature and to ensure that the laws be faithfully executed. Thus, Wis. Stat. § 14.035 does not provide an unconstitutional delegation of legislative powers to the governor, nor does it unconstitutionally aggregate powers in the governor.

¶ 153. In summary, as long as a compact does not contravene a statute or constitutional provision, the governor may enter into it under Wis. Stat. § 14.035, embracing those conditions and provisions the gover-

---

[66] *See* majority op., ¶ 69.

[67] The New Mexico Supreme Court recognized that had a statute authorized the governor to enter into a compact, he could have done so. *Clark*, 904 P.2d at 25–26.

[68] *Printz v. United States*, 521 U.S. 898, 927 (1997).

nor deems will best promote the interests of the government. The majority opinion's conclusion that a stricter standard (whatever that means) exists for delegation from the legislature to the governor ignores the constitutionally granted executive power vested in a governor.

¶ 154. Sixth, the legislature has, early in the history of the State, enacted laws authorizing the governor to negotiate and execute contracts, although the state constitution does not assign the power to contract to either the executive or legislative branch. In 1887, the legislature simply provided that all contracts for labor and material in connection with the completion of Science Hall at the University of Wisconsin-Madison be subject to the control and approval of the governor.[69] When the legislature wanted to limit the governor's contracting powers, it inserted restrictions in the enabling statute.[70] Numerous laws presently authorize the governor to execute contracts, without limitations on the contracting power.[71]

---

[69] *See* Ch. 500, Laws of 1887.

[70] *See* Ch. 243, Laws of 1879.

[71] *See, e.g.,* Wis. Stat. § 14.11, authorizing governor to employ special counsel "if in the governor's opinion the public interest requires such action" without providing any review procedures; Wis. Stat. § 14.12, authorizing governor to execute releases and satisfactions; Wis. Stat. § 14.84(1), authorizing governor to commit state to participate in multi-state Great Lakes protection fund; Wis. Stat. § 196.494(5), authorizing governor to bind the state to interstate compact to facilitate siting of regional electric transmission facilities; Wis. Stat. § 254.335(1), authorizing governor to bind state to agreements with U.S. Nuclear Regulatory Commission regarding regulation of nuclear waste; Wis. Stat. § 285.15, authorizing governor to enter multi-state agreement to control air pollution; Wis. Stat.

¶ 155. These delegations of contractual authority enable the governor to negotiate the best terms on behalf of the State for the benefit of the people of the State and allow flexibility in negotiations depending on the circumstances. Delegating power to negotiate and execute gaming contracts does not readily lend itself to limitations in the enabling legislation. "The delegation of some law-making responsibilities is an essential element of the efficient operation of government."[72] A legislative body of 132 persons does not have the ability to negotiate a contract. Separation of powers and delegation of powers principles are "vindicated, not disserved, by measured cooperation between the two political branches of the Government, each contributing to a lawful objective through its own processes."[73]

¶ 156. Wisconsin Stat. § 14.035 thus comports with a long-standing legislative pattern of granting the governor broad authority to enter into agreements on behalf of the State.

¶ 157. Seventh, Wis. Stat. § 14.035 comes to us with a presumption of constitutionality. Obviously the legislature did not see any threat to its power or to aggregated executive power in enacting Wis. Stat. § 14.035. Furthermore, the legislature implemented and reinforced its recognition of the power of the governor by creating a director of Indian gaming to assist the "governor in determining the types of gaming

§ 16.54(1) authorizing the governor to accept federal funds for the state "for the education, the promotion of health, the relief of indigency, the promotion of agriculture," and to "impose such conditions as in the governor's discretion may be necessary to safeguard the interests of this state."

[72] *In re Klisurich,* 98 Wis. 2d 274, 279–80, 296 N.W.2d 742 (1980).

[73] *Loving v. United States,* 517 U.S. at 773.

390

that may be conducted on Indian lands and in entering into Indian gaming compacts"[74] and by including moneys received under the compact in the most recent budget adopted by the legislature.[75]

¶ 158. The legislature has made policy choices in enacting Wis. Stat. § 14.035 and ratifying the 1992 compact and the 1998 and 2003 amendments. Our task, as the majority opinion concedes, is to accept those policy choices and not to second-guess the legislature.[76] The legislature has considered the impact of Wis. Stat. § 14.035 on the State and on the tribes, and the legislature understands that the stated purpose of IGRA is to provide "for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."[77]

¶ 159. Eighth, the majority opinion confesses that it is not considering the impact of its decision in the case at hand although it concedes that a court should consider the legal and practical consequences of its decisions.[78] And therein lies a major defect of the majority's decision.

¶ 160. Laws, including Wis. Stat. § 14.035, must be interpreted considering the legal and practical consequences to avoid unreasonable and absurd results.[79] So too the governor's powers and the 2003 amendments must be interpreted in light of our legislature's intent,

---

[74] Wis. Stat. § 569.02(4). *See also* Wis. Stat. § 569.015(2).

[75] 2003 Senate Bill 44.

[76] Majority op., ¶ 39.

[77] 25 U.S.C. § 2702(1).

[78] Majority op., ¶¶ 38–40.

[79] *State v. Jennings,* 2003 WI 10, ¶ 11, 259 Wis. 2d 523, 657 N.W.2d 393.

the governing federal law, namely IGRA, and the practicalities of negotiating and reaching agreement on a compact relating to gaming to avoid unreasonable and absurd results.

¶ 161. Numerous amici argue that a decision in favor of the petitioners would undermine the purposes of IGRA and harm Wisconsin's economy. The Green Bay area Wisconsin Citizen Action and the Bay Area Workforce Development Board describe the significant impact of the gaming compacts on the economic development of the Tribe. They assert that by amending the compact the State has enabled the Tribe to have a long-term, stable investment horizon and to diversify economic investment in non-gaming enterprises for the benefit of the Tribe, Brown County, and the Fox Valley economy, and community services for members of the Tribe and for other families and individuals.[80]

¶ 162. The City and County of Milwaukee oppose the petitioners' challenge because of the "enormous and immediate negative impact on the economies of the City and County,"[81] as well as the Indian community.

¶ 163. The Milwaukee Building & Construction Trades Council, Teamsters Local Union Nos. 200 and 344, Menomonee Valley Partners, Inc., Professional

---

[80] Brief of Amici Curiae Wisconsin Citizen Action and Bay Area Workforce Development Board.

[81] Brief of Amici Curiae City of Milwaukee and Milwaukee County Opposing Amended Petition for Original Jurisdiction. According to the brief, the Tribe has paid the city and county $13.24 million since 2000; has contributed over $3 million per year to Milwaukee area charities; employs 1,500 people at the Milwaukee casino; and has already paid $108 million and will pay over $243 million in future years to support the operation of the Indian Community School of Milwaukee, an important economic resource to the city and county.

Firefighters of Wisconsin, Inc., and Indian Community School of Milwaukee, Inc. jointly filed a brief arguing that a ruling against Indian gaming would have an enormous effect on the State and local economies and would interfere with federal and state policies promoting Indian education.[82]

¶ 164. The parties stipulated that if the games authorized under the compacts were discontinued Milwaukee County would lose over 8,000 jobs, increasing countywide unemployment from 6.4% to 8.0%; Brown County would lose nearly 6,000 jobs, increasing countywide unemployment from 4.6% to 8.7%; Sauk County would lose nearly 6,000 jobs, increasing countywide unemployment from 4.0% to 19.5%; and unemployment in Forest County would rise from 6.9% to 28.3%.[83]

¶ 165. The Tribe estimates that gaming compacts have created 35,000 jobs in the State to date and that the new compacts will add 20,000 more jobs and a billion dollars in new investments.

¶ 166. Ignoring the consequences of its decision as well as sound legal principles imperils the soundness of the majority opinion and the welfare of the Tribe and the State.

¶ 167. In sum, this court should accept the legislature's decision about delegating compact power to the governor unless strong reasons point in another

---

[82] Brief of Amici Curiae Milwaukee Building & Construction Trades Council, Teamsters Local Union Nos. 200 and 344, Menomonee Valley Partners, Inc., Professional Firefighters of Wisconsin, Inc., and Indian Community School of Milwaukee, Inc.

[83] Stipulation, ¶ 31.

direction.[84] As we have explained above and shall explain further below, no such reasons surface in the present case.

¶ 168. After analyzing the majority opinion and the doctrines of separation of powers and delegation of powers, we conclude that Wis. Stat. § 14.035 constitutes a valid delegation of authority to the governor. No aspect of the delegation doctrine requires us to declare the statute unconstitutional, to read words like "implicit" into the statute to render it constitutional, or to declare any provisions of the compact invalid. If any provision is invalid, we must look beyond the delegation doctrine.

¶ 169. The petitioners apparently are unhappy with the compact. Their attempt to dress up their unhappiness in constitutional garb fails.

¶ 170. We turn to the majority opinion's conclusion that the compact's duration provision is invalid.

### IV. Validity of Duration Provision

¶ 171. The majority ultimately concludes that the Governor was without authority to agree to the duration provision in the 2003 amendments.[85] It raises an ominous specter with the warning that such a provision "could terminate" the legislature's ability to make law.[86] In suggesting such a foreboding result, the majority opinion exaggerates the consequences of the provision.

---

[84] *Brown v. Heymann,* 297 A.2d 572, 577 (N.J. 1972) ("We must assume that the Legislature found there is no such threat [to aggregated executive power], and we must accept that evaluation unless it is plainly wrong.").

[85] Majority op., ¶ 113.

[86] *Id.,* ¶ 82.

¶ 172. To further the exaggeration, the majority describes the duration provision as "perpetual."[87] By employing such a term, it is apparent that the majority attempts to inflame a negative response.

¶ 173. The problems with the majority's analysis extend well beyond its exaggerated consequences. The majority mischaracterizes the differences between the 1992 compact together with the 1998 and 2003 amendments. What the majority fails to acknowledge is that not only is the 2003 duration provision substantively similar to those in the original 1992 compact and 1998 amendments, but it actually places the legislature in a better position to regulate gaming. Ultimately, the majority's analysis seems uncertain, raising more questions than it answers.

¶ 174. All of the duration provisions, whether in the 1992 compact or in the 1998 and 2003 amendments, were of a similar term. If the parties did nothing, the original compact and the amendments would continue in effect with no time limitation.

¶ 175. The 1992 compact provided that it would continue indefinitely, subject to the right of either party to issue a notice of non-renewal at specified intervals—initially after seven years, and then every five years thereafter.[88] In the event of nonrenewal, the Tribe could request the State to enter into negotiations, and the State was required to negotiate with the Tribe in good faith under IGRA.[89]

¶ 176. The 1998 amendments had no effect on the indefinite nature of the compact. Although it was

---

[87] *Id.,* ¶ 113.

[88] *Compact* Section XXV.B.

[89] *Compact* Section XXV.E. *referring to* 25 U.S.C. § 2710 (d)(7), IGRA.

renewed for a five-year period, from June 3, 1999, to June 3, 2004, the compact was still subject to the automatic rollover provision.[90]

¶ 177. With the 2003 amendments, the duration provision in the compact was revised. The 2003 amendments deleted each party's unilateral right of nonrenewal, but the compact could still terminate on the occurrence of specified conditions. The 2003 changes provided for amendment of any provision of the compact every 25 years and of gaming regulation provisions every five years.[91]

¶ 178. The majority describes this change in part by noting the following language:

> This Compact shall continue in effect until terminated by mutual agreement of the parties, or by a duly adopted ordinance or resolution of the Tribe . . . .[92]

¶ 179. Significantly, the majority omits the rest of the changes, which qualify this provision. These include revisions to Section XXX, Amendment and Periodic Enhancement of Compact Provisions. That section previously stated, "this compact shall not be modified, amended or otherwise altered without the prior written agreement of both the State and the Tribe."[93] In 2003,

---

[90] *See Compact* Section XXV *as amended* by No. 1 (12/3/98).

[91] Amendments to the compacts may be proposed at each fifth annual anniversary "to enhance the regulation of gaming." *Compact* Section XXX.D.1–2 *as amended* by No. 14 (2/19/03). Furthermore, amendments to "any provision of the compact" may be proposed at each 25th annual anniversary by the Tribe or the Governor as directed by a session law of the Wisconsin Legislature. *Id.*

[92] *Compact* Section XXV *as amended* by No. 13 (2/19/03).

[93] *Compact* Section XXX.

the section was expanded to include a time frame (five and 25 years) to address the parties' desires to change the provisions along with a dispute resolution process (last best offer arbitration).[94]

¶ 180. Additionally, the parties maintained the requirement of good faith negotiations.[95] The concept of good faith excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness.[96] This is not a meaningless provision; rather, it is a substantive limitation on the parties. A breach of contract may occur if a party violates an express or implied covenant of good faith and fair dealing.[97]

¶ 181. Accordingly, the majority's characterization of the amended compact as "perpetual" is inaccurate. Under the 1992, 1998, and 2003 version, the compact could be amended every five years.[98] Under all versions, the compact extended indefinitely absent an affirmative action by the Tribe, the State, or both.[99]

[94] *Compact* Section XXX *as amended* by No. 14 (2/19/03).

[95] *See Compact* Section XXII.A.1. *as amended* by No. 3 (5/28/03).

[96] *State v. Peppertree Resort Villas, Inc.,* 2002 WI App 207, 20, 257 Wis. 2d 421, 651 N.W.2d 345 (Restatement (Second) of Contracts 205 cmt. d (1981)).

[97] *See Ford Motor Co. v. Lyons,* 137 Wis. 2d 397, 442–43, 405 N.W.2d 354 (Ct. App. 1987).

[98] *See Compact* Section XXV and *Compact* Section XXX *as amended* by No. 14 (2/19/03).

[99] *See id.*

Finally, the new process maintains the requirement that the parties negotiate in good faith when discussing proposed amendments.[100]

¶ 182. The majority also fails to recognize that the 2003 amendments actually place the legislature in a better position to regulate gaming. Before, the legislature had delegated all of its power to the governor under Wis. Stat. § 14.035. To have any influence over the amendment process it needed to repeal that statute, which it twice failed to do. With the new provisions, however, the legislature is expressly granted an oversight role in the negotiation process. After 25 years, any provision of the compact may be amended. The Tribe or "the Governor *as directed by an enactment of a session law by the Wisconsin legislature*" may propose an amendment.[101]

¶ 183. After highlighting and bemoaning the duration of the 2003 amendments, the majority shifts course and contends that the legislature could not delegate to the Governor the power to enter into such a term because it binds future legislatures.[102] Since the majority makes this determination without citing to authority, the legal underpinnings upon which its conclusions rest are uncertain.

¶ 184. By agreeing to the duration provision in the 2003 amendments, the Governor and the Tribe were hardly plowing new ground. Including Wisconsin, seven of the 24 states with Class III tribal gaming under IGRA have compacts of similar duration that cannot be

---

[100] *See Compact* Section XXX.C. *as created* by No. 14 (2/19/03).

[101] *Compact* Section XXX *as amended* by No. 14 (2/19/03) (emphasis added).

[102] Majority op., ¶ 80.

unilaterally terminated by the State.[103] Indeed, the parties have stipulated that Colorado, Connecticut, Idaho, Kansas, Minnesota, and Mississippi all have such provisions.[104]

¶ 185. The fact is that interstate compacts of indefinite or long-term duration are commonplace throughout the country.[105] Wisconsin itself is a signatory to an interstate compact of indefinite duration, the Midwest Interstate Low-level Radioactive Waste Compact, codified at Wis. Stat. § 16.11. That compact remains in effect indefinitely, unless the signatory states unanimously agree to dissolve the compact or Congress withdraws its consent.[106] A state cannot unilaterally withdraw from the compact.[107]

¶ 186. The majority attempts to distinguish the Midwest Interstate Low-level Radiation Waste Compact on grounds that the legislature ratified it.[108] What the majority fails to mention, however, is that the legislature effectively ratified the 2003 amendments by in-

[103] Stipulation, ¶ 37.

[104] Stipulation, ¶ 41.

[105] *See, e.g.,* Delaware River Basin Compact, art. I, § 1.6(a), N.J. Stat. Ann. § 32:11D-6 (duration of 100 years, with automatic renewals unless terminated); Susquehanna River Basin Compact, art. I, § 1.5(a), 32 Pa. Cons. Stat. Ann. § 820.1 (duration of 100 years, with automatic renewals unless terminated). Many others continue indefinitely, like the compact at issue, unless the signatories mutually agree to termination or Congress repeals it: Alabama-Coosa Tallapoosa River Basin Compact, art. VIII(a), Ga. Code Ann. § 12–10–110; Colorado River Compact, art. X, Colo. Rev. Stat. Ann. § 37–61–101; Snake River Compact, art. XII, Idaho Code § 42–3401.

[106] Wis. Stat. § 16.11(8)(i).

[107] *See* Wis. Stat. § 16.11(8)(c).

[108] Majority op., ¶ 81.

cluding the revenue in the state budget, which expressly relies upon the receipt of nearly $207 million in compact payments by the tribes over the next biennium.[109] We do not understand how the legislature can simultaneously ratify the terms of a compact with one hand and attack it with the other.

¶ 187. If the governor cannot make commitments, binding future legislatures, compacts like the ones just described are necessarily invalid. Such a sweeping rule would have profound consequence.

¶ 188. Long-term contracts or compacts of indefinite duration reflect the need for government to make agreements that extend well beyond the current legislative session. The operation of government would be handcuffed if a compact, or any other type of contract, could not extend more than two years.

¶ 189. Even the petitioners do not agree with the majority's extreme position. They have conceded that long-term compacts lasting many years are both constitutionally permissible and desirable as a matter of public policy. Just last year, both petitioners supported a bill that would have recognized a governor's authority to enter into gaming compacts lasting as long as 15 years without the need for any legislative oversight. Senator Panzer was a co-sponsor of that legislation.[110] It passed both houses of the legislature but was subsequently vetoed by the Governor.

¶ 190. Ultimately, the majority's analysis regarding the duration provision raises more questions than it answers. It is unclear upon what legal basis the majority is declaring invalid the duration provision in the 2003 amendments to the compacts. Is it based on

[109] 2003 Senate Bill 44.

[110] *See* 2003 Assembly Bill 144; Stipulation, ¶ 36.

400

statutory interpretation discerning the intent of the legislature? Is the provision unconstitutional as applied? If it is the latter, one would expect such a profound conclusion to appear with supporting analysis and citation. Yet, the majority leaves the reader guessing.

¶ 191. Why would it be unconstitutional for Governor Doyle to bind future legislatures, but not unconstitutional for former Governor Thompson? Why would it be permissible to enact the legislation supported by the petitioners which allowed the governor to enter into compacts without legislative direction with 15 years duration but impermissible for the Governor to enter a compact without legislative direction with 25 years duration? Why would the difference of 10 years transform a valid compact into an invalid compact? Where is the legal authority or analysis to support such a transformation?

¶ 192. In the end, the majority attempts to accomplish by judicial override what the petitioners could not accomplish legislatively.[111] The majority's analysis cannot withstand scrutiny. The exaggerated consequences

[111] When Wis. Stat. § 14.035 was enacted in 1989, the legislature assigned to the governor the responsibility of negotiating the compacts and specifically declined to retain any oversight role for the legislature. The petitioners Panzer and Gard voted for this legislation. Both houses of the legislature considered and rejected amendments that would have required the legislature to ratify any tribal gaming compact.

Now, after the election of a new governor from a different political party, the petitioners are trying to undo what they voted for 14 years earlier. Both petitioners voted in favor of legislation (2003 Senate Bill 41) which would have amended Wis. Stat. § 14.035 by requiring legislative approval of Tribal-State gaming compacts. Panzer was a co-sponsor of the bill. The

combined with the lack of citation to authority and the uncertain legal underpinnings of its conclusion undermine the majority's result.

¶ 193. The majority fails to acknowledge that the 2003 duration provision is substantively similar to those in the original 1992 compact and 1998 amendments. It likewise fails to grasp that compacts of long-term or indefinite duration are commonplace throughout the country. Contrary to the majority's conclusion that the compacts are invalid because they bind future legislatures, such compacts reflect the government's need to enter agreements that extend well beyond a current legislative session.

### V. Validity of Adding Games: Wis. Const. Art. IV, § 24 & the Impairment of Contracts

¶ 194. We turn next to the majority opinion's conclusion that the addition of new games renders the compact invalid. Section XXVI of the 1992 compact

Governor, however, vetoed the legislation. In response, on March 4, 2003, the Senate tried, but failed, to override the Governor's veto.

Undeterred, on March 14, 2003, the legislature gave final approval to another attempted amendment to Wis. Stat. § 14.035. Again, petitioner Panzer was a co-sponsor of the bill. This time, the legislature tried to insert a provision requiring legislative approval of Tribal-State gaming compacts that exceed 15 years in duration. Assembly Bill 144 would have allowed the Governor, *without* legislative approval, to enter into a compact amendment authorizing the new types of games included in the 2003 FCP compact amendments. The Governor vetoed 2003 Assembly Bill 144 on March 18, 2003, and there was no attempt to override the Governor's veto.

Instead, the petitioners turned to the court and commenced this original action.

states the following: "To the extent that State law or Tribal ordinances, or any amendments thereto, are inconsistent with any provision of this Compact, this Compact shall control." In clear and simple language, the parties expressed their intent to be bound by the laws as they were in 1992. Regardless of future laws or amendments to preexisting laws, the parties agreed to let the terms of the compact control their relationship. In holding that the amendment to Article IV, § 24 of the Wisconsin Constitution barred the Class III games that the parties agreed to in 2003, the majority opinion takes a position that clearly violates Section XXVI of the compact, and, therefore, runs afoul of the impairment of contract clauses of the United States and Wisconsin Constitutions.

¶ 195. At the time the parties entered into the compact, all Class III games could be negotiated for and were permitted under the compact. The *Lac du Flambeau*[112] decision controls the scope of gaming for purposes of this compact. In *Lac du Flambeau,* the district court concluded that the State was required to negotiate with the tribes regarding any activity that included an element of prize or chance, unless expressly prohibited by the Wisconsin Constitution or state laws.[113] The court stated that its initial inquiry involved a determination of whether Wisconsin permitted the types of games in question.[114] "Permission," as noted by the court, was not whether the State had given its express approval of the playing of certain games.[115] Rather, "permission" could be discerned from examining

---

[112] 770 F. Supp. at 480.

[113] *Id.* at 488.

[114] *Id.* at 486.

[115] *Id.*

Wisconsin's gaming policies in general and determining whether they were civil-regulatory or criminal-prohibitory in nature.[116] For this question, the court relied heavily on the United States Supreme Court's decision in *Cabazon Band*.[117]

¶ 196. In *Cabazon Band*, the United States Supreme Court concluded that, because California did not prohibit outright all forms of gaming, its laws with respect to gaming were regulatory in nature and could not be enforced on the reservations.[118] The Supreme Court rejected California's contention that Congress expressly provided for the state laws to be applicable against the tribes by enacting Public Law 280,[119] which gave the State broad criminal jurisdiction over Indians who committed offenses on reservations.[120] In conducting its analysis, the Supreme Court stated that it must be determined whether the law the State sought to enforce was criminal, and therefore fully applicable to the tribes, or civil in nature. In *Lac du Flambeau,* the district court, in finding Wisconsin law to be civil-regulatory, explained this civil-regulatory and criminal-prohibitory distinction set forth in *Cabazon Band* as follows:

> If the policy is to prohibit all forms of gambling by anyone, then the policy is characterized as criminal-prohibitory and the state's criminal laws apply to tribal gaming activity. On the other hand, if the state allows some forms of gambling, even subject to extensive

---

[116] *Id.*

[117] 480 U.S. 202.

[118] *Id.* at 210.

[119] Wisconsin is also a Public Law 280 state. *See* 18 U.S.C. § 1162.

[120] *Cabazon Band,* 480 U.S. at 211.

regulation, its policy is deemed to be civil-regulatory and it is barred from enforcing its gambling laws on the reservation.[121]

¶ 197. The Supreme Court concluded that California permitted a substantial amount of gaming activity and actually promoted gaming by its operation of a state-run lottery.[122] Given this conclusion, the Supreme Court held that California's laws regulated, rather than prohibited, gambling; thus, the tribes could continue operating bingo games on their reservations.[123]

¶ 198. In addition to noting the civil-regulatory and criminal-prohibitory distinction addressed in *Cabazon Band*, the *Lac du Flambeau* court also commented that the congressional findings set forth in 25 U.S.C. § 2701(5) supported the proposition that the term "permitted" was not intended to limit the scope of games to those already in operation.[124] The congressional findings stated that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, *prohibit* such gaming activity."[125]

¶ 199. The *Lac du Flambeau* court noted that simply because Wisconsin prohibited certain types of games did not mean that its gaming policy was criminal-prohibitory in nature.[126] Given Wisconsin's constitutional amendment in 1987 allowing the lottery

---

[121] *Lac du Flambeau,* 770 F. Supp. at 485.

[122] *Cabazon Band,* 480 U.S. at 211.

[123] *Id.* at 222.

[124] *Lac du Flambeau,* 770 F. Supp. at 486.

[125] *Id.*

[126] *Id.*

and pari-mutuel betting, the court concluded that Wisconsin's policy was civil-regulatory in nature.[127] The district court commented that the State's assertion that it was only required to negotiate for games already in operation misconstrued both IGRA and the *Cabazon Band* holding:

> It was not Congress's intent that the states would be able to impose their gaming regulatory schemes on the tribes. The Act's drafters intended to leave it to the sovereign state and tribal governments to negotiate the specific gaming activities involving prize, chance and consideration that each tribe will offer under the terms of its tribal-state compact.[128]

¶ 200. The reasoning of *Lac du Flambeau* and *Cabazon Band* was reiterated and reaffirmed more recently in *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. United States*,[129] and *Forest County Potawatomi Community v. Norquist*.[130]

¶ 201. In *Lac Courte Oreilles,* the Seventh Circuit held that IGRA does not violate principles of federalism by interfering with the Wisconsin governor's powers.[131] The Seventh Circuit explicitly recognized that the "Wisconsin Constitution and various statutes have implemented a fairly complex gaming policy."[132] "The establishment of a state lottery signals Wisconsin's broader

[127] *Id.*

[128] *Id.* at 487.

[129] 2004 WL 909159, 367 F.2d 650 (7th Cir. April 29, 2004).

[130] 45 F.3d 1079 (7th Cir. 1995).

[131] *Lac Courte Oreilles,* slip op. at 25.

[132] *Id.* at 22–23.

public policy of tolerating gaming on Indian lands."[133] Relying on the United States Supreme Court's decision in *Cabazon Band,* the Seventh Circuit went on to state: "Further, because IGRA permits gaming on Indian lands only if they are 'located in a State that permits such gaming for any purpose by any person, organization or entity,' 25 U.S.C. § 2170(d)(1)(b), the lottery's continued existence demonstrates Wisconsin's amenability to Indian gaming."[134]

¶ 202. In *Forest County,* a jurisdiction agreement between the Tribe and the City of Milwaukee was at issue. While the original jurisdiction agreement excluded the Tribe's gaming activities from local regulation altogether, an amendment to the agreement provided that Class III gaming could be conducted if the following three conditions were met: "(1) that Wisconsin allow Class III gaming 'for any purpose by any person, organization or entity,' (2) that the Tribe comply with the IGRA, and (3) that the Tribe comply with all civil regulatory state and local regulations which authorize or regulate such gaming."[135] The Seventh Circuit concluded that all of the factors were satisfied.[136] With respect to the first factor, the court explicitly noted that, given the *Lac du Flambeau* holding, the issue of whether Class III gaming was permitted in Wisconsin was no longer in dispute.[137]

---

[133] *Id.* at 23 (*citing Cabazon Band* 480 U.S. 202 and *Lac du Flambeau,* 770 F. Supp. at 487). The Seventh Circuit reaffirmed these decisions as recently as last month.

[134] *Id.* at 23.

[135] *Forest County,* 45 F.3d at 1083.

[136] *Id.*

[137] *Id.*

¶ 203. The Seventh Circuit rejected the City of Milwaukee's contention that Class III gaming should be allowed on the tribal lands only to the extent it was allowed elsewhere in Milwaukee.[138] The amendment in question provided as follows:

Class III gaming, as defined in the Indian Gaming Regulatory Act, shall not be permitted on the Menomonee Valley land unless Class III gaming is *permitted in the State of Wisconsin for any purpose, by any person, organization or entity.* If Class III gaming is so authorized in the state of Wisconsin, such gaming may be undertaken on the Menomonee Valley land only if done in compliance both with the requirements of the Indian Gaming Regulatory Act and with all civil regulatory state and local laws and regulations which authorize or regulate such gaming, including, but not limited to any requirements to obtain authorizations or licenses to undertake such gaming.[139]

¶ 204. The court reasoned that the purpose of the jurisdiction agreement was an attempt by the city to enforce regulatory ordinances on Indian land when they would not otherwise apply.[140] Given the parties' use of the term "permitted" in the first sentence and their awareness of the civil-regulatory and criminal-prohibitory distinction following *Cabazon Band,* as well as the fact that the amendment limited compliance to those laws that "authorize or regulate" as opposed to "prohibit" such gaming, the court held that the jurisdiction agreement, both originally and as amended, did not

[138] *Id.*
[139] *Id.*
[140] *Id.*

prohibit the Tribe from conducting Class III gaming on its lands.[141]

¶ 205. As demonstrated by the case law discussed above, Wisconsin's laws with respect to Class III gaming, at the time the 1992 compact was entered into, were clear. The State was permitted to conduct negotiations regarding all Class III games. Simply because the majority asserts that Wisconsin has a "strong state policy against gambling" embodied in Article IV, § 24 does not make it so.[142] Clearly, Wisconsin has chosen to regulate gaming within the state, not prohibit it. In accordance with the holdings in *Cabazon Band* and *Lac du Flambeau,* the Tribe and the State were free to negotiate for any type of Class III game. Although the majority states that it doubts the "continued vitality of *Lac du Flambeau*'s holding,"[143] there is no reason to do so.

¶ 206. While the amendment to Article IV, § 24 did change Wisconsin's law with respect to gaming, it did not affect the compact before us. The petitioners apparently agree. Their letter brief states that: "petitioners in this action, however, do not seek to apply any change in state law directly to the 2003 amendments. Instead, petitioners challenge the authority of the Governor to enter into the compacts and to agree to compact provisions without underlying authority."

¶ 207. Any Class III games that would be outlawed by Article IV, § 24 could be negotiated for and permitted in an amended compact, given Section XXVI

---

[141] *Id.* at 1084.

[142] *See* majority op., ¶ 94.

[143] *Id.,* ¶ 92.

of the 1992 compact. This provision overrides any subsequent changes in state law, including those brought about by the amendment to Article IV, § 24. The changes to the compact made in the 1998 and 2003 amendments are permissible given the fact that they involve automatic extensions as well as amendments to the 1992 compact. That compact, in Section XXVI, clearly states that the provisions of the compact apply over any changes in state or tribal law. A conclusion to the contrary patently ignores the basic provisions contracted for by the parties involved.

¶ 208. We also recognize that federal preemption is involved in determining whether an impairment of contract would result by declaring the 2003 amendments unauthorized. Here, the compacts are between two sovereigns, the State and the Tribe, and are created under federal law with federal government approval. The compacts unquestionably have federal preemptive force. In *American Greyhound Racing, Inc. v. Hull,* the district court noted that *"IGRA preemption blocks the operation of state policy once a valid compact is executed,* but it gives effect to state policy through the compact negotiation process."[144] Because the State and Tribe entered into a valid compact in 1992, their agreement is insulated from further changes in Wisconsin's gaming laws. Section XXVI of the 1992 compact clearly reflects the intentions of the State and Tribe that changes in state law would not affect the compact's provisions.

¶ 209. The majority opinion concedes that the 1992 compact was valid when the parties agreed to it.

---

[144] *American Greyhound,* 146 F. Supp. 2d at 1052 (citations omitted) (emphasis added).

The majority correctly worries that questions regarding the validity of the 1992 compact and 1998 amendments, after the amendment to Article IV, § 24, might raise impairment of contract concerns.[145] We conclude that any attempt to read Article IV, § 24 as altering the types of games that may be negotiated for under the compact would impair the compact to which the parties agreed, and would, therefore, run afoul of the United States and Wisconsin constitutional clauses against impairment of contract.

¶ 210. Article I, § 10 of the United States Constitution states: "No state shall enter into any . . . law impairing the obligation of contracts . . . ." Similarly, Article I, § 12 of the Wisconsin Constitution provides as follows: "No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed, and no conviction shall work corruption of blood or forfeiture of estate." We have interpreted the contract clauses in the Wisconsin Constitution and the United States Constitution coextensively.[146]

¶ 211. Although the language in the United States and Wisconsin contract clauses is absolute, it has not been interpreted so strictly. Instead, it has been interpreted to accommodate the State's inherent police power.[147] It is very important to note that the federal

[145] Majority op., ¶¶ 98–102.

[146] *Chappy v. LIRC,* 136 Wis. 2d 172, 186, 401 N.W.2d 568 (1987).

[147] *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241 (1978). *See also State ex rel. Cannon v. Moran,* 111 Wis. 2d 544, 554, 331 N.W.2d 369 (1983) in regard to the interpretation of the clause in Wisconsin.

contract clause applies to state constitutional amendments as well as legislative enactments.[148]

¶ 212. In order to determine whether a change in state law has impaired the parties' obligation of contract, three criteria must be analyzed and balanced.[149] The first criterion is the severity of the impairment, that is, whether the change in the law substantially impaired the contractual relationship.[150] The severity of the impairment should be viewed in light of the reasonableness of the parties' reliance on the contract and the foreseeability of the change in the law when the contract was entered into.[151] If the State is a contracting party, the state law faces more stringent examination under the contract clause than laws regulating contracts between private parties.[152]

¶ 213. In this case, the parties relied on the state law as it was in 1992 in order to draft the terms of their compact. While it may have been foreseeable that state or tribal law could change, the parties planned for this by including Section XXVI in the compact. If the amendment to Article IV, § 24 is held to affect the 2003 amendments to the compact, which merely continue the 1992 compact, as amended in 1998, the parties' contract will be substantially impaired. The types of

---

[148] *See Russell v. Sebastian,* 233 U.S. 195, 210 (1914) ("[T]he constitutional amendment of 1911, and the municipal ordinances adopted in pursuance thereof, were ineffectual to impair this [contractual] right, and that the company was entitled [to pursue its business] . . . as it stood before the amendment.").

[149] *Spannaus,* 438 U.S. at 244; *Chappy,* 136 Wis. 2d at 187–88.

[150] *Chappy,* 136 Wis. 2d at 187.

[151] *Id. See also Chrysler Corp. v. Kolosso Auto Sales, Inc.,* 148 F.3d 892, 894 (7th Cir. 1998).

[152] *Spannaus,* 438 U.S. at 244.

Class III games that can be, and were, negotiated for as permitted games will be prohibited, and those which could have been allowed in 1992 will never be permitted. Because we conclude that such an interpretation works a substantial impairment on the contract and the contractual relationship, we proceed to the second factor.

¶ 214. The second criterion queries whether there is a significant and legitimate public purpose behind the constitutional amendment or legislation.[153] Here, it cannot be persuasively asserted that the purpose of the constitutional amendment was to curtail Indian gaming. The legislative history simply does not support it. Indeed, it appears that the impetus behind the amendment was not to limit Indian gaming but rather to affect state gaming in riverboat casinos and video gambling machines.[154]

[153] *Chappy,* 136 Wis. 2d at 187. Although *Chappy* involved a statute, we note the holding in *Russell,* 233 U.S. at 209, which stated that the federal contract clause applies to state constitutional amendments as well as legislative enactments.

[154] Between April 1989 and June 1991, seven bills were proposed in the legislature to legalize video gaming and riverboat casinos. In 1992, Governor Thompson established a blue ribbon task force on gambling that recommended the legalization of floating casinos and video gambling machines. Governor Thompson rejected the task force's floating casino recommendation, but included a proposal to allow video gaming machines in taverns. This proposal created considerable controversy, and in response Governor Thompson called a special legislative session to consider legislation to limit the scope of permissible state-operated gambling.

On June 11, 1992, the legislature passed 1991 Wis. Act 321 creating Wis. Stat. § 565.01(6m), which defined "state lottery." Some proponents worried that the legislature could repeal 1991 Wis. Act 321 at any time and favored a constitutional amend-

¶ 215. If a legitimate public purpose is found, the final inquiry is whether the change in the law is " 'based upon reasonable conditions and is of a character appropriate to the public purpose justifying [the legislation's] adoption.' "[155] Since we conclude that curtailing Indian gaming was not the impetus behind the constitutional amendment, there is no need to discuss this factor. Having determined that the majority's application of the 1993 constitutional amendment substantially impairs the contractual relationship and that the impetus behind the constitutional amendment was not related to Indian gaming, we conclude that the majority's decision violates the impairment of contracts clause.

¶ 216. Generally, the law at the time the contract is entered into governs the enforcement of the contract.[156] Subsequent changes in state law will not interfere with the parties' agreement.[157] Even though the 1992 compact was amended after the Article IV, § 24 amendment, it does not follow that the amendment should abrogate the provisions of the compact. As the amendments to the 1992 compact merely continued the original compact, and did not create a new one, the law as it was in 1992 governs. The majority opinion certainly seems to concede that the 1998 amendments did

ment to make that language permanent. The assembly did not hold a timely vote on that bill, so Governor Thompson called another special session. During that session, the legislature approved June 1992 Special Session Assembly Joint Resolution 1. This proposal was virtually similar to 1991 Wis. Act 321. Dan Ritsche, Legislative Reference Bureau, *The Evolution of Legalized Gambling in Wisconsin* at 34–38 (1993).

[155] *Id.* at 188 (citation omitted).

[156] *Cannon,* 111 Wis. 2d at 554.

[157] *Reserve Life Ins. Co. v. LaFollette,* 108 Wis. 2d 637, 645–47, 323 N.W.2d 173 (Ct. App. 1982).

not create a new compact.[158] After making that statement, the majority opinion does not attack the validity of the 1998 compact amendments, but rather recognizes the significance of the impairment of contract clauses in the United States and Wisconsin Constitutions in relation to the 1998 and 2003 amendments to the 1992 compact.[159]

¶ 217. The decision in *Rochester v. Royal Appliance Manufacturing Company*[160] contemplated this type of continuing agreement. In *Rochester,* the district court held that an oral franchise agreement entered into prior to the enactment of the Wisconsin Fair Dealership Law (WDL), which was later modified to a guaranty agreement after the WDL's enactment, did not constitute a new contract.[161] The *Rochester* court distinguished that amendment from the one present in *Kealey Pharmacy v. Walgreen Company*[162] because the *Kealey* amendments involved a new decision in each instance.

---

[158] *See* majority op., ¶ 98 ("Our holding today raises inevitable questions about the validity of the original 1992 FCP Gaming Compact *and the 1998 amendments thereto.*" (emphasis added)).

[159] *See id.,* ¶ 102. It is important to note that the 1998 amendments to the 1992 compact expanded the number of electronic games permitted from 200 to 1,000 and added previously prohibited blackjack tables as a permissible Class III game. Certainly, if Governor Doyle did not have authority to agree to the 2003 amendments, then, adopting the reasoning of the majority opinion, Governor Thompson did not have authority to agree to the 1998 amendments. We conclude, however, that both amendments were permissible.

[160] 569 F. Supp. 736 (W.D. Wis. 1983).

[161] *Id.* at 739–40.

[162] 539 F. Supp. 1357 (W.D. Wis. 1982).

¶ 218. The district court and the Wisconsin court of appeals have noted that the objective intentions of the parties, as manifested in the terms of the contract itself, serve as the best indicator of whether the parties intended an amendment to create a new contract or merely continue the previous one.[163]

¶ 219. Sections XXV and XXX of the compact clearly demonstrate the parties' intent that the original agreement would be extended and could be amended. Section XXV provides, in relevant part, the following:

> This Compact shall be in effect for a term of seven years after it becomes binding on the parties.
>
> The duration of this Compact shall thereafter be automatically extended for terms of five years, unless either party serves written notice of nonrenewal on the other party not less than one hundred eighty days prior to the expiration of the original term of this Compact or any extension thereof.[164]

¶ 220. Moreover, the parties clearly contemplated the compact could be amended, in regard to matters such as additional Class III gaming, as is evidenced by the language contained therein. The 1992 compact states in relevant part:

> The Tribe may not operate any Class III gaming not expressly enumerated in this section of this Compact unless this Compact is amended pursuant to Section XXX.[165]

---

[163] *See E.A. Dickinson v. Simpson Elec. Co.,* 509 F. Supp. 1241, 1243, 1247 (E.D. Wis. 1981); *Swan Sales Corp. v. Jos. Schlitz Brewing Co.,* 126 Wis. 2d 16, 25–26, 374 N.W.2d 640 (Ct. App. 1985); *La Follette,* 108 Wis. 2d at 645–46.

[164] *Compact,* Section XXV.

[165] *Compact,* Section IV.B.

> This Compact shall not be modified, amended or otherwise altered without the prior written agreement of both the State and the Tribe.[166]

¶ 221. Given the above-quoted language, it is evident that the parties intended to enter into a continuing agreement subject to automatic extensions and negotiated amendments.

¶ 222. We recognize that there may be concern as to whether Tribal-State compacts are more akin to contracts or interstate compacts. However, we note that even the majority concedes that the analysis would be the same regardless of the classification given such a compact.[167] Whether the compact is referred to as a contract or compared to an interstate compact, the result is the same: retroactive application of Article IV, § 24 to the compact violates the contract clauses of the United States and Wisconsin Constitutions. We note that the petitioners acknowledge this fact.

¶ 223. In their brief, Senator Panzer and Representative Gard challenge the Governor's authority to "make public policy without adequate legislative authority." In fact, they have expressed this sentiment throughout this appeal. "Petitioners only contest the Governor's authority to make binding compacts without a more substantial legislative analysis and blessing." "Petitioners[] claim that Governor Doyle lacked authority." Even at oral arguments, counsel for the petitioners emphasized this point:

> (W)e take no position on whether the legislature has that power.

---

[166] *Compact,* Section XXX.

[167] *See* majority op., ¶ 100 ("[W]e think it axiomatic that a compact is a form of contract.").

417

> We are definitely taking the position that the governor alone and unilaterally cannot expand the scope of gaming beyond that approved in the 1998 compacts, that to do so goes over what is otherwise a gray area between the legislative—or into the legislative prerogative and outside the executive prerogatives.

> (W)e are simply arguing that the governor of Wisconsin lacks authority to make a compact of virtually indefinite perpetual duration which would expand the scope of gaming beyond any of the policies embraced by the 1998 compacts, which we do not contest.

¶ 224. Yet in their letter brief to this court, the petitioners abandoned that position and stated the following: "Petitioners Panzer and Gard do not believe the Governor and Legislature have either the authority or power to enter into a compact granting any tribe the right to offer games that were not a part of the 1992 Compact." This new position implies that absolutely no course of action could be taken that would result in a compact amendment which would authorize the games in dispute. The petitioners' brief offers no support or authority for this position.

¶ 225. In response, the Governor points out the complete change in argument and direction taken by petitioners:

> Throughout the course of this litigation, petitioners have assiduously and explicitly avoided asserting the view that the new games were prohibited by the Wisconsin Constitution, a fact acknowledged in petitioners' letter brief.

¶ 226. Although the petitioners seem to have changed their minds about the legislature's ability to add new games, the petitioners are anxious that the State be permitted to renew the 1992 compacts and

allow continuation of the games specifically permitted in the 1992 compact but disallowed by the 1993 constitutional amendment.

Petitioners have taken the position in briefs and at the oral arguments that the Executive and Legislative branches have power to continue to approve games allowed in the 1992 Compact as amended in 1998 as a function of the Obligation of Contracts Clause of the United States Constitution. (U.S. Const. Article I, s. 10, clause 1). As a shorthand statement, these original games such as blackjack and slots have been grandfathered in through the subsequent amendments to the 1992 Compact.

¶ 227. On the one hand, the petitioners rely on the 1993 constitutional amendment to claim that the new games "are expressly prohibited by Article IV, § 24 (6)(c) of the Wisconsin Constitution," and yet, on the other hand, consistent with Section XXVI of the 1992 compact, recognize that:

[A]n Indian tribe enjoys the prerogatives of other sovereigns. Hence, when it engages in a compact with another sovereign, such as a state, the obligations of both parties rest on the terms of the compact. A change in a state constitution does not eliminate the compact obligation, because the state cannot divest itself, unilaterally, of an obligation to another sovereign. In this context, an Indian Tribe enjoys the same sovereign status as a state.

¶ 228. We agree completely with petitioners in regard to the latter conclusion. The *Cabazon Band* and *Lac du Flambeau* decisions together with IGRA permitted the parties to negotiate for the inclusion of *any Class III games* in a compact between the Tribe and the State of Wisconsin, and a change in Wisconsin law

419

cannot alter that fact.[168] The claim that some Class III games are "grandfathered in," while others are not permitted because of the 1993 constitutional amendment, is not only illogical, it is nonsensical.

¶ 229. The majority, in a transparent attempt to save the 1992 compact and the 1998 amendments, but kill the 2003 amendments, states that the 1992 compact was valid when entered into, and notes that "any attempt at this point to impair these compacts would create serious constitutional questions."[169] The continued vitality of the 1992 compacts is the very issue raised in *Dairyland*.[170] As the petitioners explain in their letter brief, "the appellants in *Dairyland* address the broader question or issue that includes whether the initial games approved in the 1992 Compacts such as blackjack and slot machines must be prohibited due to the substantial policy changes that occurred with the 1993 constitutional amendment." Then, after raising this question and hinting at an answer, the majority opinion declines to address whether the compact, and the 1998 amendments, were "durable enough to withstand a change in state law."[171]

¶ 230. Given the majority's analysis, and petitioners' latest position, what reasons could the majority logically and legitimately use to retain the 1992 compact and 1998 amendments, yet discard the 2003

---

[168] *See West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 28 (1951).

[169] Majority op., ¶ 99.

[170] 270 Wis. 2d 267.

[171] Majority op., ¶ 102. Although declining to address the issue, the majority opinion doubles back and states that it has "not yet been presented with a persuasive case" to conclude that the 1992 compact and 1998 amendments were invalid. *Id.*, ¶ 98, n. 37.

amendments? In its desperation to save the 1992 compacts and the 1998 amendments, and yet to invalidate the 2003 amendments, the majority has gone well beyond the issues originally presented in this case.

¶ 231. The majority, apparently taking its lead from petitioners' change of position, has taken it upon itself to import the issue from *Dairyland* into the case at hand. The issue in *Dairyland,* as we have explained, is whether Wisconsin Constitution Article IV, § 24 prohibits any extension or renewal of the 1992 compacts. The petitioners acknowledge as much in their letter brief by stating:

> It seems this Court is pressing the Petitioners for an answer to a question Petitioners sought to avoid. The issues of the scope of both the Executive and Legislative branches appears to be more directly discussed in *Dairyland Greyhound Park, Inc. v. James E. Doyle et al.* (Supreme Court Case No. 03–0421), a case presently under consideration by this Court. The appellants in *Dairyland* address the broader question or issue that includes whether the initial games approved in the 1992 Compacts such as blackjack and slot machines must be prohibited due to the substantial policy change that occurred with the 1993 constitutional amendment.

¶ 232. Given the 3–3 deadlock in our *Dairyland* decision, and the fact that the court of appeals is now faced with attempting to decide this issue, what, if anything, is left for the court of appeals to decide after the majority decision in the present case?

¶ 233. In *Cook v. Cook,*[172] we enunciated several principles regarding precedent and the court of appeals: "The court of appeals is a unitary court; published opinions of the court of appeals are preceden-

---

[172] 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997).

tial; litigants, lawyers and circuit courts should be able to rely on precedent; and law development and law defining rest primarily with the supreme court." However, we also noted that:

> The supreme court is the only state court with power to overrule, modify or withdraw language from a previous supreme court case. . . . [O]nly the supreme court, the highest court in the state, has the power to overrule, modify or withdraw language from a published opinion of the court of appeals. In that way one court, not several, is the unifying law defining and law development court.[173]

¶ 234. Given the quoted language from *Cook* and the importation of the *Dairyland* issue in this case, the court of appeals may feel compelled to adopt the majority's reasoning to invalidate the 1998 amendments; that is why the majority opinion is so dangerous, and why it is so difficult to reconcile the opinion of the justices in the majority in the present case with their position in *Dairyland*.[174] Dairyland attacked the continued validity of the 1992 compact and 1998 amendments in light of the 1993 constitutional amendment. The circuit court in *Dairyland* concluded that the compacts and 1998 extensions were still valid despite the 1993 constitutional amendment. When the *Dairyland* case reached this court, three members of the majority voted to reverse the judgment of the circuit court, and one member recused himself altogether. Those same justices now appear to be reversing their reversal and signaling that the compacts and the 1998 amendments are still permissible. Yet the reasoning of the majority opinion invalidating the 2003 amendments

---

[173] *Id.* at 189–90.

[174] *See Dairyland Greyhound Park v. Doyle,* 270 Wis. 2d 267.

invalidates the 1992 compact and 1998 amendments. Where do these contradictory signals emitted by the majority leave the court of appeals when on remand it must decide *Dairyland?*

¶ 235. In light of the majority opinion, if any Indian gaming whatsoever is to be permitted in Wisconsin in the future, it may be only because of the intervention of the federal courts, and the proper application and interpretation of the *Cabazon Band* and *Lac du Flambeau* decisions, IGRA, Section XXVI and other provisions of the compact, and the impairment of contract clauses of the United States and Wisconsin Constitutions.

## VI. Federal Issues

¶ 236. As noted above, the issue of federal preemption is lurking in this case. Not surprisingly, the majority declines to address a number of matters on grounds that "they may turn in large measure on unresolved questions of federal law."[175] Indeed, it attempts to frame the inquiry based only on state law.[176]

¶ 237. The conclusion of the majority is that the Governor violated state law by authorizing the disputed new games.[177] That conclusion misses the mark because it rests on an erroneous assumption that states can directly regulate Indian gaming, independent of IGRA. They cannot. Under IGRA, state law can only

---

[175] These issues include the application of the impairment of contracts clause in the United States Constitution as well as IGRA. Majority op., ¶ 102.

[176] Curiously, for a question of state law, all but two of the cases the majority cites in its discussion of "Expansion of Permissible Class III Gaming" are federal. *See id.,* ¶¶ 83–102.

[177] *Id.,* ¶ 113.

indirectly affect Indian gaming, and only through compact negotiations. Outside of that process, state law does not apply to Indian gaming.

¶ 238. That state law may play a role in the legal analysis does not detract from the overriding federal nature of the claim. In *Pueblo of Santa Ana v. Kelly,*[178] the Tenth Circuit held that federal courts "indisputably have the power to determine whether a Tribal-State compact is valid," notwithstanding that "[s]tate law must determine whether a state has validly bound itself to a compact."

¶ 239. At its essence, the question in this case concerning the permissible scope of gaming is the same one as addressed in *Lac du Flambeau,*[179] as well as numerous federal court cases.[180] These cases were all federal court actions brought within the framework of the remedies expressly provided by IGRA.

¶ 240. Instead of recognizing this limitation to its jurisdiction, however, the majority proceeds to analyze IGRA, going so far as to call *Lac du Flambeau*'s holding into doubt.[181] By doing so, the majority flouts Congress' clear intent to preclude state courts from adjudicating the rights of Indian tribes to engage in on-reservation activities.

---

[178] 104 F.3d 1546, 1557 (10th Cir. 1997).

[179] 770 F. Supp. at 480.

[180] *See, e.g., U.S. v. Santee Sioux Tribe of Nebraska,* 135 F.3d 558 (8th Cir. 1998); *Coeur D'Alene Tribe v. State,* 842 F. Supp. 1268 (D. Idaho 1994), *aff'd,* 51 F.3d 876 (9th Cir. 1995); *Citizen Band Potawatomi Indian Tribe v. Green,* 995 F.2d 179 (10th Cir. 1993); *Mashantucket Pequot Tribe v. State of Conn.,* 913 F.2d 1024 (2nd Cir. 1990).

[181] Majority op., ¶¶ 88–92.

¶ 241. In the wake of *Cabazon Band,*[182] states increasingly expressed their desires to be factored into Indian gaming regulation. Congress responded with the passage of IGRA in 1988. Through IGRA, Congress performed the necessary balancing of states' interest in regulating high stakes gambling within their borders and the Indians' resistance to state intrusions on their sovereignty.[183] The essential feature of IGRA is the Tribal-State compact process.[184]

¶ 242. By enacting IGRA, Congress created a "carefully crafted and intricate remedial scheme," which cannot be augmented by the courts.[185] That scheme contemplates actions only in federal—not state—courts. As the Eighth Circuit noted in *Gaming Corp. of America v. Dorsey & Whitney,*[186] "[e]very reference to court action in IGRA specifies federal court jurisdiction . . . . State courts are never mentioned."[187]

¶ 243. The legislative history of IGRA supports the notion that Congress intended it to have extraordinary preemptive power. The Senate committee report

[182] 480 U.S. at 222.

[183] *Lac du Flambeau,* 770 F. Supp. at 480–81.

[184] *Id.*

[185] *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 73–74 (1996).

[186] 88 F.3d 536, 545 (8th Cir. 1996). In *Gaming Corp.,* the Eighth Circuit also held that "[e]xamination of the text and structure of IGRA, its legislative history, and its jurisdictional framework likewise indicates that Congress intended it completely preempt state law." *Id.* at 544.

[187] *See also Pueblo of Santa Ana,* 104 F.3d at 1557 ("IGRA is a federal statute, the interpretation of which presents a federal question suitable for determination by a federal court.").

explicitly states: "S. 555 is intended to expressly pre-empt the field in the governance of gaming activities on Indian lands."[188]

¶ 244. Furthermore, the conclusion that IGRA preempts state law is reinforced when viewed within the larger jurisdictional framework of Indian law. The drafters of IGRA recognized this when they wrote:

> It is a long- and well-established principle of Federal-Indian law as expressed in the United States Constitution, reflected in Federal statutes, and articulated in decisions of the Supreme Court, that unless authorized by Congress, the jurisdiction of State governments and the application of state laws do not extend to Indian lands.[189]

¶ 245. The preemptive force of compacts is essential to the effectiveness of the congressional plan set forth in IGRA, the fulfillment of IGRA's goal of promoting tribal economic development and self-sufficiency, and tribal interest in self-governance.[190] The process allows states and tribes to decide what terms they will agree to and be bound by their own choices.

¶ 246. If the majority's approach was a sound one, Congress' strict limits on the means to enforce IGRA would be easily evaded by restyling collateral attacks on compacts as claims that the state is not bound by a particular compact because the state's agent exceeded his or her authority. The preemptive force of IGRA was designed to prevent such an evasion.

¶ 247. IGRA is not the only reason why this case belongs in federal court. Compacts entered into under

---

[188] S. Rep. No. 446, 100th Cong., 2d Sess. 6 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3076.

[189] *Id.* at 3075.

[190] *See* 25 U.S.C. § 2702(1).

IGRA are agreements between sovereigns, not private parties. Indeed, the governmental nature of compacts makes such agreements analogous to interstate compacts.[191] The majority cites to a law review article advocating that Tribal-State compacts be examined under similar rationales as interstate compacts.[192] However, it fails to appreciate the implications of such a position.

¶ 248. Questions regarding the meaning of an approved interstate compact or the parties' obligations under it present issues of federal law. As the Supreme Court recognized in *Cuyler v. Adams*,[193] "an interstate compact approved by Congress . . . is thus a federal law subject to federal rather than state construction."[194] It further noted:

> [W]here Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the State's agreement into federal law under the Compact Clause.[195]

---

[191] In *Pueblo of Santa Ana*, 104 F.3d at 1557, the court analogized Tribal-State gaming compacts to interstate compacts and cited *Dyer*, 341 U.S. at 22 for the proposition that challenges to the validity of such compacts present issues of federal law.

[192] Majority op., ¶ 81, n. 31 (citing Rebecca Tsosie, *Negotiating Economic Survival: The Consent Principle and Tribal-State Compacts Under the Indian Gaming Regulatory Act*, 29 Ariz. St. L. J. 25 (1997)).

[193] 449 U.S. 433, 438 (1981).

[194] *See also Petty v. Tennessee-Missouri Bridge Commission*, 359 U.S. 275, 278–79 (1959); *Dyer v. Sims*, 341 U.S. at 28–29.

[195] *Cuyler*, 449 U.S. at 440.

¶ 249. Thus, under the Supremacy Clause of the United States Constitution, questions regarding an approved compact's meaning of the parties' obligations under it present issues of federal law, which preempt application of inconsistent state law— whether such state law is set out in statutes, court decisions, or even state constitutional provisions.[196]

¶ 250. In the end, the majority's formulation of the scope-of-gaming issues as state law cannot mask the obvious federal nature of the case. Here, the petitioners have sought a declaratory judgment centered on the meaning and application of a federal statute and the validity of a federally approved compact. Accordingly, this court lacks jurisdiction to adjudicate the dispute.

## VII. Sovereign Immunity

¶ 251. Our final consideration is the majority's conclusion that the Governor exceeded his authority by agreeing to waive the State's sovereign immunity. The sovereign immunity provision of the state constitution provides: "[t]he legislature shall direct by law in what manner and in what courts suits may be brought against the state."[197]

¶ 252. At the outset, we note that the challenge to the compact's sovereign immunity provision is not ripe for review by this court. Although a plaintiff need not suffer an actual injury before seeking declaratory relief, the facts must nevertheless "be sufficiently developed

---

[196] *Dyer,* 341 U.S. at 28; *Petty,* 359 U.S. at 278–79.

[197] Wis. Const. Art. IV, § 27.

[both] to avoid courts entangling themselves in abstract disagreements,"[198] and to ensure a conclusive adjudication.[199]

¶ 253. Here, the petitioners' sovereign immunity claim cannot ripen until: (1) the State breaches the compact and (2) the Tribe either obtains a favorable arbitration award against the State or sues to enforce the compact. Because neither has occurred, there simply is no controversy on which this court can rule. The fact that this case "represents only a layover on the journey to federal court," does not alter this conclusion.[200]

¶ 254. If this court did consider the petitioners' claim, however, it would fail on the merits. The provision in question is paragraph 6 of the technical amendments. The majority concludes that the Governor violated the state constitution by agreeing to it. The paragraph provides:

> The Tribe and the State, *to the extent the State or the Tribe may do so pursuant to law,* expressly waive any and all sovereign immunity with respect to any claim brought by the State or the Tribe to enforce any provision of this Compact. This waiver includes suits to collect money due to the State pursuant to the terms of the Compact; to obtain an order to specifically enforce the terms of any provision of the Compact; or to obtain a declaratory judgment and/or enjoin any act or conduct in violation of the compact.[201]

[198] *Miller Brands-Milwaukee v. Case,* 162 Wis. 2d 684, 694, 470 N.W.2d 290 (1991).

[199] *Milwaukee Dist. Council 48 v. Milwaukee County,* 2001 WI 65, ¶ 41, 244 Wis. 2d 333, 627 N.W.2d 866.

[200] Majority op., ¶ 103, n. 42.

[201] *See Compact* Section XXII.C. *as amended* by No. 6 (5/28/03) (emphasis added).

¶ 255. After citing this passage, the majority spends several paragraphs reiterating the principle that no one but the legislature can waive sovereign immunity.[202] Although we agree with this basic doctrine, we fail to see how paragraph 6 undermines it. Indeed, the provision specifically states that the compact waives sovereign immunity only "to the extent the State or Tribe may do so pursuant to law."[203] Given this qualifying language, there cannot be an unlawful waiver. If the Governor were acting contrary to law, there is no waiver. As a result, we conclude that the Governor did not exceed his powers.

## VIII. Conclusion

¶ 256. In sum, Wis. Stat. § 14.035 is a valid delegation of power to the Governor, which he properly exercised. Likewise, the duration provision is valid, as similar provisions are commonplace and recognize the government's need to enter into long-term contracts. Furthermore, the majority's application of the 1993 constitutional amendment would substantially impair the contractual relationship between the State and the Tribe and violate the impairment of contracts clause. Finally, the issue of sovereign immunity is not ripe and fails on the merits. Ultimately, we conclude that the 2003 amendments are valid and that the majority opinion raises substantial federal issues, which inevitably will be resolved in federal courts.

[202] Majority op., ¶ 110.

[203] *See Compact* Section XXII.C. *as amended* by No. 6 (5/28/03) (emphasis added).

Appendix

## IX. Severability

¶ 257. The majority concludes that the sections which added new games and revised the provisions relating to duration and sovereign immunity were unlawful.[204] It does not address, however, the effect the compact's severability clause will have on its decision.

¶ 258. When a contract contains a severability clause, that clause, while not controlling, is entitled to great weight in determining whether valid portions can stand separate from any invalid portion.[205] Whether a provision is severable from the remainder of the contract is largely a question of intent, with a presumption in favor of severability.[206] If it is evident that the parties would have signed the contract without those provisions, the invalid part may be severed.[207]

¶ 259. Here, the compact contains such a provision. Section XXXV explicitly states:[208]

> Each provision of this Compact shall stand separate and independent of every other provision. If a court of competent jurisdiction finds any provision of this Com-

[204] Majority op., ¶ 113.

[205] *Town of Clearfield v. Cushman*, 150 Wis. 2d 10, 24, 440 N.W.2d 777 (1989).

[206] *State v. Janssen*, 219 Wis. 2d 362, 379, 580 N.W.2d 260 (1998).

[207] *Id.*

[208] This clause was added in its entirety in the 2003 amendment. Previously the compact contained no severability clause.

431

pact to be invalid or unenforceable, it is the intent of the parties that the remaining provisions shall remain in full force and effect.[209]

¶ 260. This provision illustrates that the parties intended for the disputed sections to be severable from the remaining provisions of the compact. Indeed, there is no indication that the compact would have been terminated without the addition of new games or the revisions relating to duration and sovereign immunity. Given the lucrative nature of the compact, it is evident that the parties would have signed the contract without those provisions. We therefore conclude that the valid portions of the compact can stand separate from the portions declared by the majority to be invalid.

### A. Additional Games & Sovereign Immunity

¶ 261. We next address what happens when a section has been declared invalid. Section XXXIII.B. states in part:

> In the event that any portion of the 2003 Amendments other than Section XXV [Effective Date and Duration] . . . are found by a court of competent jurisdiction to be unenforceable or invalid, either party may serve on the other a demand for renegotiation of such portion of the amendments as are impacted . . . .[210]

¶ 262. Under this provision, the Tribe could demand renegotiation of the affected sections. If the Tribe demanded renegotiation, the State would be required to

---

[209] *Compact* Section XXXV *as amended* by No. 18 (2/19/03).

[210] *Compact* Section XXXIII.B. *as amended* by No. 17 (2/19/03). This clause was new in the 2003 amendments. The previous Section XXXIII treated all compact terms the same. If one term were found invalid or unenforceable, the parties would meet and renegotiate that term.

negotiate in good faith. In the event that either party refused to negotiate in good faith, then the matter would be set for arbitration.[211] The Tribe may wish to renegotiate other provisions, but the State is not required to renegotiate unaffected portions of the compact. If the Tribe does not demand renegotiation, the invalid sections would be permanently removed and the rest of the compact would remain.

## B. Duration

¶ 263. The consequences of severing the provision relating to the duration of the compact, by comparison, have greater financial significance. In the 2003 amendments to the compact, the parties changed the wording of Section XXXIII.A. to specifically tie duration to payment. That section requires,

> In the event that . . . a court of competent jurisdiction finds that the provision [Effective Date and Duration] is unenforceable or invalid, or that either party lacked the legal authority to agree to the provision, then (i) the Tribe shall be entitled to a refund of the amount paid to the State by the Tribe under Section XXXI.G.1.b.[212] and the State shall be indebted to the Tribe in that

---

[211] *See generally Compact* Section XXII *as amended* by No. 11 (2/19/03).

[212] XXXI Payment to the State.

G. In consideration for the agreement in Section XXXI.B. of the Compact, which affords the Tribe substantial exclusivity, the Tribe shall:

1. Pay one-time payments, on or before the due date, by electronic transfer as follows:
 a. $6.375 million on June 30, 2003 and $6.375 million on June 30, 2004 to the State of Wisconsin as provided in Amendments #1; and

amount, which sum may be recovered from the State by the Tribe under any procedures provided by the laws of Wisconsin for recovery of unpaid debts of the State, which includes Wis. Stat. §§ 16.007 & 775.01; (ii) the Tribe shall not be required to make any further payments under Section XXXI.G.2.,[213] and (iii) the parties shall negotiate in good faith to reach agreement on substitute provisions for Sections XXV and XXXI.[214]

¶ 264. Therefore, in addition to the duration provision, Section XXXI, payments to the State, must be severed from the compact, and payments made must be returned. Again, the parties must renegotiate the sections on duration and payment in good faith.[215]

¶ 265. Section XXXIII.A. requires repayment of the amount paid under Section XXXI.G.1.b. The first payment under that section is not due until June 30, 2004.[216] Thus, while the Tribe would not be reim-

b. $34.125 million on June 30, 2004 and $43.625 million on June 30, 2005 to State of Wisconsin . . . .

*Compact* Section XXXI *as amended* by No. 16 (2/19/03).

[213] XXXI.G.2. Commencing July 1, 2005, the Tribe shall pay to the State of Wisconsin an amount equal to a percentage of the Tribe's Menomonee Valley Class III net win as follows: 7% per annum for the period July 1, 2005 to June 30, 2006; 8% per annum for the period July 1, 2006 to June 30, 2008; 7% per annum for the period July 1, 2008 to June 30, 2009; 6% per annum for the period July 1, 2009 to June 30, 2011; and 6.5% per annum thereafter. *Compact* Section XXXI.G.2. *as amended* by No. 16 (2/19/03).

[214] *Compact* Section XXXIII.A. *as amended* by No. 17 (2/19/03).

[215] *See Compact* Section XXXIII.A.(iii) *as amended* by No. 9 (5/30/03).

[216] Under Section XXXI.G.1.a. the tribe was required to pay $6.375 million on June 30, 2003 and $6.375 million on June 30,

434

bursed, it would not have to make that payment of $34.125 million on June 30, 2004, or the payment of $43.625 million on June 30, 2005.[217] Furthermore, the Tribe would not make any further payments under Section XXXI.G.2. Those payments would start in 2005 at seven percent of the net win of the Tribe's Menomonee Valley Class III games, and would fluctuate by up to one percent in the following years.

¶ 266. While the Tribe has not made the payment of $34.125 million required on June 30, 2004, that money has been allocated by the current Wisconsin biennium budget. Therefore, the State will be required to find other funds to fill the void left in the budget.

¶ 267. In light of these consequences, the majority describes the link between the duration and payment as a "poison pill."[218] This mischaracterizes the situation. Before the 2003 amendments, the Tribe paid $6.375 million annually under Section XXXI.[219] In the

2004. However, the 1998 amendment already required those payments to be made so they need not be refunded. *See Compact* Section XXXI *as amended* by No. 1 (1998). Section XXXI.G.1.b. requires payments in addition to the payments previously required and reflects the changes made by the 2003 amendments.

[217] *See Compact* Section XXXI.G.1.b. *as amended* by No. 8 (5/30/03). As previously noted, payments from all Wisconsin Tribes would have totaled nearly $207 million over the biennium.

[218] Majority op., ¶ 75.

[219] The Tribe shall make an annual payment to the State for each one (1) year period beginning June 3, 1999 through June 3, 2004 in the amount of $6,375,000. *Compact* Section XXXI.A. *as created* by No. 6 (1998).

2003 amendments, the Tribe agreed to make that payment on June 30, 2004, *and* pay an additional $34.125 million on that date.

¶ 268. The connection between duration and payment cannot be construed as a punishment for the State to keep it from challenging the section. Rather, it is a protection for the Tribe in case the State does challenge the term since the Tribe agreed to make more than *six* times the previously agreed upon amount.

¶ 269. In sum, the addition of the severability clause in Section XXXV indicates that the parties intended for only the affected sections to be renegotiated if a court concludes they are invalid. Accordingly, the parties must go back to the table and renegotiate the duration provision, the payment section, and may renegotiate the sections regarding added games and sovereign immunity. Until the new terms are agreed upon, the 1998 amendments to those sections govern.[220]

## X. Appropriations

¶ 270. The petitioners assert that certain terms of the 2003 amendments intrude into the domain of the legislature in that they appropriate state funds. The majority defers decision on that issue because it concludes that "it is likely that any subsequent amendments will have different terms."[221] However, pursuant

---

[220] *See Compact* Section XXXIII.C. *as amended* by No. 17 (2/19/03).

[221] Majority op., ¶ 112.

to the severability clause of the compact discussed above, that provision will not be renegotiated. Accordingly, we must consider the petitioners' claim.

¶ 271. At the outset, we again note that the petitioners' challenge is not ripe for review by this court. Three things must happen before the petitioners' appropriations claim can ripen: (1) the State must breach the compact; (2) an arbitrator must grant an award of monetary damages against the State; and (3) the legislature must disallow the claim. There is no evidence in the record that any of these three conditions has been met.

¶ 272. Neither party has asserted a breach or invoked the dispute resolution process in response to a breach. Even if that process had been invoked and an arbitrator had ruled that the State owed the Tribe money, such a debt would still have to go to the claims board or the legislature, either of which could approve it. Only if the legislature refuses to pay the debt will the claimant have a right "to maintain an action [in court] on his claim."[222] Until that occurs, the petitioners' claim remains nothing more than an "abstract disagreement."

¶ 273. Thus, the petitioners' argument regarding appropriations cannot be maintained. If this court did consider the claim, however, it would fail on the merits.

¶ 274. The petitioners contend that the Governor unlawfully obliged the State to pay money to the Tribe in violation of Wisconsin Constitution Article VIII, § 2

---

[222] *Chicago, M. & St. P. Ry. State,* 53 Wis. 509, 512, 10 N.W. 560 (1881).

("No money shall be paid out of the treasury except in pursuance of an appropriation by law."). They rely upon paragraph 2 of the technical amendments, which they maintain unconstitutionally creates a future appropriation without prior legislative approval. Paragraph 2 provides:

> If the State fails to comply with an award of the tribunal, other than an award to pay money to the Tribe, and asserts the State's sovereign immunity, then the tribunal, upon the application of the Tribe, may issue an order requiring the State to pay the Tribe a sum of money as liquidated damages that the tribunal determines is commensurate with the value of the loss to the Tribe due to the inability of the Tribe to obtain judicial enforcement of the Compact provision which is the subject of the award and that is commensurate with the State's failure to comply with the order. The sum due to the Tribe under the order is a debt of the State, which may be recovered by the Tribe, unless the State complies with the award or a federal court sets aside the award on grounds set forth in 9 U.S.C. § 10.[223]

¶ 275. The problem with the petitioners' argument is that it confuses "debt" with "appropriation." Like many other state contracts, the compact at issue simply creates "a debt of the State." This, in turn, invokes a process by which the State agrees to become a "debtor" in its contractual relationships.[224] Wisconsin

---

[223] *See Compact* Section XXII.A.9.C. *as amended* by No. 2 (5/28/03).

[224] *See CleanSoils Wisconsin, Inc. v. DOT,* 229 Wis. 2d 600, 610–11, 599 N.W.2d 903 (Ct. App. 1999).

Stat. §§ 16.007[225] and 775.01[226] together constitute legislative "consent" to suit in certain contract actions.[227]

¶ 276. The fact remains that the State regularly enters into contracts for goods and services that require a future payment.[228] Each purchase contract makes the

---

[225] Wisconsin Stat. § 16.007 provides in pertinent part:

(1) Purpose. The claims board shall receive, investigate and make recommendations on all claims of $10 or more presented against the state which are referred to the board by the department. No claim or bill relating to such a claim shall be considered by the legislature until a recommendation thereon has been made by the claims board. . . .

(3) Procedure. When a claim has been referred to the claims board, the board may upon its own motion and shall upon request of the claimant, schedule such claim for hearing. . . .

(5) Findings. The board shall report its findings and recommendations, on all claims referred to it, to the legislature.

[226] Wisconsin Stat. § 775.01 provides:

Actions against state; bond. Upon the refusal of the legislature to allow a claim against the state the claimant may commence an action against the state by service as provided in s. 801.11(3) and by filing with the clerk of court a bond, not exceeding $1,000, with 2 or more sureties, to be approved by the attorney general, to the effect that the claimant will indemnify the state against all costs that may accrue in such action and pay to the clerk of court all costs, in case the claimant fails to obtain judgment against the state.

[227] *See State v. P.G. Miron Const. Co., Inc.*, 181 Wis. 2d 1045, 1053, 512 N.W.2d 499 (1994).

[228] Wisconsin Stat. § 16.75 provides in part:

(1)(a) 1. All orders awarded or contracts made by the department for all materials, supplies, equipment, and contractual services to be provided to any agency, except as otherwise provided . . . shall be awarded to the lowest responsible bidder, taking into consideration life cycle cost estimates under sub. (1m), when appropriate, the location of the agency, the quantities of the articles to be

439

State a "debtor." If the State could not waive its sovereign immunity to allow payment of such debts, there would be no state contracts for future goods or services.

¶ 277. Moreover, as the Governor notes, the legislature has already created a standing, sum sufficient appropriation to pay for settlements and judgments on "debts." Wisconsin Stat. §§ 20.505(2)(a) and (k)[229] together with 20.865(1)(fm)[230] reference, inter alia, Wis. Stat. § 775.04, which provides that judgments against

supplied, their conformity with the specifications, and the purposes for which they are required and the date of delivery. . . .

(1m) The department shall award each order or contract for materials, supplies or equipment on the basis of life cycle cost estimates, whenever such action is appropriate. Each authority other than the University of Wisconsin Hospitals and Clinics Authority shall award each order or contract for materials, supplies or equipment on the basis of life cycle contract for materials, supplies or equipment on the basis of life cycle cost estimates, whenever such action is appropriate. . . .

[229] Wisconsin Stat. § 20.505(2)(a) and (k) provide:

(a) General fund supplement — risk management claims. A sum sufficient to supplement the appropriation under par. (k) whenever the amounts collected under par. (k) are insufficient to pay all claims under that paragraph and all administrative costs under par. (ki) in any fiscal year.

(k) Risk management costs. All moneys received from agencies under s. 16.865(8) and all moneys transferred from the appropriation under par. (ki) for the costs of paying claims for losses of and damage to state property, settlements of state liability under ss. 165.25(6), 775.04, 895.46(1) and 895.47, and state employer costs for worker's compensation claims of state employees under ch. 102, and for related administrative costs under par. (ki).

[230] Wisconsin Stat. § 20.865(1)(fm) provides:

The amounts in the schedule to supplement the appropriations of state agencies for costs assessed under s. 16.865(8) to pay for state liability arising from judgments and settlements under ss. 165.25(6), 775.04, 895.46 (1) and 895.47, for state employer costs for worker's compensation claims of state employees under ch. 102

the State "shall be paid out of the state treasury." As a result, the terms of the compact do not create an appropriation any more than the numerous other state contracts that can give rise to debts recoverable in judgments.

¶ 278. Finally, it is important to remember that the 2003 amendments were anything but an appropriation. Indeed, the compact would have brought hundreds of millions of dollars into the state treasury. Such a revenue-generating agreement "and appropriations are more nearly antonyms than synonyms."[231] Accordingly, the petitioners' argument fails on the merits and the provision in question need not be renegotiated.

and for losses of and damage to state property incurred in programs financed with general purpose revenue.

[231] *State ex rel. Finnegan v. Dammann,* 220 Wis. 143, 148, 264 N.W.2d 622 (1936) (internal quotation marks omitted).